**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **MICHAEL P. CHECKA,** | ) | |
| | ) | |
| Plaintiff, | ) | **Case No. 1:07CV00099 (GK)** |
| | ) | **Judge Gladys Kessler** |
| v. | ) | |
| | ) | **Next Scheduled Deadline:** |
| | ) | **Dispositive Motions Due** |
| | ) | **November 1, 2007** |
| **RITE AID OF** | ) | |
| **WASHINGTON, D.C., INC.,** | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DEFENDANT RITE AID OF WASHINGTON, D.C., INC.'S**
**MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 56.1 of the Local Rules of the U.S. District Court for the District of Columbia, Defendant, Rite Aid of Washington, D.C., Inc. ("Rite Aid"), by undersigned counsel, hereby moves for summary judgment on the claim alleged in Plaintiff Michael Checka's Amended Complaint. Rite Aid is entitled to summary judgment for the following reasons: (1) Plaintiff cannot establish a *prima facie* case of intentional discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq.*; and (2) assuming that Plaintiff could establish a *prima facie* case, he cannot show that Rite Aid's legitimate, nondiscriminatory reasons for its actions were pretextual or that Rite Aid intentionally discriminated against him on the basis of his race. Based on the absence of any genuine issues of material fact, Rite Aid is entitled to judgment as a matter of law on the sole claim in Plaintiff's Amended Complaint for discrimination based on disparate treatment.

As shown in the accompanying Memorandum of Points and Authorities in Support, Rite Aid requests that the Court grant this Motion in its entirety and dismiss Plaintiff's Amended Complaint with prejudice.

Dated: November 1, 2007

Respectfully submitted,

LITTLER MENDELSON, P.C.


_____/s/_____
Katherine E. Bierma Pregel
D.C. Bar No. 486615
1150 17th Street, N.W.
Suite 900
Washington, D.C. 20036
(202) 842-3400 Telephone
(202) 842-0011 Facsimile
kbpregel@littler.com

Theodore A. Schroeder
(Admitted *Pro Hac Vice*)
625 Liberty Avenue
26th Floor
Pittsburgh, Pennsylvania 15222
(412) 201-7600 Telephone
(412) 774-1959 Facsimile
tschroeder@littler.com

Counsel for Defendant,
Rite Aid of Washington, D.C., Inc.

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing Defendant Rite Aid of Washington, D.C., Inc.'s Motion for Summary Judgment, accompanying Statement of Undisputed Material Facts in Support of Motion, Memorandum of Points and Authorities in Support of Motion, Appendix of Exhibits in Support of Motion, and Proposed Order were served via ECF Electronic Filing this 1st day of November, 2007, upon:

> Robert F. Condon, Esquire
> Artabane & Belden, P.C.
> 818 18th Street, N.W.
> Suite 410
> Washington, DC 20006
>
> Counsel for Plaintiff

                              /s/

                        Katherine E. Bierma Pregel

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                        )
**MICHAEL P. CHECKA,**                  )
                                        )
              **Plaintiff,**            )    **Case No. 1:07CV00099 (GK)**
                                        )    **Judge Gladys Kessler**
**v.**                                  )
                                        )    **Next Scheduled Deadline:**
                                        )    **Dispositive Motions Due**
                                        )    **November 1, 2007**
**RITE AID OF**                         )
**WASHINGTON, D.C., INC.,**             )
                                        )
              **Defendant.**            )
_____)

**DEFENDANT RITE AID OF WASHINGTON, D.C., INC.'S
STATEMENT OF UNDISPUTED MATERIAL FACTS
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Defendant Rite Aid of Washington, D.C., Inc. ("Rite Aid"), by undersigned counsel, pursuant to Local Civil Rules 7(h) and 56.1, hereby submits its Statement of Undisputed Material Facts in support of its Motion for Summary Judgment.

1.      Rite Aid maintains a policy prohibiting Violent and Inappropriate Behavior in the Workplace.  (Declaration of Scott Zavinski ("Zavinski Decl."), attached to the Appendix of Exhibits in Support of Defendant's Motion for Summary Judgment ("Defendant's Appendix") as Exhibit A, at ¶ 8; Ex. 1 to Zavinski Decl.)  That policy provides, in part, that any associate "[d]isplaying threatening, physically aggressive or violent behavior that intimidates or instills fear in others [or] [m]aking threats of any kind, verbally, physically or in writing," "will be subject to appropriate corrective action, up to and including discharge."  (Id.)

2.      Rite Aid hired Plaintiff Michael P. Checka ("Mr. Checka"), a white male, on May 18, 1997 as a pharmacist at the Rite Aid store located at 3301 New Mexico Avenue, N.W.,

Washington, D.C. 20016.   (Deposition of Michael Checka ("Checka Dep."), attached Defendant's Appendix as Exhibit B,[1] 32-33; Amended Complaint for Discrimination Under Title VII ("Am. Compl."), attached to Defendant's Appendix as Exhibit C, at ¶ 2.)

3.      As a pharmacist, Mr. Checka was responsible for ensuring that prescriptions were properly filled and dispensed to customers.  (Ex. 7 to Checka Dep.)  Mr. Checka also supervised pharmacy technicians working with him.  (Id.)

4.      Mr. Checka was aware that engaging in violent or threatening behavior during his employment could subject him to termination.  (Checka Dep. 66-68.)

5.      In July 1998, Mr. Checka transferred to Rite Aid Store #3846, located at 1815 Connecticut Avenue, N.W., Washington, D.C. 20009.  (Checka Dep. 33; Am. Compl. at ¶ 4.)

6.      Mr. Checka's performance was generally acceptable.   (Checka Dep. 57.) However, in December 1997, associates complained about Mr. Checka's behavior and alleged that he could not work with individuals of a different race.  (Checka Dep. 58-59; Ex. 12 to Checka Dep.)

7.      In November 1999, Mr. Checka was promoted to the position of Pharmacy Manager of Store #3846.  (Checka Dep. 34.)

8.      As Pharmacy Manager, Mr. Checka was responsible for the overall operations of the pharmacy.  (Ex. 8 to Checka Dep.)  Moreover, in the absence of other supervisory personnel, Mr. Checka was responsible for the total operations of the store and its personnel.  (Ex. 6 to Checka Dep.)  Mr. Checka, like all managerial personnel, was responsible for enforcing the Company's rules and policies.  (Id.)

---

[1] Selected excerpts and document exhibits from the deposition of Michael Checka are collectively attached to Defendant's Appendix as Exhibit B.

9.      On February 5, 2005, an incident occurred between Mr. Checka and Ashenafi Legesse Alene ("Mr. Alene"), an entry-level associate at Store #3846.  (Checka Dep. 69-78; Am. Compl. at ¶ 5.)

10.     According to Mr. Checka, on that day Mr. Alene was "wagging his tongue" and saying "Mike, Mike, look."  (Ex. 2 to Zavinski Decl.; Checka Dep. 71-72.)  Mr. Checka then "motioned" like he was going to try to catch Mr. Alene.  (Ex. 2 to Zavinski Decl.; Checka Dep. 72.)  Mr. Checka then briefly chased Mr. Alene.  (Ex. 2 to Zavinski Decl.; Checka Dep. 100.)

11.     A short time later, Mr. Checka went to a storage room in the back of the store where the restrooms are located.  (Ex. 2 to Zavinski Decl.; Checka Dep. 73, 100-101.)  At that time, Mr. Alene was also in storage room.  (Id.)  Mr. Checka said to Mr. Alene words to the effect of "'What do you have to say to me now?' meaning 'what do you have to say to me now that you have nowhere to run?'"  (Ex. 2 to Zavinski Decl.; Checka Dep. 73, 101.)  Mr. Checka moved towards Mr. Alene as he said this.  (Checka Dep. 73, 101-102.)

12.     Mr. Checka stood between Mr. Alene and the exit from the storage area.  (Ex. 2 to Zavinski Decl.; Checka Dep. 101, 112.)  Other than to try and go past Mr. Checka, there was no way for Mr. Alene to exit the storage area other than to go out the back door.  (Checka Dep. 77-78, 101, 112.)  Employees are not permitted to exit through the back door.  (Checka Dep. 78.)  Mr. Alene turned around and moved towards the back of the storage room while Mr. Checka continued to approach him.  (Ex. 2 to Zavinski Decl.; Checka Dep. 73.)

13.     According to Mr. Checka, Mr. Alene tripped over some crates and fell down.  (Ex. 2 to Zavinski Decl.; Checka Dep. 73-74.)  According to Mr. Alene, Mr. Checka punched him in the face.  (Zavinski Decl. at 11.)

14. As a result of the incident, Mr. Alene's nose was bleeding. Checka Dep. 74. The blood spattered on Mr. Checka's smock. (Id.)

15. Mr. Checka offered to help Mr. Alene clean his wound, but Mr. Alene refused. (Checka Dep. 74-75.)

16. Instead, Mr. Alene re-entered the front area of the store where he saw employees Donna Maria Brooks, cashier, and Shakia Carmichael, clerk. (Checka Dep. 75.)

17. Ms. Brooks told Mr. Alene that she would assist him in filling out an incident report. (Ex. 3 to Zavinski Decl.; Checka Dep. 75.)

18. The store's shift supervisor, Mukund Karnik, then called Mr. Checka on the store phone and asked him what had happened. (Ex. 3 to Zavinski Decl.; Checka Dep. 76.) Mr. Checka told Mr. Karnik that Mr. Alene fell in the bathroom. (Id.)

19. A police officer who happened to be in the store at the time arrested Mr. Checka. (Checka Dep. 76-77; Am. Compl. at ¶ 8.) Mr. Checka was booked for assault and battery and released at 6:30 p.m. (Checka Dep. 77.) He then returned to the store to finish his shift. (Id.)

20. When he returned to work, Mr. Checka called his supervisor, Anand Shah, Pharmacy District Manager. (Checka Dep. 84.) Mr. Shah told Mr. Checka not to report to work the next day. (Checka Dep. 84-85.) Mr. Shah subsequently informed Mr. Checka that he was suspended pending the investigation regarding Mr. Alene's allegations. (Checka Dep. 85.)

21. On February 22, 2005, Mr. Checka's assault and battery charge was "no papered" by the United States Attorney. (Checka Dep. 87; Am. Compl. at ¶ 8.) The United States Attorney retained the right to prosecute Mr. Checka. (Checka Dep. 129.)

22. At the time of the February 5 incident between Mr. Checka and Mr. Alene, Scott Zavinski, white, was employed as Rite Aid's Human Resources Manager for Region 60, which

includes Rite Aid stores in the District of Columbia, Maryland and Virginia. (Zavinski Decl. at ¶ 3.)

23.    As Human Resources Manager for this region, Mr. Zavinski was responsible for employees of Rite Aid of Washington, D.C., Inc. working at Rite Aid stores in the District of Columbia. (Zavinski Decl. at ¶ 4.)

24.    Mr. Zavinski's duties as a Human Resources Manager included, among other things, training, recruiting, administering Rite Aid's employment policies, partnering with district managers and pharmacy development managers to ensure compliance with these policies and applicable employment laws, and investigation of allegations of employee misconduct. (Zavinski Decl. at ¶ 5.)

25.    As Human Resources Manager for Region 60, Mr. Zavinski reported directly to the Regional Vice President, Bill Jackson, white. (Zavinski Decl. at ¶ 6.) Mr. Zavinski also consulted with Wayne LeClair, white, Rite Aid's Vice President of Human Resources Administration, in the administration of his duties. (Id.)

26.    When issues of employee misconduct were reported to Mr. Zavinski, he was responsible for investigating them and making recommendations regarding appropriate discipline, up to and including termination. (Zavinski Decl. at ¶ 7.) Termination decisions were ultimately approved by the Regional Vice President, Bill Jackson. (Id.)

27.    On or about February 5, 2005, Mr. Zavinski was informed that Mr. Checka had allegedly assaulted Mr. Alene. (Zavinski Decl. at ¶ 9.)

28.    Mr. Zavinski conducted an investigation regarding the allegations. (Zavinski Decl. at ¶ 10.)

29.     Mr. Zavinski interviewed Mr. Alene.  Mr. Alene claimed that Mr. Checka punched him in the face.  (Zavinski Decl. at ¶ 11.)

30.     Mr. Zavinski also interviewed eight other employees who worked in Store #3846, and received statements from several of them.  (Zavinski Decl. at ¶ 10.b.)  None of the associates witnessed the incident.  (Zavinski Decl. at ¶ 12.)

31.     David Green, pharmacy intern, informed Mr. Zavinski that Mr. Checka told him that he had "lunged" at Mr. Alene.  (Ex. 3 to Zavinski Decl.)  Mr. Zavinski has no reason to doubt the veracity of Mr. Green's statement.  (Checka Dep. 113.)

32.     Tonya Chatman, pharmacy technician, informed Mr. Zavinski that she was working on the second floor of Store # 3845 on the afternoon of February 5 and saw Mr. Alene with blood on his nose and hands.  (Ex. 3 to Zavinski Decl.)  Mr. Alene told her that Mr. Checka had "punched him in the face."  (Id.)

33.     Shakia Carmichael, associate, also informed Mr. Zavinski that Mr. Alene told her that Mr. Checka punched him in the face.  (Ex. 3 to Zavinski Decl.)  She told Mr. Zavinski that she found it hard to believe that Mr. Alene fell due to the amount that he was bleeding.  (Id.)

34.     Donna Maria Brooks, shift supervisor, told Mr. Zavinski that she saw Mr. Alene come from the back of the store and that his vest was covered with blood.  (Ex. 3 to Zavinski Decl.)  She also saw Mr. Checka return to the pharmacy area, where he washed his hands.  (Id.)  She stopped Mr. Alene and advised him to come with her to complete an incident report.  (Id.)

35.     Markund Karnik, shift supervisor, informed Mr. Zavinski that Mr. Alene told him immediately after the incident that Mr. Checka had punched him in the face.  (Ex. 3 to

Zavinski Decl.)  Mr. Karnik told Mr. Zavinski that he then called Mr. Checka and asked him what happened.  (Id.)  Mr. Checka told Mr. Karnik that Mr. Alene fell in the bathroom.  (Id.)  When Mr. Karnik responded that Mr. Alene had claimed that Mr. Checka had punched him, Mr. Checka told Mr. Karnik that he "may have hit him - he was not sure." (Id.)

36.    On February 9, 2005, Mr. Zavinski interviewed Mr. Checka regarding the incident and reviewed Mr. Checka's written statement regarding the incident.  (Zavinski Decl. at ¶ 10.a; Checka Dep. 85.)

37.    Mr. Checka claimed that Mr. Alene's nose was bloodied when he fell over boxes in a storage room.  (Zavinski Decl. at ¶ 11; Ex. 2 to Zavinski Decl.)

38.    Mr. Checka admitted to chasing Mr. Alene into the storeroom and to moving quickly toward him.  (Zavinski Decl. at ¶ 12.a; Ex. 2 to Zavinski Decl.)

39.    Mr. Checka admitted to asking Mr. Alene what he had to say to him now that he had nowhere to run, or words to that effect.  (Zavinski Decl. at ¶ 12.b; Ex. 2 to Zavinski Decl.)

40.    Mr. Alene's nose was bloodied as a result of the incident, and his blood was spattered on Mr. Checka's smock.  (Zavinski Decl. at ¶ 12.c; Ex. 2 to Zavinski Decl.)

41.    Mr. Checka acknowledged that the incident was his fault, and offered to pay any medical expenses incurred by Mr. Alene.  (Zavinski Decl. at ¶ 12.d; Ex. 2 to Zavinski Decl.; Checka Dep. 113-114.)

42.    Mr. Zavinski discussed the findings of his investigation with Wayne LeClair. (Zavinski Decl. at ¶ 13.)  Mr. Zavinski and Mr. LeClair agreed that Mr. Checka's conduct violated Rite Aid's policy prohibiting violent and inappropriate behavior in the workplace.  (Id.) In particular, Mr. Zavinski and Mr. LeClair concluded that, even if Mr. Checka had not punched Mr. Alene, as Mr. Alene claimed, Mr. Checka's admitted conduct violated the policy's

- 7 -

prohibition against "[d]isplaying threatening, physically aggressive or violent behavior that intimidates or instills fear in others."  (Id.)  In light of these conclusions, Mr. Zavinski and Mr. LeClair recommend that Mr. Checka be terminated.  (Id.)

43.    Mr. Zavinski communicated this recommendation to Bill Jackson, who agreed and approved the termination of Mr. Checka's employment.  (Zavinski Decl. at ¶ 14.)

44.    On February 11, 2005, Mr. Checka was informed by Mr. Shah that his employment was terminated for violating Rite Aid's Violent and Inappropriate Behavior in the Workplace policy.  (Checka Dep. 88.)

45.    Following his termination, Mr. Checka, through counsel, challenged his termination and sought reinstatement.  (Checka Dep. 88.)

46.    In June, 2005, four months after Mr. Checka's termination, Mr. Checka's counsel contacted Mr. LeClair and informed him that a customer, Norman Collins, had witnessed the February 5 incident.  (Document numbered D-00171, produced in response to Plaintiff's First Request for Production of Documents ("Def. Doc. Prod."), attached to Defendant's Appendix as Exhibit D.)  No one, including Mr. Checka, had previously mentioned such a witness.  (Checka Dep. 95-96; Def. Doc. Prod. Doc. No. D-00141.)

47.    Mr. Checka's counsel submitted a Declaration from Mr. Collins to Mr. LeClair. (Def. Doc. Prod. Doc. No. D-00172.)

48.    In his Declaration, Mr. Collins stated that, on February 5, 2005, he was exiting the men's room of Store #3845, when he saw "a small black man" rush past him and trip over some milk crates.  (Def. Doc. Prod. Doc. No. D-00172.)  He saw Mr. Checka in the doorway of the storeroom.  (Id.)  He did not hear any conversation between the two men.  (Id.)

49.    Mr. Zavinski interviewed Mr. Collins on July 13, 2005.  (Def. Doc. Prod. Doc. Nos. D-00138 - 00140.)  Mr. Collins informed Mr. Zavinski that he was exiting the restroom in the storeroom on February 5, 2005, when he saw Mr. Alene "rush" past him and fall on some boxes or milk crates.  (Id.)  He said that he saw Mr. Checka leaning against the doorway of the storeroom.  (Id.)  He said that he walked by Mr. Checka and left the store.  (Id.)  He further said that he did not hear or observe any exchange between Mr. Alene and Mr. Checka prior to seeing Mr. Alene fall.  (Id.)

50.    Although Mr. Collins said that he walked past Mr. Checka when exiting the storeroom, Mr. Checka does not remember seeing Mr. Collins in the storeroom that day. (Checka Dep. 95-96.)

51.    Rite Aid informed Mr. Checka's counsel that the Company was upholding Mr. Checka's termination.  (Def. Doc. Prod. Doc. No. D-00149.)

52.    In June 2004, Mr. Zavinski was informed of an alleged incident at Store #2653 involving Chukwuemeka "Steve" Obidike, a pharmacist at that store.  (Zavinski Decl. at ¶ 15.)

53.    Angela Nwosu, a pharmacy technician at Store #2653, claimed that on June 15, 2004, Mr. Obidike grabbed her by the forearm and pushed her.  (Zavinski Decl. at ¶ 16; Ex. 4 to Zavinski Decl.)

54.    Mr. Zavinski conducted an investigation into this incident, in which he interviewed Mr. Obidike, Ms. Nwosu, Store Manager James Felix, and Security Guard Eugene Brown.  (Zavinski Decl. at ¶ 17; Ex. 4 to Zavinski Decl.)

55.    There were no eyewitnesses to the alleged incident.  (Zavinski Decl. at ¶ 18.)  Mr. Obidike denied that it occurred and claimed that the allegations were based on his race and national origin.  (Id.)

- 9 -

56.     As a result of the investigation, Mr. Zavinski was unable to confirm any wrongdoing on the part of Mr. Obidike.  (Zavinski Decl. at ¶ 19.)  Clif Wetsel, the Loss Prevention Manager for Region 60, also investigated this matter and reached a similar conclusion.  (Id.)

57.     Mr. Obidike was suspended without pay during the investigation of the incident. (Zavinski Decl. at ¶ 20.)  Because Rite Aid was unable to conclude that he violated the Violent and Inappropriate Behavior in the Workplace policy, Mr. Obidike was reinstated to work with a warning that any future incidents could result in his termination.  (Id.; Ex. 4 to Zavinski Decl.)

58.     Mr. Checka did not observe the alleged incident between Mr. Obidike and Ms Nwosu.  (Checka Dep. 106.)

59.     On December 1, 2005, Mr. Checka filed a charge of discrimination with the District of Columbia Office of Human Rights.  (Ex. 24 to Checka Dep.)  The Charge was cross-filed with the United States Equal Employment Opportunity Commission ("EEOC").  (Id.)

60.     On August 28, 2006, the D.C. Office of Human Rights issued a Letter of Determination finding No Probable Cause "to believe that [Mr. Checka] was subjected to disparate treatment on the basis of his race (White) when he was terminated in February 11, 2005 due to [Rite Aid's] Zero Tolerance Policy for Violence in the Workplace."  (Ex. 27 to Checka Dep.)

61.     On October 26, 2006, the EEOC issued a Dismissal and Notice of Rights adopting the findings of the D.C. Office of Human Rights.  (Ex. 28 to Checka Dep.; Ex. 1 to Am. Compl.)

62.     On January 16, 2007, Mr. Checka filed a Complaint against Rite Aid Corporation in this Court alleging discrimination based on race.  (Complaint, attached to Defendant's Appendix as Exhibit E.)

63.     On April 17, 2007, Mr. Checka filed his Amended Complaint in this Court against Rite Aid Corporation and Rite Aid of Washington, D.C., Inc.  (Am. Compl.)

64.     On July 16, 2007, Mr. Checka voluntarily dismissed Rite Aid Corporation as a Defendant to his Amended Complaint.  (Voluntary Dismissal, attached to Defendant's Appendix as Exhibit F.)

Dated:  November 1, 2007

Respectfully submitted,

LITTLER MENDELSON, P.C.


_____/s/_____

Katherine E. Bierma Pregel
D.C. Bar No. 486615
1150 17th Street, N.W.
Suite 900
Washington, D.C.  20036
(202) 842-3400  Telephone
(202) 842-0011  Facsimile
kbpregel@littler.com

Theodore A. Schroeder
(Admitted *Pro Hac Vice*)
625 Liberty Avenue
26th Floor
Pittsburgh, Pennsylvania 15222
(412) 201-7600  Telephone
(412) 774-1959  Facsimile
tschroeder@littler.com

Counsel for Defendant,
Rite Aid of Washington, D.C., Inc.

- 11 -

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| MICHAEL P. CHECKA, | ) |
| | ) |
| Plaintiff, | )    **Case No. 1:07CV00099 (GK)** |
| | )    **Judge Gladys Kessler** |
| v. | ) |
| | )    **Next Scheduled Deadline:** |
| | )    **Dispositive Motions Due** |
| | )    **November 1, 2007** |
| RITE AID OF | ) |
| WASHINGTON, D.C., INC., | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF DEFENDANT RITE AID OF
## <u>WASHINGTON, D.C., INC.'S MOTION FOR SUMMARY JUDGMENT</u>

Dated: November 1, 2007

Katherine E. Bierma Pregel
D.C. Bar No. 486615
LITTLER MENDELSON, P.C.
1150 17th Street, N.W.
Suite 900
Washington, DC 20036
202.842.3400 Telephone
202.842.0011 Facsimile
kbpregel@littler.com

Theodore A. Schroeder
(Admitted *Pro Hac Vice*)
625 Liberty Avenue
26th Floor
Pittsburgh, PA 15222
412.201.7600 Telephone
412.774.1959 Facsimile
tschroeder@littler.com

Counsel for Defendant
Rite Aid of Washington, D.C., Inc.

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ........................................................................................... 1

II.     STATEMENT OF MATERIAL FACTS ........................................................ 2

    A.    Rite Aid's Policies Regarding Violence in the Workplace.................................... 2

    B.    Michael Checka's Employment with Rite Aid ..................................................... 2

    C.    February 5, 2005 Incident Between Michael Checka and Ashenafi Alene ........... 3

    D.    Rite Aid's Investigation Regarding the February 5, 2005 Incident and
        Michael Checka's Termination............................................................................ 5

    E.    Rite Aid's Investigation Regarding the June 14, 2004 Incident Between
        Steve Obidike and Angela Nwosu ....................................................................... 8

    F.    Mr. Checka's Administrative Charges and United States District Court
        Complaints ........................................................................................................... 9

III.    ARGUMENT ................................................................................................. 10

    A.    The Summary Judgment Standard ...................................................................... 10

    B.    Plaintiff's Burden Of Proof ................................................................................ 11

    C.    Plaintiff Cannot Establish a *Prima Facie* Case of Race Discrimination
        Because He Cannot Demonstrate the Requisite "Background
        Circumstances" of Discriminatory Motive or That Similarly Situated
        Employees Outside His Protected Class Were Treated More Favorably ........... 12

        1.    Elements of a *Prima Facie* Case of "Reverse" Race Discrimination ...... 12

        2.    Plaintiff Cannot Meet the First and Third Prongs of his *Prima
            Facie* Case ............................................................................................. 13

            a.    Plaintiff Cannot Establish the Requisite "Background
                Circumstances" to Support the First Prong of his *Prima
                Facie* Case..................................................................................... 13

            b.    Plaintiff Cannot Demonstrate That His Termination Gives
                Rise to An Inference of Discrimination Because He Cannot
                Establish That He Was Similarly Situated to His Alleged
                Comparitor ...................................................................................... 14

**TABLE OF CONTENTS**
**(continued)**

Page

D.    Plaintiff Cannot Present any Evidence that Rite Aid's Legitimate,
      Nondiscriminatory Reasons for Terminating Him are Pretextual ...................... 17

      1.    Plaintiff Cannot Rebut Rite Aid's Reason For Terminating His
            Employment................................................................................... 18

      2.    Plaintiff Cannot Demonstrate that Rite Aid's Decision to
            Terminate His Employment Was Motivated By Discriminatory
            Animus.............................................................................................. 20

IV.   CONCLUSION............................................................................................. 22

# TABLE OF AUTHORITIES

**Page**

## CASES

\* <u>Anderson v. Liberty Lobby,</u>
  477 U.S. 242, 255 (1986) ................................................................ 10, 11

<u>Barbour v. Browner,</u>
  181 F.3d 1342, 1346 (D.C. Cir. 1999) ........................................... 21

<u>Board of Trustees of Keene State College v. Sweeney,</u>
  439 U.S. 24, 25 (1978) ..................................................................... 11

<u>Branson v. Price River Coal Co.,</u>
  853 F.2d 768, 772 (10th Cir. 1988) ............................................... 22

<u>Brown v. Brody,</u>
  199 F.3d 446, 452 (D.C. Cir. 1999) ......................................... 12, 22

<u>Burke v. Gould,</u>
  286 F.3d 513, 520 (D.C. Cir. 2002) ............................................... 18

<u>Celotex Corp. v. Catrett,</u>
  477 U.S. 317, 323 (1986) ............................................................ 10, 11

<u>Duffy v. Wolle,</u>
  123 F.3d 1026, 1036-37 (8th Cir. 1997) ........................................ 13

\* <u>Fischbach v. Dept. of Corrections,</u>
  86 F.3d 1180, 1183 (D.C. Cir. 1996) ................................... 19, 20, 21

<u>Furnco Constr. Corp. v. Waters,</u>
  438 U.S. 567 (1978) ........................................................................ 11

\* <u>George v. Leavitt,</u>
  407 F.3d 405, 412 (D.C. Cir. 2005) ................................... 12, 14, 20

\* <u>Harding v. Gray,</u>
  9 F.3d 150, 153 (D.C. Cir. 1993) ................................................... 13

\* <u>Holbrook v. Reno,</u>
  196 F.3d 255, 261 (D.C. Cir. 1999) ......................... 12, 14, 15, 17

<u>Holcomb v. Powell,</u>
  433 F.3d 889, 896 (D.C. Cir. 2006) ............................................... 18

<u>Hunter v. Rice,</u>
  480 F. Supp. 2d 125, 136 (D.D.C. 2007) ...................................... 14

<u>International Bhd. of Teamsters v. United States,</u>
  431 U.S. 324, 335 n.15 (1977) ....................................................... 11

<u>Lathram v. Snow,</u>
  336 F.3d 1085, 1088 (D.C. Cir. 2003) ........................................... 18

<u>Lynn v. Deaconess Med. Center-West,</u>
  160 F.3d 484, 488 (8th Cir. 1998) ................................................. 15

## TABLE OF AUTHORITIES
### (continued)

**Page**

McCoy v. WGN Continental Broadcasting Co.,
957 F.2d 368, 373 (7th Cir. 1992) ............................................................................... 20

* McDonnell Douglas Corp. v. Green,
411 U.S. 792 (1973) ...................................................................................................... 11

* McNally v. Norton,
498 F. Supp. 2d 167, * 41-42 (D.D.C. 2007) .......................................................... 20, 21

Mills v. Health Care Serv. Corp.,
171 F.3d 450, 457 (7th Cir. 1999) ............................................................................... 13

Milton v. Weinberger,
696 F.2d 94, 100 (D.C. Cir. 1982) ............................................................................... 20

* Neuren v. Adduci, Mastriani, Meek & Schill,
43 F.3d 1507, 1514 (D.C. Cir. 1995) ...................................................................... 15, 17

Parker v. Balt. & Ohio R.R.,
652 F.2d 1012, 1017 (D.C. Cir. 1981) ......................................................................... 13

Pierce v. Commonwealth Life Ins. Co.,
40 F.3d 796, 802 (6th Cir. 1994) ................................................................................. 15

Plummer v. Safeway, Inc.,
No. 93-0316, 1995 U.S. Dist. LEXIS 3428, *13 (D.D.C. March 17, 1995) ..................... 15

Reeves v. Sanderson Plumbing Prods.,
530 U.S. 133, 143 (2000) ........................................................................................ 12, 17

Slade v. Billington,
700 F.Supp 1134, 1148-49 (D.D.C. 1988) .................................................................... 14

St. Mary's Honor Center v. Hicks,
509 U.S. 502, 507-508 (1993) .................................................................................. 12, 17

Stella v. Mineta,
284 F.3d 135, 144 (D.C. Cir. 2002) ........................................................................ 11, 12

Texas Dep't of Community Affairs v. Burdine,
450 U.S. 248, 253 (1981) .............................................................................................. 11

### STATUTES

Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq.* .................... 1

### RULES

Fed. R. Civ. Pro. 56 .................................................................................................. 1, 10

United States District Court for the District of Columbia Local Rule 56.1 .................................... 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **MICHAEL P. CHECKA,** | ) |
| | ) |
| **Plaintiff,** | ) **Case No. 1:07CV00099 (GK)** |
| | ) **Judge Gladys Kessler** |
| **v.** | ) |
| | ) **Next Scheduled Deadline:** |
| | ) **Dispositive Motions Due** |
| | ) **November 1, 2007** |
| **RITE AID OF** | ) |
| **WASHINGTON, D.C., INC.,** | ) |
| | ) |
| **Defendant.** | ) |

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF DEFENDANT RITE AID OF
<u>WASHINGTON, D.C., INC.'S MOTION FOR SUMMARY JUDGMENT</u>

Defendant, Rite Aid of Washington, D.C., Inc. ("Rite Aid"), by undersigned counsel, pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 56.1 of the Local Rules for the United States District Court for the District of Columbia, submits this Memorandum of Points and Authorities in Support of its Motion for Summary Judgment.

## I.    <u>INTRODUCTION</u>

This is a race discrimination case brought by Plaintiff, Michael P. Checka, pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII"). In his Amended Complaint, Mr. Checka alleges that he was subject to disparate treatment by Rite Aid due to his race, white. Rite Aid terminated Mr. Checka, after a thorough investigation, for violating its policy against violent and inappropriate workplace behavior.

Mr. Checka's race discrimination claim under Title VII must fail, as a matter of law, because he has no evidence that Rite Aid intentionally discriminated against him because of his race. Because Plaintiff cannot satisfy his burden of proof, Rite Aid is entitled to judgment as a matter of law.

## II.    STATEMENT OF MATERIAL FACTS[1]

### A.    Rite Aid's Policies Regarding Violence in the Workplace

Rite Aid maintains a policy prohibiting Violent and Inappropriate Behavior in the Workplace. (Declaration of Scott Zavinski ("Zavinski Decl."), attached to the Appendix of Exhibits in Support of Defendant's Motion for Summary Judgment ("Defendant's Appendix") as Exhibit A,[2] at ¶ 8; Ex. 1 to Zavinski Decl.) That policy provides, in part, that any associate "[d]isplaying threatening, physically aggressive or violent behavior that intimidates or instills fear in others [or] [m]aking threats of any kind, verbally, physically or in writing," "will be subject to appropriate corrective action, up to and including discharge." (Id.)

### B.    Michael Checka's Employment with Rite Aid

Rite Aid hired Plaintiff Michael P. Checka ("Mr. Checka"), a white male, on May 18, 1997 as a pharmacist. (Deposition of Michael Checka ("Checka Dep."), attached to Defendant's Appendix as Exhibit B,[3] 32-33; Amended Complaint for Discrimination Under Title VII ("Am. Compl."), attached to Defendant's Appendix as Exhibit C, at ¶ 2.) As a pharmacist, Mr. Checka was responsible for ensuring that prescriptions were properly filled and dispensed to customers.

---

[1] The facts supporting Defendant's Motion for Summary Judgment are set forth in more detail in Defendant's Statement of Undisputed Material Facts, which has been filed contemporaneously with this Memorandum.

[2] The Declaration of Scott Zavinski and Exhibits 1-5 thereto are collectively attached to Defendant's Appendix as Exhibit A.

[3] Selected excerpts and document exhibits from the deposition of Michael Checka are collectively attached to Defendant's Appendix as Exhibit B.

(Ex. 7 to Checka Dep.) Mr. Checka also supervised pharmacy technicians working with him. (Id.) Mr. Checka was aware that engaging in violent or threatening behavior during his employment could subject him to termination. (Checka Dep. 66-68.)

Mr. Checka's performance was generally acceptable. (Checka Dep. 57.) However, in December 1997, associates complained about Mr. Checka's behavior and alleged that he could not work with individuals of a different race. (Checka Dep. 58-59; Ex. 12 to Checka Dep.)

In November 1999, Mr. Checka was promoted to the position of Pharmacy Manager of Rite Aid Store #3846, located at 1815 Connecticut Avenue, N.W., Washington, D.C. 20009. (Checka Dep. at 33; Am. Compl. at ¶ 4; Checka Dep. 34.) As Pharmacy Manager, Mr. Checka was responsible for the overall operations of the pharmacy. (Ex. 8 to Checka Dep.) Moreover, in the absence of other supervisory personnel, Mr. Checka was responsible for the total operations of the store and its personnel. (Ex. 6 to Checka Dep.) Mr. Checka, like all managerial personnel, was responsible for enforcing the Company's rules and policies. (Id.)

## C.    February 5, 2005 Incident Between Michael Checka and Ashenafi Alene

On February 5, 2005, an incident occurred between Mr. Checka and Ashenafi Legesse Alene ("Mr. Alene"), an entry-level associate at Store #3846. (Checka Depo 69-78; Am. Compl. at ¶ 5.) According to Mr. Checka, on that day Mr. Alene was "wagging his tongue" and taunting him by saying "Mike, Mike, look." (Ex. 2 to Zavinski Decl.; Checka Dep. 71-72.) Mr. Checka then "motioned" like he was going to try to catch Mr. Alene and briefly chased him. (Ex. 2 to Zavinski Decl.; Checka Dep. 72, 100.)

A short time later, Mr. Checka went to a storage room in the back of the store where the restrooms are located. (Ex. 2 to Zavinski Decl.; Checka Dep. 73, 100-101.) At that time, Mr. Alene was also in the storage room. (Id.) Mr. Checka moved towards Mr. Alene while

- 3 -

saying words to the effect of "What do you have to say to me now?" by which he meant "what do you have to say to me now that you have nowhere to run?" (Ex. 2 to Zavinski Decl.; Checka Dep. 73, 101-102.) Mr. Checka stood between Mr. Alene and the exit from the storage area. (Ex. 2 to Zavinski Decl.; Checka Dep. 101, 112.) Other than to try and go past Mr. Checka, there was no way for Mr. Alene to exit the storage area other than to go out the back door, which was prohibited. (Checka Dep. 77-78, 101, 112.) Mr. Alene turned around and moved towards the back of the storage room while Mr. Checka continued to approach him. (Ex. 2 to Zavinski Decl.; Checka Dep. 73.)

According to Mr. Checka, Mr. Alene tripped over some crates and fell down. (Ex. 2 to Zavinski Decl.; Checka Dep. 73-74.) According to Mr. Alene, Mr. Checka punched him in the face. (Zavinski Decl. at 11.)

As a result of the incident, Mr. Alene's nose was bleeding and the blood spattered on Mr. Checka's smock. (Checka Dep. 74.) Mr. Checka offered to help Mr. Alene clean his wound, but Mr. Alene refused. (Checka Dep. 74-75.) Instead, Mr. Alene re-entered the front area of the store. (Checka Dep. 75.)

A police officer who happened to be in the store at the time arrested Mr. Checka. (Am. Compl. at ¶ 8.; Checka Dep. 76-77.) Mr. Checka was booked for assault and battery and released. (Checka Dep. 77.)[4] He then returned to the store to finish his shift. (Id.)

When he returned to work, Mr. Checka called his supervisor, Anand Shah, Pharmacy District Manager. (Checka Dep. 84.) Mr. Shah initially told Mr. Checka not to report to work the next day, and later informed him that he was suspended pending the investigation regarding Mr. Alene's allegations. (Checka Dep. 84-85.)

---

[4] Mr. Checka's assault and battery charge was later "no papered" by the United States Attorney. (Am. Compl. at ¶ 8; Checka Dep. 87.)

- 4 -

**D.**    **Rite Aid's Investigation Regarding the February 5, 2005 Incident and Michael Checka's Termination**

On or about February 5, 2005, Scott Zavinski was informed that Mr. Checka had allegedly assaulted Mr. Alene. (Zavinski Decl. at ¶ 9.) Mr. Zavinski, white, was at the time employed as Rite Aid's Human Resources Manager for Region 60, which includes Rite Aid stores in the District of Columbia, Maryland and Virginia. (Zavinski Decl. at ¶ 3.) Mr. Zavinski promptly conducted a thorough investigation regarding the allegations. (Zavinski Decl. at ¶ 10.)

Mr. Zavinski interviewed Mr. Checka and Mr. Alene, who claimed that Mr. Checka punched him in the face. (Zavinski Decl. at ¶ 11.) Mr. Zavinski also interviewed eight other employees who worked in Store #3846, and received statements from several of them. (Zavinski Decl. at ¶ 10.b.) Although none of the associates witnessed the incident, each was working at Store # 3845 at the time of the incident, or otherwise had knowledge of the circumstances leading up to it. (Zavinski Decl. at ¶ 12.) Mr. Zavinski gathered the following information during his investigation:

- David Green, pharmacy intern, informed Mr. Zavinski that Mr. Checka told him that he had "lunged" at Mr. Alene. (Ex. 3 to Zavinski Decl.)

- Tonya Chatman, pharmacy technician, informed Mr. Zavinski that she was working on the second floor of the store and saw Mr. Alene with blood on his nose and hands. (Ex. 3 to Zavinski Decl.) Mr. Alene told her that Mr. Checka had "punched him in the face." (Id.)

- Shakia Carmichael, associate, also informed Mr. Zavinski that Mr. Alene told her that Mr. Checka punched him in the face. (Ex. 3 to Zavinski Decl.) She

told Mr. Zavinski that she found it hard to believe that Mr. Alene fell due to the amount that he was bleeding.  (Id.)

- Donna Maria Brooks, shift supervisor, told Mr. Zavinski that she saw Mr. Alene come from the back of the store and that his vest was covered with blood.  (Ex. 3 to Zavinski Decl.)  She also saw Mr. Checka return to the pharmacy area washing his hands.  (Id.)  She stopped Mr. Alene and advised him to come with her to complete an incident report.  (Id.)

- Markund Karnik, shift supervisor, informed Mr. Zavinski that Mr. Alene told him immediately after the incident that Mr. Checka had punched him in the face.  (Ex. 3 to Zavinski Decl.)  Mr. Karnik then asked Mr. Checka what happened and Mr. Checka responded that Mr. Alene fell in the bathroom.  (Id.)  When Mr. Karnik told Mr. Checka that Mr. Alene claimed that he had punched him, Mr. Checka said that he "may have hit him - he was not sure."  (Id.)

Mr. Zavinski interviewed Mr. Checka regarding the incident on February 9, 2005. (Zavinski Decl. at ¶ 10.a; Checka Dep. 85.)  He also reviewed Mr. Checka's written statement regarding the incident.  (Zavinski Decl. at ¶ 10.a.)  Mr. Checka claimed that Mr. Alene's nose was bloodied when he fell over boxes in a storage room.  (Zavinski Decl. at ¶ 11; Ex. 2 to Zavinski Decl.)

Mr. Checka admitted to chasing Mr. Alene into the storeroom and to moving quickly toward him, which Mr. Zavinski interpreted as a threatening act.  (Zavinski Decl. at ¶ 12.a; Ex. 2 to Zavinski Decl.)  Mr. Checka further admitted to asking Mr. Alene what he had to say to him now that he had nowhere to run, or words to that effect, which Mr. Zavinski also interpreted as a threat toward Mr. Alene.  (Zavinski Decl. at ¶ 12.b; Ex. 2 to Zavinski Decl.)

- 6 -

Mr. Alene's nose was bloodied as a result of the incident, and his blood was spattered on Mr. Checka's smock.   (Zavinski Decl. at ¶ 12.c; Ex. 2 to Zavinski Decl.)   Mr. Checka acknowledged that the incident was his fault, and offered to pay any medical expenses incurred by Mr. Alene, which Mr. Zavinski interpreted as an admission of wrongdoing.   (Zavinski Decl. at ¶ 12.d; Ex. 2 to Zavinski Decl.; Checka Dep. 113-114.)

Mr. Zavinski discussed the findings of his investigation with Wayne LeClair, Rite Aid's Vice President of Human Resources Administration. (Zavinski Decl. at ¶ 13.)  Mr. Zavinski and Mr. LeClair agreed that Mr. Checka's conduct violated Rite Aid's policy prohibiting violent and inappropriate behavior in the workplace.   (Id.)   In particular, Mr. Zavinski and Mr. LeClair concluded that, even if Mr. Checka had not punched Mr. Alene, as Mr. Alene claimed, Mr. Checka's admitted conduct violated the policy's prohibition against "[d]isplaying threatening, physically aggressive or violent behavior that intimidates or instills fear in others." (Id.)  In light of these conclusions, Mr. Zavinski and Mr. LeClair recommended that Mr. Checka be terminated.  (Id.)

Mr. Zavinski communicated this recommendation to Bill Jackson, Rite Aid's Regional Vice President, who was responsible for approving termination decisions.   Mr. Jackson agreed with Mr. Zavinski's conclusion and approved the termination of Mr. Checka's employment. (Zavinski Decl. at ¶ 14.)

On February 11, 2005, Rite Aid informed Mr. Checka that his employment was terminated for violating Rite Aid's Violent and Inappropriate Behavior in the Workplace policy. (Checka Dep. 88.)

Following his termination, Mr. Checka, through counsel, challenged his termination and sought reinstatement.   (Checka Dep. 88.)   In June, 2005, four months after Mr. Checka's

termination, Mr. Checka's counsel contacted Rite Aid and informed them that a customer, Norman Collins, had witnessed the February 5, 2005 incident.  No one, including Mr. Checka, had previously mentioned such a witness.  (Checka Dep. 95-96; Document No. D-00141, produced in response to Plaintiff's First Request for Production of Documents ("Def. Doc. Prod."), attached to Defendant's Appendix as Exhibit D.)[5]

Mr. Checka's counsel submitted a Declaration from Mr. Collins to Rite Aid.  (Def. Doc. Prod. Doc. No. D-00172.)  In his Declaration, Mr. Collins stated that, on February 5, 2005, he was exiting the men's room of Store #3845 when he saw "a small black man" rush past him and trip over some milk crates.  (Id.)

Mr. Zavinski interviewed Mr. Collins on July 13, 2005.  (Def. Doc. Prod. Doc. Nos. D-00138 - 00140.)  Mr. Collins' statement, however, did not contradict Rite Aid's findings that Mr. Checka had acted in a threatening manner towards Mr. Alene on February 5.  Accordingly, Rite Aid informed Mr. Checka's counsel that the Company was upholding Mr. Checka's termination. (Def. Doc. Prod. Doc. No. D-00149.)

### E.    Rite Aid's Investigation Regarding the June 14, 2004 Incident Between Steve Obidike and Angela Nwosu

In June 2004, Mr. Zavinski was informed of an alleged incident at Store #2653 involving Chukwuemeka "Steve" Obidike, a pharmacist at that store.  (Zavinski Decl. at ¶ 15.)  Angela Nwosu, a pharmacy technician at that store, claimed that on June 15, 2004, Mr. Obidike grabbed her by the forearm and pushed her.  (Zavinski Decl. at ¶ 16; Ex. 4 to Zavinski Decl.)

Mr. Zavinski conducted an investigation into this incident, in which he interviewed Mr. Obidike, Ms. Nwosu, Store Manager James Felix, and Security Guard Eugene Brown.  (Zavinski

---

[5] Selected documents produced by Defendant in response to Plaintiff's First Request for Production of Documents are collectively attached to Defendant's Appendix as Exhibit D.

Decl. at ¶ 17; Ex. 4 to Zavinski Decl.)  There were no eyewitnesses to the alleged incident. (Zavinski Decl. at ¶ 18.)  Mr. Obidike denied that it occurred and claimed that the allegations were based on his race and national origin.  (Id.)

As a result of the investigation, Mr. Zavinski was unable to confirm any wrongdoing on the part of Mr. Obidike.  (Zavinski Decl. at ¶ 19.)  Clif Wetsel, the Loss Prevention Manager for Region 60, also investigated this matter and reached a similar conclusion.  (Id.)  Mr. Obidike was suspended without pay during the investigation of the incident.  (Zavinski Decl. at ¶ 20.)  At the conclusion of the Company's investigation, Mr. Obidike was reinstated to work with a warning that any future incidents could result in his termination.  (Id.; Ex. 4 to Zavinski Decl.)

**F.**     **Mr. Checka's Administrative Charges and United States District Court Complaints**

On December 1, 2005, Mr. Checka filed a charge of discrimination with the District of Columbia Office of Human Rights, which was cross-filed with the United States Equal Employment Opportunity Commission ("EEOC").  (Ex. 24 to Checka Dep.)

On August 28, 2006, the D.C. Office of Human Rights issued a Letter of Determination finding No Probable Cause "to believe that [Mr. Checka] was subjected to disparate treatment on the basis of his race (White) when he was terminated in February 11, 2005 due to [Rite Aid's] Zero Tolerance Policy for Violence in the Workplace." (Ex. 27 to Checka Dep.)  On October 26, 2006, the EEOC issued a Dismissal and Notice of Rights adopting the findings of the D.C. Office of Human Rights.  (Ex. 28 to Checka Dep.; Ex. 1 to Am. Compl.)

On January 16, 2007, Mr. Checka filed a Complaint against Rite Aid Corporation in this Court alleging discrimination based on race.  (Complaint for Discrimination under Title VII, attached to Defendant's Appendix as Exhibit E.)  Mr. Checka later filed an Amended Complaint in this Court against Rite Aid Corporation and Rite Aid of Washington, D.C., Inc.  (Am. Compl.)

- 9 -

On July 16, 2007, Mr. Checka voluntarily dismissed Rite Aid Corporation as a Defendant to his Amended Complaint. (Voluntary Dismissal, attached to Defendant's Appendix as Exhibit F.)

## III.   ARGUMENT

Mr. Checka contends that Rite Aid discriminated against him based on his race, white, in violation of Title VII, when it terminated his employment following an altercation with a co-worker. Mr. Checka claims that Rite Aid treated him differently than a black employee, Steve Obidike, allegedly involved in an altercation with a co-worker. Rite Aid, however, terminated Mr. Checka for violating its policy against violent and inappropriate workplace behavior. Mr. Checka has produced no evidence that he was similarly situated to Mr. Obidike or that his race was a determinative factor in Rite Aid's decision to terminate him. Therefore, Rite Aid is entitled to summary judgment on Mr. Checka's discrimination claim.

### A.   The Summary Judgment Standard

Summary judgment is appropriate where, viewing the facts in the light most favorable to the nonmoving party, "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Anderson v. Liberty Lobby, 477 U.S. 242, 255 (1986). However, any disputed facts must be *material*, meaning that they must be facts that might affect the outcome of the claim under governing law. Anderson at 249. The moving party is not required to provide evidence "negating the opponent's claim," but rather, need only show "that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmoving party to point to specific evidence – as opposed to mere allegations, general denials or vague statements – establishing a genuine issue for trial. Id. at 324. The Supreme Court has made it clear that "[t]he mere existence of a scintilla of evidence in support of plaintiff's position

- 10 -

will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson, 477 U.S. at 252. The nonmoving party cannot rest on the allegations of its pleadings, but must come forward with admissible evidence establishing a genuine issue of material fact. Celotex, 477 U.S. at 324. If he fails to make such a showing, summary judgment must be entered against him. Celotex, 477 U.S. at 322-23; Anderson, 477 U.S. 249-50.

## B.    Plaintiff's Burden Of Proof

Mr. Checka claims that Rite Aid discriminated against him based on his race by terminating his employment. For a plaintiff to prevail on these claims, "[p]roof of discriminatory motive is critical . . .." International Bhd. of Teamsters v. United States, 431 U.S. 324, 335 n.15 (1977). "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981).

The order and burden of proof in a race discrimination case are governed by the principles established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under McDonnell Douglas, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination. Id. at 802. To meet this burden, the plaintiff "must . . . [offer] evidence adequate to create an inference that an employment decision was based on a discriminatory criterion illegal under the Act." International Bhd. of Teamsters, 431 U.S. at 358. See also Furnco Constr. Corp. v. Waters, 438 U.S. 567 (1978).

Even if a plaintiff establishes a *prima facie* case, an employer need only "articulate some legitimate, nondiscriminatory reason" for the challenged conduct. Board of Trustees of Keene State College v. Sweeney, 439 U.S. 24, 25 (1978); Stella v. Mineta, 284 F.3d 135, 144 (D.C. Cir. 2002). Once the employer has articulated some legitimate, nondiscriminatory reason for the

- 11 -

action complained of, a plaintiff must demonstrate that the defendant's articulated reason was a pretext for discrimination. Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 143 (2000); St. Mary's Honor Center v. Hicks, 509 U.S. 502, 507-508 (1993); Stella, 284 F.3d at 144. It is not enough that the plaintiff show that the employer's reason is wrong or false. Hicks, 509 U.S. at 517. The plaintiff at all times bears the burden of persuasion on the ultimate issue – whether the employment decision was discriminatory. Id. at 510-11.

### C. Plaintiff Cannot Establish a *Prima Facie* Case of Race Discrimination Because He Cannot Demonstrate the Requisite "Background Circumstances" of Discriminatory Motive or That Similarly Situated Employees Outside His Protected Class Were Treated More Favorably.

Mr. Checka, a white male, has brought a "reverse" discrimination claim against Rite Aid, alleging that he was treated differently than a similarly situated black employee when he was terminated for violating Rite Aid's Violent and Inappropriate Behavior in the Workplace policy.

### 1. Elements of a *Prima Facie* Case of "Reverse" Race Discrimination

To establish a *prima facie* case of discrimination based on race, a plaintiff must establish that: (1) he is a member of a protected class; (2) he suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination. See, e.g., George v. Leavitt, 407 F.3d 405, 412 (D.C. Cir. 2005) (quoting Stella, 284 F.3d at 145 (quoting Brown v. Brody, 199 F.3d 446, 452 (D.C. Cir. 1999))). A plaintiff may satisfy the third prong of the *prima facie* case by "demonstrating that [he] was treated differently from similarly situated employees who are not part of the protected class." George, 407 F.3d at 412 (citing Holbrook v. Reno, 196 F.3d 255, 261 (D.C. Cir. 1999)).

In the context of a reverse discrimination claim, the *prima facie* case is modified. Because "there is nothing inherently suspicious" about an employer's decision to terminate a white employee, a majority-group plaintiff alleging Title VII discrimination must show

- 12 -

"additional background circumstances that support the suspicion that the defendant is that unusual employer who discriminates against the majority." Harding v. Gray, 9 F.3d 150, 153 (D.C. Cir. 1993) (quoting Parker v. Balt. & Ohio R.R., 652 F.2d 1012, 1017 (D.C. Cir. 1981)). The "background circumstances" requirement modifies the first prong of the *prima facie* framework and "substitutes for the minority plaintiff's burden to show that he is a member of a racial minority." Harding, 9 F.3d at 153. The requirement is "not designed to disadvantage the white plaintiff," but "means simply that in our society, where 'reverse discrimination' is the exception, white plaintiffs must show more than the mere fact that they are white" to show that an adverse action raises an inference of discrimination. Id. at 154; see also Mills v. Health Care Serv. Corp., 171 F.3d 450, 457 (7th Cir. 1999); Duffy v. Wolle, 123 F.3d 1026, 1036-37 (8th Cir. 1997).

Two general categories of evidence constitute "background circumstances." The first includes evidence indicating that a particular employer "has some reason or inclination to discriminate invidiously against whites," such as affirmative action plans or other pressure to promote particular minorities based on race. Harding, 9 F.3d at 153. The other category is evidence indicating "that there is something 'fishy' about the facts of the case at hand that raises an inference of discrimination." Id.

## 2. Plaintiff Cannot Meet the First and Third Prongs of his *Prima Facie* Case.

Mr. Checka's discrimination claim fails because he cannot establish the first or third prongs of his *prima facie* case.

### a. Plaintiff Cannot Establish the Requisite "Background Circumstances" to Support the First Prong of his *Prima Facie* Case.

Plaintiff has not presented the requisite "background circumstances" necessary to support

- 13 -

a reverse discrimination claim. He has not identified any inclination on the part of Rite Aid to discriminate against white employees. He has not alleged that Rite Aid has an affirmative action plan or that the Company was subject to any other pressure to discriminate against white employees. Moreover, Mr. Checka cannot identify anything "fishy" about his termination that raises an inference of discrimination. Like Mr. Checka, all of the individuals involved in the decision to terminate Mr. Checka are white. Mr. Zavinski conducted a thorough investigation into the February 5 incident before concluding that Mr. Checka's conduct violated Company policy. (Zavinski Decl. at ¶ 10.) Mr. Zavinski shared the substance and findings of his investigation with Mr. LeClair and Mr. Jackson, who agreed and approved Mr. Checka's termination. (Zavinski Decl. at ¶ 13-14.) Mr. Zavinski, Mr. LeClair and Mr. Jackson are all white. It is illogical that these decision-makers would discriminate against someone who shared their own characteristics. See Hunter v. Rice, 480 F. Supp. 2d 125, 136 (D.D.C. 2007) (finding that it would be "unusual" for a man to discriminate against another man based on gender); Slade v. Billington, 700 F.Supp 1134, 1148-49 (D.D.C. 1988) (refusing to find requisite "background circumstances" where plaintiff and relevant decision-makers were white).

     **b.**     **Plaintiff Cannot Demonstrate That His Termination Gives Rise to An Inference of Discrimination Because He Cannot Establish That He Was Similarly Situated to His Alleged Comparitor.**

Mr. Checka also fails to establish the third prong of his *prima facie* claim of discrimination because he cannot demonstrate that his termination gives rise to an inference of discrimination. As noted above, a plaintiff may satisfy the third prong of the *prima facie* case by "demonstrating that [he] was treated differently from similarly situated employees who are not part of the protected class." George, 407 F.3d at 412 (citing Holbrook, 196 F.3d at 261). The crux of Mr. Checka's claim is that he was treated differently than a similarly situated black

employee.  Mr. Checka was terminated for violating Rite Aid's Violent and Inappropriate Behavior in the Workplace policy following an altercation with Mr. Alene on February 5, 2005. He claims that another employee, Steve Obidke, who is black, was suspended, but not terminated, following an altercation with a co-worker in June 2004.  Mr. Checka points to the different discipline imposed on him and Mr. Obidike as evidence that his termination was motivated by discriminatory animus based on his race.  Mr. Checka's claim fails because he cannot demonstrate that he and Mr. Obidike were similarly situated.  To the contrary, Rite Aid's investigation of both cases revealed significantly different circumstances.

To prove that he was similarly situated to Mr. Obidike, Mr. Checka must demonstrate that he and Mr. Obidike were charged with or found to engage in conduct of comparable seriousness and that all of the relevant aspects of his employment situation were "nearly identical" to Mr. Obidike's.  See Holbrook, 196 F.3d at 261 (citing Lynn v. Deaconess Med. Center-West, 160 F.3d 484, 488 (8th Cir. 1998)); Neuren v. Adduci, Mastriani, Meek & Schill, 43 F.3d 1507, 1514 (D.C. Cir. 1995) (quoting Pierce v. Commonwealth Life Ins. Co., 40 F.3d 796, 802 (6th Cir. 1994)).  Mr. Checka and Mr. Obidike are not similarly situated because Rite Aid did not find that they engaged in similar conduct and all relevant aspects of their employment situations were not nearly identical.

Mr. Checka and Mr. Obidike were not alleged to have engaged in comparable conduct. Mr. Checka was alleged to have punched Mr. Alene in the face, drawing a considerable amount of blood.  (Zavinski Decl. at 11.)   Mr. Obidike was accused of grabbing a pharmacy technician's arm and pushing her.  (Zavinski Decl. at 16.)  These allegations do not involve comparably serious conduct.  See Plummer v. Safeway, Inc., No. 93-0316, 1995 U.S. Dist.

- 15 -

LEXIS 3428, *13 (D.D.C. March 17, 1995)[6] (refusing to find that male plaintiff who engaged in altercation with customer involving name calling was similarly situated to female co-worker who also engaged in altercation with customers because plaintiff could not show that female co-worker's altercation involved name calling).

Moreover, unlike Mr. Obidike, Mr. Checka made several admissions during Rite Aid's investigation that supported its decision to terminate him. Although Mr. Checka denied punching Mr. Alene, Mr. Checka admitted to chasing Mr. Alene, cornering him in the store room, where Mr. Alene had no way to exit, and moving quickly towards Mr. Alene while asking him what he had to say to him now that he had nowhere to run. (Zavinski Decl. at ¶ 12; Checka Dep. 73, 101.) Mr. Checka also admitted having Mr. Alene's blood on his clothes as a result of the incident and offering to pay Mr. Alene's medical expenses. (Id.) In other words, Mr. Checka acknowledged engaging in threatening conduct towards Mr. Alene, and those admissions were a key component of Rite Aid's decision to terminate him. (Zavinski Decl. at ¶¶ 12-14.)

Mr. Obidike, conversely, categorically denied grabbing or pushing Ms. Nwosu. (Zavinski Decl. at. ¶ 18.) Mr. Obidike did not admit to engaging in any threatening or violent behavior and Rite Aid did not find evidence during its investigation of Ms. Nwosu's allegations to conclude otherwise. (Zavinski Decl. at. ¶ 19.) Therefore, Mr. Checka's and Mr. Obidike's conduct, supported by Mr. Checka's own admissions, was not similar and cannot support an inference of discrimination.

Finally, Mr. Checka and Mr. Obidike are not similarly situated because they were employed by Rite Aid in different positions. At the time of the February 5 incident with Mr.

---

[6] A copy of this case is attached to Defendant's Appendix as Exhibit G.

Alene, Mr. Checka was employed by Rite Aid as a Pharmacy Manager. (Checka Dep. 34.) As a Pharmacy Manager, Mr. Checka was responsible for the overall operations of the pharmacy. (Ex. 8 to Checka Dep.)  In addition, in the absence of other supervisory personnel, Mr. Checka was responsible for the total operations of the store and its personnel. (Ex. 6 to Checka Dep.) Moreover, Mr. Checka, like all managerial personnel, was responsible for enforcing the Company's rules and policies. (Id.)

Mr. Obidike, on the other hand, was employed by Rite Aid as a pharmacist. (Am. Compl. at ¶ 11.)  He did not have managerial responsibilities and was not charged with enforcing Company policy.  This difference in Mr. Checka's and Mr. Obidike's positions precludes a finding that they were similarly situated.  See, e.g., Neuren, 43 F.3d at 1514 (refusing to find law firm associate and more junior level associate similarly situated); Holbrook, 196 F.3d at 262 (refusing to find probationary trainee and veteran employee with supervisory duties similarly situated).

Because Mr. Checka cannot establish the first or third prongs of his *prima facie* case, his discrimination claim must fail.

### D.  Plaintiff Cannot Present any Evidence that Rite Aid's Legitimate, Nondiscriminatory Reasons for Terminating Him are Pretextual.

Assuming that Mr. Checka could establish a *prima facie* case of race discrimination, which he cannot, there is no basis upon which a reasonable fact-finder could conclude that the legitimate, nondiscriminatory reasons Rite Aid has articulated for its decisions were false, and that the real reason was his race. Reeves, 530 U.S. at 143; Hicks, 509 U.S. at 511. Mr. Checka's race discrimination theory is based solely upon conjecture, suspicion and surmise; there is no evidence suggesting pretext.

Defendant has presented a legitimate, nondiscriminatory reason for terminating Mr.

- 17 -

Checka, namely, his violation of Rite Aid's Violent and Inappropriate Behavior in the Workplace policy. Once a defendant presents a legitimate, nondiscriminatory explanation for its actions, "the presumption of discrimination 'simply drops out of the picture.'" Holcomb v. Powell, 433 F.3d 889, 896 (D.C. Cir. 2006) (quoting Burke v. Gould, 286 F.3d 513, 520 (D.C. Cir. 2002)). Then, to survive summary judgment, "'the plaintiff must show that a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for a discriminatory reason.'" Holcomb, 433 F.3d at 896-897 (quoting Lathram v. Snow, 336 F.3d 1085, 1088 (D.C. Cir. 2003)). Mr. Checka's discrimination claim fails because he cannot present any evidence rebutting Rite Aid's proffered reasons for his termination or that the decision was motivated by discriminatory animus.

### 1. Plaintiff Cannot Rebut Rite Aid's Reason For Terminating His Employment.

Rite Aid terminated Mr. Checka's employment because it concluded that he violated the Company's Violent and Inappropriate Behavior in the Workplace policy by engaging in threatening behavior towards Mr. Alene. (Checka Dep. 88.) Mr. Alene alleged that Mr. Checka punched him in the face, resulting in a bloody nose. Rite Aid conducted a prompt and thorough investigation regarding Mr. Alene's allegations. Rite Aid interviewed Mr. Alene, Mr. Checka, eight other Rite Aid employees, and Norman Collins, a Rite Aid customer who allegedly witnessed the incident. (Zavinski Decl. at ¶¶ 10-12; Def. Doc. Prod. Doc. Nos. D-00138 - 00140.) No witness, including Mr. Collins, witnessed the events leading up to Mr. Alene's injury.

Rite Aid's investigation uncovered substantial evidence suggesting that Mr. Checka punched Mr. Alene. Rite Aid also concluded, however, based on its witness interviews and Mr. Checka's own admitted conduct, that Mr. Checka engaged in threatening behavior towards Mr.

Alene, whether or not he actually punched him.  (Zavinski Decl. at ¶ 13.)  Markund Karnik, shift supervisor, reported that Mr. Checka had told him that he may have punched Mr. Alene.  (Ex. 2 to Zavinski Decl.)  David Green, pharmacy intern, stated that Mr. Checka told him that he "lunged" at Mr. Alene.  (Id.)  Mr. Checka, himself, admitted to chasing Mr. Alene, cornering him in a room from which he could not escape, and moving towards him while asking him "what do you have to say to me now?"  (Checka Dep. 73, 100-102, 112; Def. Doc. Prod. Doc. Nos. D-00138 – 00140.)  Even if Mr. Alene tripped and fell over boxes while moving towards the back of the store room, as Mr. Checka alleges, Rite Aid could reasonably conclude that Mr. Checka's conduct precipitated Mr. Alene's injury.  Viewing the evidence in a light most favorable to Mr. Checka, the Company still reasonably concluded that he engaged in threatening behavior.

Rite Aid found that Mr. Checka's admitted conduct violated the Violent and Inappropriate Behavior in the Workplace policy's prohibition against "[d]isplaying threatening, physically aggressive or violent behavior that intimidates or instills fear in others."  (Zavinski Decl. at ¶ 13.)  The Company concluded that Mr. Checka's conduct was serious enough to warrant termination.

Significantly, Mr. Checka does not dispute the conduct that resulted in his termination.  He has repeatedly admitted standing between Mr. Alene and the exit to the store room and moving towards him while asking "what do you have to say to me now?"  (Zavinski Decl. at ¶ 12.; Ex. 2 to Zavinski Decl.; Checka Dep. 73, 100-102, 112.)  Rather, Mr. Checka disagrees that his conduct should have resulted in termination.  (Checka Dep. 103-105.)  However, Mr. Checka's disagreement, without more, is insufficient to create an inference of discrimination.  A court may not "'second-guess an employer's personnel decision absent a demonstrably discriminatory motive.'"  Fischbach v. Dept. of Corrections, 86 F.3d 1180, 1183 (D.C. Cir.

1996) (quoting <u>Milton v. Weinberger</u>, 696 F.2d 94, 100 (D.C. Cir. 1982)).

### 2. Plaintiff Cannot Demonstrate that Rite Aid's Decision to Terminate His Employment Was Motivated By Discriminatory Animus.

Mr. Checka's only purported evidence of discrimination is that he was terminated while Mr. Obidike was not. As described in detail above, Mr. Checka and Mr. Obidike were not similarly situated. Accordingly, Rite Aid's different disciplinary decisions regarding Mr. Checka and Mr. Obidike cannot support Mr. Checka's discrimination claim. However, even if Mr. Checka and Mr. Obidike were similarly situated, which they are not, Mr. Checka utterly fails to present any evidence to show that Rite Aid's decisions to terminate him and suspend Mr. Obidike was based on anything other than the reasonable conclusions drawn after investigating each incident.

"Once the employer has articulated a non-discriminatory explanation for its action . . . the issue is not 'the correctness or desirability of [the] reasons offered . . . [but] whether the employer honestly believes in the reasons its offers.'" <u>Fischbach</u>, 86 F.3d at 1183 (quoting <u>McCoy v. WGN Continental Broadcasting Co.</u>, 957 F.2d 368, 373 (7th Cir. 1992)). Demonstrating that an employer's reason is wrong does not necessarily constitute evidence of pretext because "an employer's action may be justified by a reasonable belief in the validity of the reason given even though that reason turns out to be false." <u>George</u>, 407 F.3d at 415 (citing <u>Fischbach</u>, 86 F.3d at 1183). The court must examine not whether the reasons offered by Rite Aid are correct, but rather whether the decision-makers honestly believed the reasons they offered. <u>See McNally v. Norton</u>, 498 F. Supp. 2d 167, * 41-42 (D.D.C. 2007) (citing <u>Fischbach</u>, 86 F.3d at 1183).

Mr. Checka has not presented any evidence that Mr. Zavinski, Mr. LeClair and Mr. Jackson did not honestly believe that Mr. Checka's admitted conduct warranted termination and

- 20 -

that his circumstances were distinguishable from those of Mr. Obidike. Accordingly, Mr. Checka's claim must fail. Title VII does not "permit a court to act as a 'super-personnel department that reexamines an entity's business decisions.'" McNally, 498 F. Supp. 2d at *36-37 (citing Barbour v. Browner, 181 F.3d 1342, 1346 (D.C. Cir. 1999)). Even if a court believes that an employer made a mistake, it may not "'second-guess an employer's personnel decision absent [a] demonstrably discriminatory motive.'" McNally, 498 F. Supp. 2d at *37 (quoting Fishbach, 86 F.3d at 1183).

Rite Aid thoroughly investigated Mr. Alene's allegations of assault by Mr. Checka, and the Company concluded, based in large part on Mr. Checka's own admissions, that Mr. Checka engaged in threatening behavior towards Mr. Alene. (Zavinski Decl at ¶ 13.) This conduct violates company policy and warranted termination. Rite Aid conducted a similar investigation regarding Angela Nwosu's allegations of assault by Mr. Obidike. (Zavinski Decl at ¶ 17.) However, unlike Mr. Checka, Mr. Obidike was not covered with his alleged victim's blood, Mr. Obidike did not admit to engaging in any threatening or violent behavior, Mr. Obidike did not offer to pay for the medical expenses of his alleged victim, and the Company could not otherwise confirm that any such conduct occurred. (Zavinski Decl at ¶ 18.) Therefore, the findings of the Company's investigations into the two incidents were different in kind and the Company reasonably determined that Mr. Checka's and Mr. Obidike's conduct warranted different disciplinary action.

Mr. Checka has presented no evidence that the Company's decisions were tainted by racial discrimination. He has presented no statements by any decision-maker, nor any statistics or trends that point to a discriminatory motive for the Company's actions. Mr. Checka's mere belief that Rite Aid's decision was discriminatory is insufficient to create a triable issue of fact.

See Brown, 199 F.3d at 459 ("a plaintiff's mere speculations are 'insufficient to create a genuine issue of material fact regarding [an employer's] articulated reasons for [its decisions] and avoid summary judgment.'") (quoting Branson v. Price River Coal Co., 853 F.2d 768, 772 (10th Cir. 1988)).

Because Mr. Checka has failed to demonstrate that Rite Aid's legitimate and nondiscriminatory reasons for its decision to terminate his employment were a pretext for discrimination, Rite Aid is entitled to summary judgment.

## IV.    CONCLUSION

For the foregoing reasons, Rite Aid requests that the Court grant this Motion, and dismiss Plaintiff's Amended Complaint with prejudice.

Dated:  November 1, 2007

Respectfully submitted,

LITTLER MENDELSON, P.C.

_____/s/_____

Katherine E. Bierma Pregel
D.C. Bar No. 486615
1150 17th Street, N.W.
Suite 900
Washington, DC  20036
202.842.3400  Telephone
202.842.0011  Facsimile
kbpregel@littler.com

Theodore A. Schroeder
(Admitted *Pro Hac Vice*)
625 Liberty Avenue
26th Floor
Pittsburgh, PA  15222
412.201.7600  Telephone
412.774.1959  Facsimile
tschroeder@littler.com

Counsel for Defendant
Rite Aid of Washington, D.C., Inc.

- 23 -

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

| | |
|---|---|
| **MICHAEL P. CHECKA,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| | ) |
| | ) |
| **RITE AID OF** | ) |
| **WASHINGTON, D.C., INC.,** | ) |
| | ) |
| **Defendant.** | ) |

_____)

**Case No. 1:07CV00099 (GK)**
**Judge Gladys Kessler**

**Next Scheduled Deadline:**
**Dispositive Motions Due**
**November 1, 2007**

## APPENDIX OF EXHIBITS IN SUPPORT OF
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**Exhibit A**    **Declaration of Scott Zavinski and attached Exhibits**

**Exhibit B**    **Selected Excerpts and Exhibits from Deposition of Michael P. Checka**

**Exhibit C**    **Amended Complaint for Discrimination Under Title VII**

**Exhibit D**    **Selected Documents Produced in Response to Plaintiff's First Request
for Production of Documents**

**Exhibit E**    **Complaint for Discrimination Under Title VII**

**Exhibit F**    **Voluntary Dismissal**

**Exhibit G**    **Plummer v. Safeway, No. 93-0316; 1995 U.S. Dist. LEXIS 3428
(D.D.C. March 17, 1995)**

# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MICHAEL P. CHECKA,                    ) | |
| )| |
| Plaintiff,          ) | **Case No. 1:07CV00099 (GK)** |
| ) | **Judge Gladys Kessler** |
| v.                                    ) | |
| ) | |
| RITE AID OF                           ) | |
| WASHINGTON, D.C., INC.,               ) | |
| ) | |
| Defendant.          ) | |
| ) | |

## DECLARATION OF SCOTT ZAVINSKI

I, Scott A. Zavinski, do hereby declare, verify and state as follows, based upon my personal knowledge of the matters contained herein:

1.     I am over eighteen (18) years of age and reside at 7701 Bogey Place, Glen Allen, Virginia 23059. I am competent to testify to the matters stated in this Declaration.

2.     I was employed by Rite Aid Corporation from March 31, 1996 through January 26, 2006.

3.     From September 1999 through January 2006, I was the HR Manager for Region 60, which includes Rite Aid stores in the District of Columbia, Maryland and Virginia.

4.     As the HR Manager for Region 60, I had Human Resources responsibility for employees of Rite Aid of Washington, D.C., Inc. working at Rite Aid stores in the District of Columbia.

5.     My duties as an HR manager included, among other things, training, recruiting, administering Rite Aid's employment policies, partnering with district managers and pharmacy

development managers to ensure compliance with these policies and applicable employment laws, and investigation of allegations of employee misconduct.

6.      As HR Manager for Region 60, I reported directly to the Regional Vice President, Bill Jackson. I also would consult with Wayne LeClair, Rite Aid's Vice President of Human Resources Administration, in the administration of my duties.

7.      When issues of employee misconduct were reported to me, I was responsible for investigating them and making recommendations regarding appropriate discipline, up to and including termination. Termination decisions were ultimately approved by the Regional Vice President, Bill Jackson.

8.      During my employment with Rite Aid, the company had a policy prohibiting Violent and Inappropriate Behavior in the Workplace. A summary of that policy, as in effect in February 2005, is contained in the excerpts from Rite Aid's Associate Atlas attached hereto as Exhibit 1. That policy provides, in part, that any associate "[d]isplaying threatening, physically aggressive or violent behavior that intimidates or instills fear in others [or] [m]aking threats of any kind, verbally, physically or in writing," "will be subject to appropriate corrective action, up to and including discharge."

9.      On or about February 5, 2005, I became aware of allegations that Michael Checka, the Pharmacy Manager at Store #3846 in Washington, D.C., had allegedly assaulted Asehenafi Alene, an hourly associate at that store.

10.      I conducted a thorough investigation of this incident, which included:

      a.      I interviewed Michael Checka on February 9, 2005; I also reviewed a written statement about the incident prepared by Checka. Checka's statement and the notes of my interview with him are attached hereto as Exhibit 2.

2

b.    I interviewed nine associates who worked in Store #3846, and received statements from several of them.  The notes of my interviews and the statements I received from associates are attached hereto as Exhibit 3.

11.    During the investigation, Mr. Alene claimed that Mr. Checka punched him in the face.  Mr. Checka claimed that Mr. Alene's nose was bloodied when he fell over boxes in a storage room.

12.    There were no witnesses who could conclusively confirm either man's story.  My investigation, however, did confirm the following facts:

a.    Mr. Checka admitted to chasing Mr. Alene into the storeroom and to moving quickly toward him, which I interpreted as a threatening act;

b.    Mr Checka admitted to asking Mr. Alene what he had to say to him now that he had nowhere to run, or words to that effect, which I also interpreted as a threat toward Mr. Alene;

c.    Mr. Alene's nose was bloodied as a result of the incident, and his blood was spattered on Mr. Checka's shirt;

d.    Mr. Checka acknowledged that the incident was his fault, and offered to pay any medical expenses incurred by Mr. Alene, which I interpreted as an admission of wrongdoing.

13.    I discussed these conclusions with Wayne LeClair.  We agreed that Checka's conduct violated Rite Aid's policy prohibiting violent and inappropriate behavior in the workplace policy.  In particular, we concluded that the conduct set forth above violated the policy's prohibition against ""[d]isplaying threatening, physically aggressive or violent behavior

that intimidates or instills fear in others." In light of these conclusions, we agreed that we should recommend that Checka be terminated.

14.    I made this recommendation to Bill Jackson, who agreed and approved the termination of Michael Checka's employment.

15.    In June 2004, I was informed of an alleged incident at Store #2653 involving Chukwuemeka "Steve" Obidike, a Pharmacist at that store.

16.    Angela Nwosu, a Pharmacy Technician at that store, claimed that on June 15, 2004, Obidike grabbed her by the forearm and pushed her.

17.    I conducted an investigation into this incident, in which I interviewed Obidike, Nwosu, Store Manager James Felix and Security Guard Eugene Brown. My interview notes and statements I collected are attached hereto as Exhibit 4.

18.    There were no eyewitnesses to the alleged incident. Obidike denied that it occurred and alleged that the allegations were based on his race and national origin.

19.    As a result of the investigation, I was unable to confirm any wrongdoing on the part of Obidike. Clif Wetsel, the Loss Prevention Manager for Region 60, also investigated this matter and reached a similar conclusion. Wetsel's summary is attached hereto as Exhibit 5.

20.    Obidike was suspended without pay during the investigation of the incident. Because we were unable to conclude that he violated the Violent and Inappropriate Behavior in the Workplace policy, he was reinstated to work with a warning that any future incidents could result in his termination.

Pursuant to 28 U.S.C. § 1746, I verify under penalty of perjury that the foregoing is true and correct.

Dated: September **23**, 2007

Scott A. Zavinski

# An Associate Atlas





*A New Beginning...*
*A New Direction...*
*A New Journey...*



EXHIBIT

1

©2005, Rite Aid All rights reserved.
This document is for internal Rite Aid use only.
Unauthorized reproduction is prohibited.

Employment at Rite Aid is "at will," which means both the associate and Rite Aid have the
right to terminate employment at any time, with or without advance notice, and with or
without cause. (Associates covered by union agreements may have other rights as described
in those agreements.) Nothing in this handbook should be construed as creating a contract
for any length of employment, or any limitation on discipline or alteration of the terms of
employment by Rite Aid. Only a corporate officer has the authority to make any contrary
agreement, and any such agreement must be in writing and signed by both the corporate
officer and the affected associate.

Rite Aid
Human Resources Department
P.O. Box 3165
Harrisburg, PA 17105

an internal drug investigation. (This includes refusing to submit to required testing, searches, and professional evaluation for drug and alcohol use; giving false, diluted, or altered urine samples, or failing to comply with the rehabilitation counselors.)

• Selling or giving alcohol or tobacco to an underage customer or associate.

Rite Aid will revise this policy as it deems appropriate and will enforce it in a manner consistent with applicable state and federal laws.

## Violent and Inappropriate Behavior

Engaging in threatening or violent behavior in our workplace is a serious matter. Such conduct places the safety and health of our associates, customers, visitors, and suppliers in jeopardy and will not be tolerated. Associates engaging in such activities will be subject to appropriate corrective action, up to and including discharge. Violent or inappropriate behavior includes, but is not limited to:

• Displaying threatening, physically aggressive, or violent behavior that intimidates or instills fear in others. Making threats of any kind, verbally, physically or in writing.

• Engaging in other hostile behavior, including belligerent speech, excessive arguing, or provoking another.

• Sabotaging or defacing the company's property or causing physical damage to the company's facilities.

• Bringing weapons or firearms of any kind onto the company's premises, in the company's parking lots, in the company's vehicles, or while conducting business for the company.

• Using any object in a threatening or violent manner.

If you are threatened, or are a victim of a violent act in the workplace, or if you observe behavior that is violent or potentially violent, report it immediately to your supervisor, your facility's human resources manager, or any other member of management. This includes threats or violent acts by coworkers, customers, visitors, or others who have come onto our premises.

If it is not suitable for you to report an incidence of violence and/or threatening behavior locally, you may contact the Human Resources Department directly or use the Rite Call toll-free hotline (1-888-RITE-CALL or 1-888-748-

34

3225). Rite Call is available 24 hours a day, seven days a week and is operated by an independent company. Callers may remain anonymous; however, it is beneficial to the company's investigation of the incident to have as much information as possible. It is extremely important that all threatening/violent conduct be reported immediately.

All reports of workplace violence will be taken seriously, investigated promptly, and held confidentially. Release of information will be to only those with a business need to know. Moreover, we will not tolerate retaliation against any associate who reports workplace violence, potential threats of violence, and/or inappropriate behavior.

## Smoking

State and local laws regulate smoking practices in public buildings. To ensure we comply with these regulations and maintain a safe and comfortable working environment in all Rite Aid offices and facilities, familiarize yourself with the areas, if any, where smoking is either permitted or prohibited. Because Rite Aid may be subject to criminal and civil penalties for violations of applicable smoking laws, we must insist on strict adherence to this policy. Underage associates may neither smoke, nor purchase cigarettes while on the company's property. Associates violating any part of this smoking policy, including smoking in non-smoking areas, will be subject to disciplinary action.

## Rite Aid Policies and Procedures Manual

The Human Resources department develops, maintains, and distributes company policies and procedures dealing with Human Resources management activities, associate relations, and personnel policies. As a rule of thumb, these policies pertain to the company's work force (such as recruitment, employment classification, benefits, labor relations, EEO, etc.) or concern compliance with state and/or federal regulations. These policies are maintained in the Rite Aid publication titled "Policies and Procedures Manual, A Manager's Guide to Company Practices and Associate Relations." This manual should be considered the authoritative source of record for Rite Aid's company policies.

Each department, store, pharmacy, and facility manager has a copy of the Policies and Procedures Manual: A Manager's Guide to Company Practices

35

February 9, 2005

To whom it may concern:

As regards the incident cited on 2-5-05 may I preface it by addressing the antipathy between the accuser and myself. This animosity began when I started to refer to Ashnafi as a "freak" because of his behavior towards women (ie. inappropriately touching a female employee named Stacie Martin and propositioning female customers.) I am not certain whether or not these incidents were written up or not. But contact with Stacie Martin and fellow co-workers will bear this out as true. These incidents occurred to the best of my memory in late 2003, so for about 14 months I have been taunted by the accuser starting when his shift begins (usually 3PM) with his customary tongue wag, a lewd dance he does and with oscillating comments like "Mike, Mike looks hot." and "Mike I love you" or "Mike I'll bill you" The veracity of these statements can be attained. When my shift ends at 7PM I must also endure his taunts as I leave the building as he is usually outside from 7PM - 7.15PM.

On the day in question (2-5-05) the volume was a little bit heavier than usual due to a student conference taking place at the Hilton Hotel. The lines upstairs at the cash registers became heavy and consequently I was made to be

EXHIBIT 2

ALL-STATE LEGAL®

cashier longer than usual until my tech Chris Green arrived and then he was also made to cashier longer than usual. On a typical Saturday this isn't unusual it just seemed this way due to the lack of an efficient store manager on the premises. At about 1PM the accuser arrived for work and began picking up the boxes that had been delivered Thursday night and started with his "Milk, Milk Milk" taunts. I was too busy to pay much attention to him, but around 3PM I heard him (and Chris did also, as he asked me from the further terminal "what is he shouting about now?") When I did look the accuser was standing on the ramp doing his "tongue wag". At about 3:30PM I went to get a couple of sodas and saw the accuser about 20 feet in front of me and I motioned like I was going to catch him. I chased him for about 5 feet until he disappeared down aisle 13. I got my sodas and went back to the pharmacy. About 4PM I felt a little reflux in my stomach and thought that I might get sick.

I got a couple paper towels in case I got sick on the way and entered the

was in the back room. When I saw him in the back room I asked him "What do you have to say to me now?" Meaning, now that you have no where to run what taunts will you come up with? He immediately turned and sort of headed for the back of the room which was full of trash, boxes, milk crates, red totes, and other miscellaneous paraphenalia, I continued to approach him when he fell down, tripped, lost his balance or otherwise wound up with his back to me. When he turned around his nose was bleeding and some blood had entered his mouth. When he looked up at me I was shocked and he blew some of the blood out of his mouth and it got on my smock. I asked him to come into the bathroom so I could get some paper towels and soap and water and clean him up. He said "You are crazy, I'm going to have you arrested". I again asked him to come into the bathroom to get cleaned up and he threw about three milk crates at me. Then he took out his cell phone but didn't use it. He exited the back room and Donna Marie (a key carrier) and Shakia (a clerk) were on aisle 13. Donna Marie said to the accuser "Come on and we will fill out an incident report". He went back into

the pharmacy and to my surprise the accuser followed me back there also. He followed me back to the sink area where I thought he was going to let me clean his nose. But Donna Marie told him to get out of the pharmacy. and they went upstairs. The manager at the time, Macon, called me on the phone several minutes later and asked what happened. I told him the accuser fell in the back room. About 10 minutes later I was arrested (4:30 PM). I was processed and released at 6:30 PM) I was back in the pharmacy at 6:45 PM.

Mohd Chla

MICHAEL  CHECRA
2/9/05

— 1 ½ YRS

— ASANAFEI, Came in 1 PM.
    Has been taunting MIKE for 1 ½ yrs.

2/8/05

Does
Didn't he
expect every
would by him

STACIA MARTIN — AFANASHE touched her
                inappropriately

No proposition Cx.        Asks Associates
Carries $500 - 600 cash. if they would like
                                        it

Unfortunately
he fell
Low tone

✱ Mike called him Freak

Sticks his tongue out @ MIKE
MIKE going to kill you, MIKE I LOVE You

CHRIS
WITNESS  2/5/05 - Came in 1PM,
              Wagging tongue @ MIKE

✱   Makes moves to AFANASHER
    Mike said felt ill went to Bachroom.
    Asked Afanasher if he had something
    to say to say it now.
    Said fell down on MILK Crates.
    When he came up his nose was bloody

Donna + Shaqu'ra + Cris
WITNESS

offered to take him to Bathroom +
clean him up — Refused

Donna came, took Afanalee upstairs
to clean him up look @ him

Mike saying that he should have
blood on hand.

Wags his tongue

- Horseplay - admits fault          on and
- Gesture of CHASING ASSOCIATE   off 14
- MIKE CALLED HIM A FREAK          months
- 2/5/05 IF YOU HAVE SOMETHING To
  SAY THEN SAY TO MY FACE.

- Once a week
- Alfaneshi Runs away
- No one knew about this          —
- ~~intelligent students~~ Mike said
  Alfi hates him because he called him freak.
- Second hand info about Stacia Martin

Mike —

Chis / Harold witness Mike Checka
@ gesturing to chose

Bobby

**MIKE**    Mike said he would compensate
for the Injury
" Take it out of my bonus "

⊗ Unexcused absence

✱    Notes from Interview
w/ MIKE CHECKA w/
PDU ANAND SHAH present

1/10/05    DAVID CHRISTOPHER GREEN
RA STORE # 3845
PHARMACY INTERN

KNOWLEDGE OF INCIDENT ON 2/5/05
• I PERSONALLY DID NOT SEE THE INCIDENT
ON 2/5/05 BETWEEN MIKE CHEEKA AND
ASHENAFI 8 . I WAS RINGING UP
CUSTOMERS AT THE PHARMACY REGISTER.
I DON'T RECALL IF MIKE TOLD ME
IF HE WAS GOING TO THE BATHROOM
OR IF HE WOULD BE RIGHT BACK. SOMEHOW
MIKE AND ASHENAFI ENDED UP IN THE BACK
ROOM BY THE BATHROOMS. I HEARD A TOTE
FALL. THEN MIKE OUT FROM THE BACK, THEN
ASHENAFI WALKED OUT AFTER MIKE. MIKE
HAD BLOOD ON HIS JACKET AND TIE AND
ASHENAFI WAS BLEEDING AROUND HIS NOSE.
ASHENAFI MADE THREATENING REMARKS SAYING
HE WAS GOING TO GET MIKE. MIKE TOLD
ME THAT HE DID NOT PUNCH ASHENAFI. MIKE
SAID THAT HE LUNGED AT ASHENAFI AND ASHENAFI
DUCKED DOWN AND MAYBE HIT HIS NOSE ON
HIS KNEE OR THE TOTE. WHO KNOWS.



EXHIBIT
3
ALL-STATE LEGAL®

```
          HRMSAZ - ZAVINSKI, SCOTT A.              Message ID: 576468
From:     HRMSAZ - ZAVINSKI, SCOTT A.              Date Sent:  02/10/05
Subject:  STORE 3845, T. CHATMAN    Priority: 000  Time Sent:  19:07
```

Today I spoke to Tonya Chatman about her knowledge
of an incident between Ashenafi Alene and Mike Checka
at store 3845 on 2/5/05.

Tonya stated that she was on duty that day and was
on the 2nd floor of the store when when she saw
Ashenafi coming towards the one hour photo counter
with blood on his nose and hands.  She said she asked
him what happened and her told her that Mike punched
him in the face.  She said she asked him twice if he
provoked Mike in any manner to warrant such actions.
She said he stated both times that he did nothing to Mike.

```
F1=Help      F2=Answer     F3=End      F4=Transfer  F5=Defer     F6=Readnext
F7=Up        F8=Down       F9=Top      F10=Bottom   F11=Delete   F12=More...
```

SYSM Unread/Deferred Message Review _____ 3.1
ZAVINSKI, SCOTT A.                                19:08 - Thu, Feb 10, 2005
Select Key/Command:

          HRMSAZ - ZAVINSKI, SCOTT A.              Message ID: 576468
From:     HRMSAZ - ZAVINSKI, SCOTT A.              Date Sent: 02/10/05
Subject:  STORE 3845, T. CHATMAN      Priority: 000   Time Sent: 19:07


Tonya stated that this was very alarming as she never
knew of any problem between Ashenafi and Mike.  She said
the only things she has ever witnessed Ashenafi do was
to carry boxes down aisles where she may work and by
"playing around" he attempts to get in her way.  She said
she is not offended by this at all.

She said that the only behavior she does not like from Mike
is when on delivery days, he throws empty boxes over the
pharmacy counter onto the salesfloor towards the backroom.
She says no one else does this and the boxes end up being
picked up by her or others from the salesfloor and taken

F1=Help      F2=Answer      F3=End        F4=Transfer  F5=Defer      F6=Readnext
F7=Up        F8=Down        F9=Top        F10=Bottom   F11=Delete    F12=More...

```
                          SYSM Unread/Deferred Message Review                    3.1
ZAVINSKI, SCOTT A.                                    19:08 - Thu, Feb 10, 2005
Select Key/Command:


            HRMSAZ - ZAVINSKI, SCOTT A.              Message ID: 576468
From:       HRMSAZ - ZAVINSKI, SCOTT A.              Date Sent:  02/10/05
Subject:    STORE 3845, T. CHATMAN        Priority: 000    Time Sent:  19:07

to the trash disposal area.


Scott Zavinski
HR Mgr
Region 60

Sent to:  HRMSAZ               ZAVINSKI, SCOTT A.              (to)
* * *        End of Message          * * *
```

2/10/05

```
F1=Help        F2=Answer      F3=End       F4=Transfer   F5=Defer       F6=Readnext
F7=Up          F8=Down        F9=Top       F10=Bottom    F11=Delete     F12=More...
```

1

```
********************************************************************
*** REQUESTOR: HRMSAZ - ZAVINSKI, SCOTT A.    RGN 60           ***
********************************************************************
***                S Y S M   I N B A S K E T   P R I N T        ***
```

MESSAGE ID: 639461TE    DATE: 03/14/05  TIME: 09:58    PRIORITY: 000

TO:        HRMSAZ - ZAVINSKI, SCOTT A.
           HUMAN RESOURCES MGR.
           RGN 60

FROM:      HRMSAZ - ZAVINSKI, SCOTT A.
           HUMAN RESOURCES MGR.
           RGN 60

SUBJECT:   STORE 3845/H. VIZIAN


*** Original Author:  HRMSAZ - ZAVINSKI, SCOTT A.; 02/15/05 16:58


Today I spoke with Rx Tech Harold Vizian of store 3845
to discuss an incident involving Ashenafi Alene and
Michael Checka of store 3845.  Harold stated that he had
heard of an incident but was not working that day.
I asked him if he had witnessed either Michael or Ashenafi
harrassing one another on previous occasions.
Harold stated that he knows of the two to taunt one another
on occasion.  He said Michael has gestured to chase after
Ashenafi but only after Ashenafi sticks his tongue out at
Michael.  He said that is about the only thing he knows of.

Scott Zavinski
HR Mgr, Reg.60

```
3/10/05  14:44:41       Display Employee Basic D        PRDMSD   PRDMSD
Employer  . . . :  AAA  RITE AID U.S. STORE OPS          Page 1 of 6
Employee  . . . :       951501
                         Personal Information
Last Name  . . . :  VIZIAN            Suffix  . . . . :
First Name  . . :   HAROLD            Common Name . . :  HAROLD
Middle Initial  . : D                 Middle Name . . :
Birth Name  . . :                     Name Title  . . :
Address  . . . . :  4716 BRADLEY BLVD
(Line 2)  . . . :  APT 105
City/Town  . . . :  CHEVY CHASE
State/Province  . : MD                County  . . . . :  24031
Postal Code  . . :  20815-6323        User Field 1  . :
Country  . . . . :  USA               User Field 3  . :
Foreign Post Code
Foreign St/Prov :
Home Tel. No. . :   301.652.3045      Date of Birth . .  8/09/1973
Tax ID  . . . . :   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       Date of Hire  . .  2/05/2000
Sex . . . . . . :   M                 Adjusted D.O.H. . :
Location  . . . :   03845
DIVISION  . . . :   00003             DISTRICT  . . . :  00003
REGION  . . . . :   00060             STORE     . . . :  03845
F3=Exit   F5=Code Descriptions    F10=Access   F12=Previous
```

(phone
Interview w/ Harold)

2/15/05
Not there, when happened
has seen Ashingt.
Stick his tongue out
@ Mike

1

```
                    SYSM Unread/Deferred Message Review _____ 3.1
ZAVINSKI, SCOTT A.                              16:58 - Tue, Feb 15, 2005
Select Key/Command:

    :      HRMSAZ - ZAVINSKI, SCOTT A.         Message ID: 639461
From:      HRMSAZ - ZAVINSKI, SCOTT A.         Date Sent: 02/15/05
Subject:   STORE 3845           Priority: 000  Time Sent: 16:58
```

Today I met with associate Ashenafi Alene of store 3845
to discuss an incident involving him and pharmacist
Michael Checka of store 3845.  Ashefani has stated that
he was punched in the face by Michael Checka on 2/5/05
at the store in the stores backroom/restroom area,
a location for associates only.

I asked Ashenafi why Michael would do such a thing to
him and he did not know why.  I informed Ashenafi that
during my investigation of this incident that reports have
been made to me by associates that Ashenafi sticks his
tongue out at associates, whispers I love you to female

```
F1=Help      F2=Answer    F3=End     F4=Transfer F5=Defer     F6=Readnext
F7=Up        F8=Down      F9=Top     F10=Bottom  F11=Delete   F12=More...
```

SYSM Unread/Deferred Message Review _____ 3.1

ZAVINSKI, SCOTT A.                                16:58 - Tue, Feb 15, 2005
Select Key/Command:

    :        HRMSAZ - ZAVINSKI, SCOTT A.              Message ID: 639461
from:        HRMSAZ - ZAVINSKI, SCOTT A.              Date Sent:  02/15/05
Subject:     STORE 3845               Priority: 000   Time Sent:  16:58

associates and has inappropriately touched female
associates on occasion.

At this time I am advising Ashenafi that I need to complete
an investigation on these allegations against him.  I also
am advising him that I will need a translator to assist me
in speaking to Ashenafi in his native language of Maharic,
in order to complete the investigation.  Until I am able
able to find an individual I am comfortable in assisting
me I am advising Ashenafi that he will be returned to work
and is expected to follow company policy in regards to
harrassment in the workplace. If he violates this policy
then he will be subjected to disciplinary action up to and

F1=Help     F2=Answer    F3=End      F4=Transfer  F5=Defer     F6=Readnext
F7=Up       F8=Down      F9=Top      F10=Bottom   F11=Delete   F12=More...

1

```
                    SYSM Unread/Deferred Message Review                3.1
ZAVINSKI, SCOTT A.                                    16:58 - Tue, Feb 15, 2005
Select Key/Command:

   :       HRMSAZ - ZAVINSKI, SCOTT A.            Message ID: 639461
From:      HRMSAZ - ZAVINSKI, SCOTT A.            Date Sent: 02/15/05
Subject:   STORE 3845                 Priority: 000  Time Sent:  16:58

including termination.  The policy on this subject is
posted in the Store Managers office at Store 3845 and is
visible to all associates.


Scott Zavinski                    Stephen Komm
HR Mgr, Region 60                 Store Manager, Store 3845

Sent to:  HRMSAZ                  ZAVINSKI, SCOTT A.          (to)
* * *        End of Message       * *

F1=Help      F2=Answer   F3=End      F4=Transfer  F5=Defer    F6=Readnext
F7=Up        F8=Down     F9=Top      F10=Bottom   F11=Delete  F12=More...
```

REFUSED TO SIGN

* I have also asked Ashenafi to provide me with a written statement in his words about the incident on 2/5/05 and the other allegations

* I have given Ashenafi a copy of the policy on harassement in the workplace.

* Additionally Ashenafi has stated that he does not wish to Return to work until he visits his doctor for a follow up visit on 2/23/05. HE is visiting the doctor as a result of the injury he claims to have been obtained when Mike CHECKa allegedly punched him. Ashenafi will call Steve Komm when he is Released to Return to work.

February 10, 2005

To whom it may Concern:

This letter is to verify that on February 5, 2005 Saturday, at approximately 3:00 I saw mr. Ashraf come from out of the back where the Employee Restroom are and he was covered with blood, from nose and mouth. he told me that the Pharmacist had Punched him and that's when Micheal Chekea came from the back also and his vest was covered with blood.

the blood on the vest was like spots not wiped blood. I turned to the pharmacy tech and said oh my God whats going on.

Mr. Cheekea went behind the Pharmacy counter to wash his hands at that Time Ashrafi jumped over the Pharmacy Counter, thats when I advised him to come with me so that we could make an incident report. Mr. Ashrafi then came and I took him up stairs so that mr. Mukund Could do a report. thats when ashrafi said call the Police. fortunately there was

1

an Police in the Store and he came and to a Report of the incident thats in Question, after that I left and continued my shift. at

which time ashanafi was taken to the hospital and mr. Checka was arrested,

on several accasions there have been times when ashanafi and mr. Checka have had verbal, expressions with each other, but it has never come to this, where some one has gotten hurt before.

Thank you
Ms. DonnaMaria Brown
Shift Supervisor

1

```
                         SYSM Unread/Deferred Message Review _____ 3.1
ZAVINSKI, SCOTT A.                                    13:15 - Thu, Feb 10, 2005
Select Key/Command:


              HRMSAZ - ZAVINSKI, SCOTT A.           Message ID: 568744
From:         HRMSAZ - ZAVINSKI, SCOTT A.           Date Sent: 02/10/05
Subject:      STORE 3845/S. MARTIN     Priority: 000  Time Sent: 13:15
```

I spoke with Stacia Martin (former associate of store 3845)
now active associate at store 5360.

Her name was given to me from Michael Checka on 2/9/05
in which he stated he had been exposed to hearsay that
Stacia had been harassed by associate Ashenafi Alene
of store 3845.

I spoke to Stacia on 2/9/05 with PDM Anand Shah present
via the telephone.  Stacia stated that she was a salesfloor
associate at store 3845 in November of 2003 at which time
she said Ashenafi approached her from behind when she was

```
F1=Help      F2=Answer     F3=End       F4=Transfer  F5=Defer     F6=Readnext
F7=Up        F8=Down       F9=Top       F10=Bottom   F11=Delete   F12=More...
```

( (

SYSM Unread/Deferred Message Review _____ 3.1
ZAVINSKI, SCOTT A.                                13:15 - Thu, Feb 10, 2005
Select Key/Command:

        HRMSAZ - ZAVINSKI, SCOTT A.              Message ID: 568744
From:   HRMSAZ - ZAVINSKI, SCOTT A.              Date Sent:  02/10/05
Subject:  STORE 3845/S. MARTIN    Priority: 000  Time Sent:  13:15

working setting a seasonal aisle and put his arms around
her from behind her and groped her.  Stacia said that
she reprted this to shift supervisor Arazell Rowe.  She said
that Arazell told her not let the incident get to her.  She said
that she did not tell anyone else about the incident and
apparently Arazell did not report such to anyone else.
I asked her if she reported this to anyone else and she said
she did the bext to keep it to herself.

Stacia stated that from 1/04 to 5/04, Ashenafi was intimidating,
rude and personally antagonized her and others at the pharmacy.
She said he would intentionally walk down aisles she was working
in with debris/garbage and ask her to move out of the way.

F1=Help       F2=Answer     F3=End       F4=Transfer  F5=Defer     F6=Readnext
F7=Up         F8=Down       F9=Top       F10=Bottom   F11=Delete   F12=More...

```
                          SYSM Unread/Deferred Message Review _____ 3.1
ZAVINSKI, SCOTT A.                                    13:15 - Thu, Feb 10, 2005
Select Key/Command:


            HRMSAZ - ZAVINSKI, SCOTT A.            Message ID: 568744
From:       HRMSAZ - ZAVINSKI, SCOTT A.            Date Sent:  02/10/05
Subject:    STORE 3845/S. MARTIN      Priority: 000  Time Sent:  13:15
```

She said that that he would stick his tongue out at her and
others in the pharmacy, call out associates names in the
pharmacy when they were busy working, and basically trying
to get under their skin.

Additionally she said she would tell him to leave the area
and that she was fully aware that he had propositioned
women (she mentioned the names of Tonya and Shakia).

Scott Zavinski
HR Mgr, Reg. 60

```
Sent to:  HRMSAZ              ZAVINSKI, SCOTT A.           (to)

F1=Help       F2=Answer    F3=End        F4=Transfer  F5=Defer    F6=Readnext
F7=Up         F8=Down      F9=Top        F10=Bottom   F11=Delete  F12=More...
```

*[handwritten signature]* 2/10/05

*[handwritten notes]* Arazell Rowe denied that Stacia had reported such conduct to her. She said it may have seen Sherry (Former Asst. MGR)

*[handwritten signature]* 2/10/05

2/10/05

Ashenafi as an employee he likes to taunt people in a sexual manner by sticking out his tongue and tries to whisper I love you I love you in your ear. On one occasion last year I was walking past him and he touches me in a sexual way which makes me feel really uncomfortable working in the same environment with him. I reported this matter to Steve. Two employees complain to me about him touching them which causes them to quit this job.

AHEXEH

1

2/5/05

From: Stephen Kemon
Manager - 3845

RE: Incident on 2/5/05

The two managers on duty during 2/5/05 where Donna Brooks and Mukund Kornik. Both gave me accounts as follows:

Ashenafi Alene came from the back of store with a nose/face that was bleeding. He stated to them that Mike Checka had punched him. Mike stated to Donna and Mukund that Ashenafi fell in the restroom. It was noted that Mike had blood on his lab coat.

Stephen Kemon
2/5/05

1

MUKUND —            3  4/1/05

Athenafi came to him on 2/5/05. Said Mike Chelka punched him in the face. Saw him in the office. Said police then arrived.

Said he called mike on the phone (to pharmacy) Mike said he felt Athenafi fell down. Then Mike told him he may have hit him

Said he called mike on the store phone (office to Rx). Asked him what happened. Mike said Athenafi fell in bathroom. Mukund said he was told he punched him. Mike told him he may have hit him. He was not sure. Mukund said he has never seen Mike or Athenafi fighting or yelling at each other at anytime. Said he has never received any complaints



INTERVIEW NOTES
w/ ASSOCIATE MUKUND KARNIK

```
_____ SYSM Unread/Deferred Message Review _____ 3.1
ZAVINSKI, SCOTT A.                                       15:02 - Thu, Feb 10, 2005
Select Key/Command:


          HRMSAZ - ZAVINSKI, SCOTT A.             Message ID: 571578
From:     HRMSAZ - ZAVINSKI, SCOTT A.             Date Sent:  02/10/05
Subject:  STORE 3845, S. CARMICHAEL     Priority: 000   Time Sent:  15:02
```

Today I spoke with Shakia Carmichael of store 3845
in regards to her knowledge of an incident between
Pharmacist Mike Checka and cashier Ashenafi Alene
that occurred on 2/5/05.

Shakia stated that she was going to the 2nd floor of
the store when she saw Ashenafi on the salesfloor with
a bloody nose and blood on his hands.  She was told by
him that Mike Checka  punched him in the face.
Shakia stated she did not witness any such thing.


```
F1=Help      F2=Answer     F3=End       F4=Transfer   F5=Defer      F6=Readnext
F7=Up        F8=Down       F9=Top       F10=Bottom    F11=Delete    F12=More...
```

```
_____ SYSM Unread/Deferred Message Review _____ 3.1
ZAVINSKI, SCOTT A.                              15:02 - Thu, Feb 10, 2005
Select Key/Command:


           HRMSAZ - ZAVINSKI, SCOTT A.           Message ID: 571578
From:      HRMSAZ - ZAVINSKI, SCOTT A.           Date Sent:  02/10/05
Subject:   STORE 3845, S. CARMICHAEL   Priority: 000   Time Sent:  15:02
```

She said Ashenafi went upstairs with Donna Brooks
after that.  She said that she nver saw either
Mike or Ashenafi fighting before and was surprised
of the news.  She said she has never had any problems
w/ Ashenafi and likes him as a friend/co-worker.
She said she does not interact much with Mike.

She said that she finds it hard to believe that Ashenafi
fell in the backroom as he was covered with too much
blood.  She said she with the news of the event she would
be concerned with Mike coming back to work at the store.


```
F1=Help      F2=Answer     F3=End      F4=Transfer  F5=Defer    F6=Readnext
F7=Up        F8=Down       F9=Top      F10=Bottom   F11=Delete  F12=More...
```

1

```
_____ SYSM Unread/Deferred Message Review _____ 3.1
ZAVINSKI, SCOTT A.                              15:03 - Thu, Feb 10, 2005
Select Key/Command:


          HRMSAZ - ZAVINSKI, SCOTT A.            Message ID: 571578
From:     HRMSAZ - ZAVINSKI, SCOTT A.            Date Sent:  02/10/05
Subject:  STORE 3845, S. CARMICHAEL    Priority: 000   Time Sent:  15:02

Scott Zavinski
HR Mgr
REG 60

Sent to:  HRMSAZ                  ZAVINSKI, SCOTT A.          (to)
* * *       End of Message        * * *
```

```
F1=Help     F2=Answer   F3=End      F4=Transfer  F5=Defer      F6=Readnext
F7=Up       F8=Down     F9=Top      F10=Bottom   F11=Delete    F12=More...
```

2/10/05

1

```
_____ SYSM Unread/Deferred Message Review _____ 3.1
ZAVINSKI, SCOTT A.                                          09:48 - Wed, Jul 21, 2004
Select Key/Command:

         HRMSAZ - ZAVINSKI, SCOTT A.                 Message ID: 793131EEE
  From:  HRMSAZ - ZAVINSKI, SCOTT A.                 Date Sent: 07/20/04
  Subject: STEVE OBIDIKE            Priority: 999    Time Sent: 21:33
```

The conclusion to this investigation is that
Steve has been spoken to about allegations of
verbal and physical harrassment towards other
associates between 10/2003 and 6/2004.
6/2003 23

At this time Steve is being made aware that any
future behavior will result in immediate termination
of employment from Rite Aid.  Steve is to act as
a professional pharmacist and conduct himself in
the best behavior in the presence of associates
and customers.

```
F1=Help      F2=Answer      F3=End        F4=Transfer  F5=Defer     F6=Readnext
F7=Up        F8=Down        F9=Top        F10=Bottom   F11=Delete   F12=More...
```



EXHIBIT
4
ALL-STATE LEGAL

```
_____ SYSM Unread/Deferred Message Review _____ 3.1
ZAVINSKI, SCOTT A.                                    09:48 - Wed, Jul 21, 2004
Select Key/Command:


        HRMSAZ - ZAVINSKI, SCOTT A.            Message ID: 793131EEE
From:   HRMSAZ - ZAVINSKI, SCOTT A.            Date Sent:  07/20/04
Subject: STEVE OBIDIKE           Priority: 999 Time Sent:  21:33


Steve has reviewed the companies policy on
Harrassment in the Workplace and such will
be noted and included in his personnel file.

WITNESS:    SCOTT ZAVINSKI (HRM)    Scott Zavinski ·    7/21/04

            ANAND SHAH    (PDM)     _____    7/21/04

ASSOCIATE:  STEVE OBIDIKE           Steve O. Obidike    7/21/04

Sent to:  HRMSAZ                ZAVINSKI, SCOTT A.         (to)
* * *      End of Message        * * *

F1=Help      F2=Answer     F3=End      F4=Transfer  F5=Defer     F6=Readnext
F7=Up        F8=Down       F9=Top      F10=Bottom   F11=Delete   F12=More...
```

```
_____ SYSM Unread/Deferred Message Review _____ 3.1
ZAVINSKI, SCOTT A.                                 09:48 - Wed, Jul 21, 2004
Select Key/Command:


        HRMSAZ - ZAVINSKI, SCOTT A.              Message ID: 793030E
From:   HRMSAZ - ZAVINSKI, SCOTT A.              Date Sent:  07/20/04
Subject: STEVE OBIDIKE              Priority: 999   Time Sent:  21:32
```

On 7/21/04, Scott Zavinski (HRM), Anand Shah (PDM)
and Stve Obidike (Rph) of region 60 met to discuss
the investigation of allegations against Steve.

An allegation was made about him by Angela Nwosu
on 06/15/04 in which she claimed Steve grabbed her
by the arm and pushed her to the side in the pharmacy
at store 2653.  Steve denied such actions.

An allegation was made by Esther Ajua on 6/10/04
in which he insulted Esther by calling her stupid.
Steve denied this incident.

```
F1=Help      F2=Answer     F3=End      F4=Transfer  F5=Defer    F6=Readnext
F7=Up        F8=Down       F9=Top      F10=Bottom   F11=Delete  F12=More...
```

```
_____ SYSM Unread/Deferred Message Review _____  3.1
ZAVINSKI, SCOTT A.                                      09:48 - Wed, Jul 21, 2004
Select Key/Command:

         HRMSAZ - ZAVINSKI, SCOTT A.                     Message ID: 793030E
ʀ.om:    HRMSAZ - ZAVINSKI, SCOTT A.                     Date Sent: 07/20/04
Subject: STEVE OBIDIKE                    Priority: 999  Time Sent: 21:32
```

Steve was questionned about another allegation made
by Mgr James Felix in which Steve was heard to have
sworn to other associates in the store on a few
occasions.  Steve denied swearing at others.

Steve was spoken to about another allegation made
by former intern Tim Betton in which Steve verbally
harrassed in the pharmacy at Store 2653 on 6/20/03.
Cynthia Willis (PDM) spoke to Steve about his manners and
advised him that the company does not tolerate such
behavior and further behavior would result in

```
F1=Help      F2=Answer    F3=End      F4=Transfer  F5=Defer     F6=Readnext
F7=Up        F8=Down      F9=Top      F10=Bottom   F11=Delete   F12=More...
```

```
_____ SYSM Unread/Deferred Message Review _____ 3.1
ZAVINSKI, SCOTT A.                                    09:48 - Wed, Jul 21, 2004
Select Key/Command:


         HRMSAZ - ZAVINSKI, SCOTT A.               Message ID: 793030E
From:    HRMSAZ - ZAVINSKI, SCOTT A.               Date Sent:  07/20/04
Subject: STEVE OBIDIKE          Priority: 999      Time Sent:  21:32

disciplinary action up to and including termination.
This was presented to Steve on 7/21/04 and
he responded as such:

Sent to: HRMSAZ                  ZAVINSKI, SCOTT A.          (to)
* * *         End of Message          * * *
```

— STEVE SAID THE INCIDENT DID NOT OCCUR 8Z

— STEVE SAID TIM BETTON HAD INSULTED HIM 8Z

— STEVE SAID HE ASKED CYNTHIA WILLIS FOR

```
F1=Help     F2=Answer     F3=End      F4=Transfer  F5=Defer     F6=Readnext
F7=Up       F8=Down       F9=Top      F10=Bottom   F11=Delete   F12=More...
```

TRANSFER OUT OF 2653 8Z

_S. Zavinski_ 7/21/04

1 8 2

```
**********************************************************************
*** REQUESTOR: HRMSAZ - ZAVINSKI, SCOTT A.      RGN 60              ***
**********************************************************************
***               S Y S M   I N B A S K E T   P R I N T            ***
```

MESSAGE ID: 574097      DATE: 07/05/04  TIME: 11:21    PRIORITY: 000

TO:       HRMSAZ - ZAVINSKI, SCOTT A.
          HUMAN RESOURCES MGR.
          RGN 60

FROM:     HRMSAZ - ZAVINSKI, SCOTT A.
          HUMAN RESOURCES MGR.
          RGN 60

SUBJECT:   STORE 2653 (COMPLAINT)


Jayne,


The following is an investigation to date of an incident
at Store 2653.  Rx tech Angela Nwosu filed a complaint
against Rph Chukwuemeka "Steve" Obidike on 6/15/04 in
which she claims he grabbed her by the left forearm/bicep
area and pushed her aside causing her to fall against
the wall in the pharmacy area.

The incident under investigation was reviewed by
PM Clif Wetsel, DM Mark Dryden, PDM Anand Shah and
store Mgr James Felix.  Statements have been obtained
from Angela, James, Security Guard Eugen Brown.
In addition, two other statements are available regarding
Steve's actions on other dates from Rx tech Esther Ajua
and former intern Timothy Betton.

These statements have been faxed to your attention.

The main body of the compaint was that Angela stated
that Steve grabbed and pushed her (no witnesses) and
contacted James Felix.  DM Mark Dryden was then notified.
The Washington DC police were called by Angela and she
filed assault charges against Steve.  Steve was arrested
and removed by the police.  His case was dropped two days
later.  Steve was interviewed by Mark Dryden, Anand Shah
and myself on 6/21/04.  He denied grabbing and pushing
Angela and claims the story was fabricated.  He said
Angela and Esther would make up stories about him and
report such to his supervisors.  He said he feels discriminated
against as other Nigerian pharmacists are not treated in
such manner.  He said he appeared in court and the case was
dismissed.  Steve was then suspended until 6/27/04 pending
an investigation.

2 of 2

Information was obtained from Mark Dryden about an incident involving a confronation between Tim Betton and Steve June of 2003. No discplinary action was taken against Steve. I had not heard of the incident until 6/25/04.

In addition, PDM Cynthia Willis stated to me that she was called by the store in October 2003 over arguments Steve was having with Angela Nwosu. Cynthia stated she told Steve in person that we do not tolerate harrassment of any type and further violations would involve disciplinary action up to and including termination. Cynthia stated the incident involved Steve arguing with Angela and Tim and she had two letters stating such written by customers. These letters have not been located.

The incident between Esther and Steve occurred on 6/10/04. Esther reported to Anand that Steve had insulted her. This was also reported in writing to James Felix on 6/12/04. This incident was reviewed with Steve on 6/21/04 in which he denied insulting Esther.

Incident reports from Eugene Brown were obtained and written on 6/14/04. The incidents occurred on 4/15/04 and 6/15/04. Eugene did not witness any incidents but locuemented such.

James Felix documented the incident on 6/15/04 and stated that he had heard Steve tell the police that he had grabbed Angela. James also made note that Steve would bump into associates (male) intentionally. Such associates could not be identified. Also, James stated that Steve would swear in his presence and swore at Esther Ajua.

Both Clif Wetsel and myself have been at the store to speak to the associates involved and have not found any other associates with additional information to report or complaints on Steve. Steve has returned to work and pending the outcome of the investigation will not be scheduled to work at store 2653.

Scott

Sent to:   HRSWML                LECLAIR, WAYNE            (to)
           HRMSAZ                ZAVINSKI, SCOTT A.        (to)

1 of 4

Jun 21, 2004

I Angela Nwosu Pharmacy technician for Rite Aid at store #02653. The pharmacist Steve, was already in the pharmacy before me at the time, I arrived to work on Monday June 15 2004 at 9:00 – 9:05 Am. Two customers came in and we helped them and they left. After the two customers had gone, the pharmacist went to the back of the pharmacy to eat his breakfast as he normally do almost every morning for about 20-30 minutes. After he had finished eating, he brought out a small to medium size box and sat down at the counseling window and was reading a phamphlet containing instructions on how to operate what was in the small box. At this point of time no customer has come to the pharmacy yet. But there was many phone calls

2 of 4

both from doctors an customers
calling in refills. The pharmacist
sat down for about 30-35 minutes
reading the ~~scr~~ ~~pham~~ pamphlet.
After that he opened the small
box had brought out a small to medium
size radio and plugged it on. He
then turned the radio on, it was
very loud, he then ~~started~~ to scan
the radio channel. At this point
of time I did not say anything
but in my mind I was thinking
that he had just bought a new
radio and was testing it to
see if it was working properly.
So, I continued with my job
counting the prescriptions he had
filled earlier. When he left the
radio on at 95.5 Fm. And the
song that was being sang was
one of Bobby Brown's song
~~say~~ saying that " It feels good,
it feels good ya---". That was
when I told him the pharmacist
that the PBM forbids playing radio

3 & 4

in the pharmacy. But the
Pharmacist ignored my saying.
I waited for a few minutes
and then told him to turn the
volume down ~~a little bit~~ but
he also ignored me. About
10:15am I called the assistant
manager Frank and he came. I told
him to please tell the pharmacist
to turn down the volume of the radio.
~~Frank~~ said he will go and ~~get James~~
the main store manager. While, he ~~had~~
~~was~~ gone to get James. A customer
called for a refill but because the
radio was so loud, I could not
understand the customer properly.
So, I went over where the radio
was to turn it down so, that I
could hear the customer, the
pharmacist grabed me by my upper
arm and fling me so hard that
I fell against the wall. That was
when I paged the manager and
ran out of the pharmacy department.

4 of 4

After the pharmacist grab my
arm he told me to get
out off his face ~~is~~
or he will hurt me. This
he said in my language

Angela Rudder

June 16, 2004

1 of 1

**To whom it may concern:**

On June 15, 2004 approximately 10:30 am I was working in the backroom of the store when I overheard a page from Angela Nwosu. She was requesting a manager to pharmacy. My assistant manager motioned to me that he would take care of it. He soon came back to me and said that I needed to go to the RX that there was a problem between Steve and Angela regarding the radio being too loud. As I started to walk to the Pharmacy Angela came storming out of the Pharmacy crying hysterically and holding her arm. When I asked her what happened she stated" Steve grabbed my arm and pushed me down". She also asked me can she call the police and I told her it was her right. We went to the office and I took a picture of her arm and it was very red. She then proceeded to talk to Mark Dryden and she later called the police. The police then showed up about 15 minutes later and interviewed Angela and she told them the story and they next went to talk to Steve. Before the police left the office the officer told me I should follow them to the back because they would probably be arresting Steve. As they asked him the questions about what happened he stated that Angela put her hand on his property and he grabbed her arm and pushed her away. He said she had no right to touch his property. While listening to him I just thought about all the confrontations that Steve has had with fellow employees including myself. I had an occasion where Steve came in fro vacation and I was on the floor working my truck and he walked by swearing at me for no apparent reason. He has also recently had an occasion where he publicly swore at another RX technician and it was also involving the radio being too loud. Steve also has had several occasions where he has bumped into several male employees in a confrontational manner for no apparent reason.

\* Due to the fact that Steve Pushed Angela away
She fell down against the racking and hurt her side.

James Felix

James Felix

1 of 1

```
***********************************************************************
*** REQUESTOR: HRMSAZ - ZAVINSKI, SCOTT A.    RGN 60              ***
***********************************************************************
***            S Y S M   I N B A S K E T   P R I N T            ***
```

MESSAGE ID: 443794     DATE: 06/24/04  TIME: 16:14     PRIORITY: 000

TO:        HRMSAZ - ZAVINSKI, SCOTT A.
           HUMAN RESOURCES MGR.
           RGN 60

FROM:      LPMCW1 - WETSEL, CLIFTON
           LOSS PREVENTION MANAGER
           RGN 60

SUBJECT:   2653 WPV


I spoke to several people today regarding the workplace violence
issue at 2653.

Eugene Brown, security guard, did not witness anything first hand
however he did have 2 statements from Angela Nwosu. One is dated
5/14 and is a condensed version of her main statement you already have.
There is one minor discrepancy though between the one I got today
from the guard and the one you have. When describing where Steve
grabbed her, she states in one "on the upper arm" and on the other
"grabbed my hand". Probably just an oversight.

The other statement, and the same thing Esther Ajia told me today,
was really no more than a general complaint of Steve being rude
toward her and Angela and having an "attitude" with them.

James Felix did not have anything to really add to the grabbing
incident other than he was there when Angela came to him and
told him what happend. He did mention that when the police arrived
Steve admitted to grabbing her to the officer. It sounded like
James had a few incidents with Steve that were, in his opinion,
minor and did not get reported. These included an instance where
Steve was cursing out loud and James asked him what was wrong.
James stated that Steve continued to curse and he asked him to
stop.

My two cents are, none of these incidents happend where there was
another person to witness. If he admitted to the police then
there should not be a problem.

I'll see you Friday if you are at Beltsville.

Clif

Sent to:   SCOTT              <list>                    (to)


EXHIBIT
5
ALL-STATE LEGAL



Dear Consumer:

Thank you for contacting us regarding the disclosure of your consumer file. In response to your request, enclosed, please find our consumer disclosure materials. Please review all instructions and the "Summary of Your Rights" to assist you in returning all the required documentation. Your completion of Form CRD-001 "Request for Disclosure" gives us permission to disclose the information that we currently maintain in your consumer file. Please sign and mail the "Request for Disclosure", to the address specified in the instructions. Additionally, review the "Consumer Disclosure Instructions" items #1 and #2 to see if you are entitled to a **free** copy of your consumer file.

We are a consumer reporting agency that assembles and evaluates consumer information and reports that information to clients for the purpose of residential and employment screening. The information we maintain is gathered from sources such as public records and landlord-tenant court filings. Under the regulations of the Federal Trade Commission (FTC), the Fair Credit Reporting Act (FCRA), as amended by the Fair and Accurate Credit Transactions Act of 2003 (FACTA), we may disclose information about your credit, court, criminal and other related history to potential housing providers and employers whom you have authorized to access the information in your consumer file.

We are a reseller of some consumer information such as credit reports obtained from the three national credit reporting agencies. If you need assistance with your credit report, please refer to the "Obtaining Your Credit Report" section of the enclosed instructions.

Please note: To ensure your privacy, we are unable to discuss your consumer file with you unless we have a written disclosure request **and** sufficient information verifying your identity.

If you have any questions or comments with regard to this information, please do not hesitate to contact our automated Consumer Relations phone line at 1(800) 815-8664 or email us at: consumerrelations@FADVSafeRent.com.

Sincerely,


Consumer Relations Department

# EXHIBIT B

Michael P. Checka

Page 31

1    around that time?

2        A    Yes.

3        Q    And this indicates that your salary will

4    be $2,320 and it says /80.  Does that mean that that

5    was an 80 hour base for a two-week period?

6        A    Yes.

7        Q    And was that 2,320 per weekly or biweekly?

8        A    It must have been biweekly.

9        Q    Okay.  In the first paragraph of this

10   document it says "I agree to conform to the rules

11   and regulations of the company.  I have also both

12   the employee handbook and the security handbook."

13            Were you provided those documents at the

14   beginning of your employment?

15       A    Yes.

16       Q    And did you review them?

17       A    Yes.

18       Q    Were you provided updated copies of any of

19   those documents throughout your employment?

20       A    On occasion, I was asked to sign updates.

21   I don't know if I've signed 100 percent of them, but

22   occasionally, I was asked to.

**Michael P. Checka**

Page 32

1      Q      Okay.   The next sentence says "I

2  understand that each store has a store manual and

3  policies and procedures to which I will refer."

4             Was that accurate throughout your

5  employment with Rite Aid?

6      A      Is this intimating that there is a

7  store -- that each store has a book located

8  somewhere?

9      Q      Well, I guess that's what I'm asking you.

10  Did each store have a store -- have a policy and

11  procedures manual that was available to you to

12  refer?

13      A      As six of the eight years I spent with

14  Rite Aid were in management, I'm aware of no such

15  book.

16      Q      Okay.   What store were you working at when

17  you started with Rite Aid?

18      A      For the first four months of my

19  employment, I had no set store.   I would cover

20  vacations and rotate from store to store.

21      Q      What about after that?

22      A      My first full-time store with Rite Aid was

Michael P. Checka

Page 33

1     Fox Hall Square on New Mexico Avenue.

2          Q     What dates did you work at that store?

3          A     July '97 to July '98.

4          Q     Who was your supervisor during that time?

5          A     Mr. Seigal had a heart attack, and there

6     really wasn't another PDM that took over that spot.

7     A lot of people filled in.  I guess Linda Newman

8     would be the closest thing to a PDM back then.

9          Q     Was Mr. Seigal eventually replaced?

10         A     Yes.

11         Q     By whom?

12         A     Initially, Linda Newman.

13         Q     Okay.  And then after that?

14         A     Mike Hoover, then Jim Gavigan, then

15    Cynthia Willis, and then Anand Shah.

16         Q     And Mr. Shah was the PDM at the time of

17    your termination; is that right?

18         A     Yes.

19         Q     Which store did you go to after New Mexico

20    Avenue?

21         A     The Connecticut Avenue store.

22         Q     Was that transfer initiated by you or by

**Michael P. Checka**

1    Rite Aid?

2        A    By Rite Aid.

3        Q    For what reason?

4        A    It was becoming a 24-hour store, and since

5    most of my professional life has been spent in

6    24-hour stores, they thought I would fit well there.

7        Q    And that's store 3845; is that right?

8        A    Right.

9        Q    What was your position when you moved to

10   the Connecticut Avenue store?

11       A    Initially, it was a staff pharmacist.

12       Q    And did that change at some point?

13       A    In November of '99, I was made the

14   pharmacy manager.

15            MR. SCHROEDER:  Would you mark all three

16   of these, please.

17            (Checka Deposition Exhibit Numbers 6

18   through 8 were marked for identification.)

19            BY MR. SCHROEDER:

20       Q    Exhibit 6 is titled "Rite Aid Prescription

21   Department Manager's Duties."  Is that your

22   signature on the second page?

Michael P.  Checka

Page 35

```
1        A    Yes, that's my signature.

2        Q    Was this provided to you at the beginning

3   of your employment at Rite Aid?

4        A    Yes, it was.  I'm just curious as to why

5   it says "department manager" on it.  I wasn't yet

6   manager.

7        Q    Okay.  So you weren't the department

8   manager at that time?

9        A    Right.

10       Q    Okay.  Exhibit 7 and 8 are job

11  descriptions titled "Pharmacist and Pharmacy

12  Manager."  Were these documents provided to you

13  during your employment with Rite Aid?

14       A    No.

15       Q    Could you review Exhibit 7 and tell me if

16  it's an accurate description of the staff pharmacist

17  position?

18            MR. CONDON:  Can I ask you to clarify,

19  Ted, at the top, if I'm looking at the right

20  exhibit, it says -- oh, reports to pharmacy manager.

21  I'm sorry.  I withdraw.

22            MR. SCHROEDER:  Okay.
```

Michael P. Checka

Page 56

1   would be able to do every night.

2        Q    I take it that you typically did not work

3   the night shift; is that correct?

4        A    No.  Typically 7:00 to 7:00 weekdays and

5   8:00 to 8:00 weekends.

6        Q    Did you keep copies of performance reviews

7   you received at Rite Aid?

8        A    No.

9        Q    Prior to your termination, had you ever

10  been disciplined for any reason?

11       A    No.

12       Q    Had any of your managers or co-workers

13  ever complained to you about any aspect of your job

14  performance?

15       A    One of the nighttime pharmacists, Saba,

16  thought I was being a little too hard on her, but

17  that was all.

18       Q    Did you ever discuss that with your

19  supervisor?

20       A    Yeah.  I raised that concern to

21  Mr. Gavigan and Mr. Shah, yes.

22       Q    And what was their response?

**Michael P.  Checka**

Page 57

1      A    That they would speak to her privately.

2      Q    And did they, to your knowledge?

3      A    Yes.

4      Q    And was that the end of it then?

5      A    No.  It was an ongoing problem.

6      Q    Okay.  Any other complaints you received

7   from co-workers or supervisors?

8      A    No.

9      Q    Prior to your termination, had you ever

10   raised any complaints to management about employees

11   in the pharmacy other than the pharmacists who

12   worked directly for you?

13     A    Just basically Greg Jackson when I thought

14   he was stealing from the pharmacy.

15     Q    Okay.  Anyone else?

16     A    No.  None that come to mind.

17          MR. SCHROEDER:  Why don't we take a

18   five-minute break?

19          MR. CONDON:  Okay.

20          (Brief Recess.)

21          (Checka Deposition Exhibit Number 12 was

22   marked for identification.)

Michael P. Checka

1              BY MR. SCHROEDER:

2        Q    I'm showing you what's been marked as

3   Exhibit 12.  Have you ever seen this document

4   before, Mr. Checka?

5        A    No, I haven't.

6        Q    Okay.  I think you said Linda Newman was

7   the PDM; is that correct?

8        A    Yes.

9        Q    Who is James Watson?

10       A    That was the pharmacy manager at the Fox

11  Hall Square pharmacy.

12       Q    This document has a date of December 24th,

13  1997?

14       A    Yes.

15       Q    Were you working at that store at that

16  time?

17       A    Yes.

18       Q    And would Mr. Watson have been your

19  supervisor then?

20       A    Yes.

21       Q    Now, the message here at the bottom has

22  the name of someone named Ibrahim.  Do you know who

**Michael P. Checka**

Page 59

1    that individual was?

2        A    He was a pharmacy tech at the Fox Hall

3    Square store.

4        Q    Okay.  Did you ever have any problems with

5    him when you worked there?

6        A    None that I can recall, no.

7        Q    Okay.  Now, on this list it says -- No. 8

8    on this list it says "If you are planning or

9    thinking of sending some tech of black origin to

10   this store, you better not do it because he or she

11   is not going to survive."

12            Do you have any idea what he's referring

13   to?

14       A    None whatsoever.

15       Q    Did anyone at that store ever indicate to

16   you that there was a complaint about you dealing

17   with African-American employees?

18       A    No.

19       Q    Okay.  Did you ever feel like you had a

20   problem dealing with African-American employees?

21       A    Not once.

22       Q    Okay.  Did you ever have any particular

Michael P. Checka

Page 60

1    problems with this Ibrahim?

2        A    I believe once he took my pen and I asked

3    for it back since it was the only pen that I had at

4    that moment, and he was rather upset by that.

5        Q    Okay.  Anything else?

6        A    No.

7        Q    Did anyone in management ever discuss this

8    document with you?

9        A    No.  This is the first I've seen of it.

10       Q    Or any of the complaints that were raised

11   in this document?

12       A    No.

13            (Checka Deposition Exhibit Number 13 was

14   marked for identification.)

15            BY MR. SCHROEDER:

16       Q    Have you seen Exhibit 13 before?

17       A    I don't recall it.

18       Q    Is that your signature at the bottom?

19       A    That's my signature.

20       Q    Okay.  And did you complete this document

21   or was it completed by someone else?

22       A    No, I completed this.

**Michael P. Checka**

Page 66

1    company policy when you were employed with Rite Aid?

2       A    Yes, I did.

3       Q    Turn to Page 24, please.  Page 24 has a

4    heading "Standards of Conduct."  And in the second

5    paragraph it says "The following is a partial list

6    of infractions that may result in corrective action

7    up to and including immediate discharge," and

8    there's a bullet point list.  The third bullet point

9    says "fighting, throwing things, participating in

10   horseplay, playing practical jokes or exhibiting

11   other disorderly conduct that may endanger the

12   well-being of any associate or customer on the

13   company's premises or while working."  Do you see

14   where I'm referring?

15      A    Yes, I do.

16      Q    Okay.  And did you understand that to be

17   company policy during your employment?

18      A    No, I didn't.

19      Q    Okay.  Did you believe during your

20   employment that fighting could subject you to

21   discharge?

22      A    Yes, I did.

Michael P. Checka

Page 67

1      Q     Turn to Page 34, please. Do you see

2 there's a violent and inappropriate behavior policy

3 there?

4      A     Yes.

5      Q     Okay. Was there a policy similar to that

6 in effect during your employment with Rite Aid?

7      A     I don't recall seeing it written out like

8 this, no.

9      Q     Okay. Was there ever any communication to

10 you about any violence in the workplace policy

11 during your employment?

12      A     I don't recall receiving anything in

13 writing.

14      Q     How about orally?

15      A     Not from my supervisors, no.

16      Q     Well, how about from anyone?

17      A     As far as another member of management?

18      Q     Yes.

19      A     No. Not speaking about violent behavior,

20 no.

21      Q     Okay. But again, I assume you didn't need

22 a policy to tell you that violent or threatening

Michael P. Checka

Page 68

1    behavior could subject you to discharge, correct?

2         A    No.   That's common sense.

3         Q    Right.

4              Turn to Page 35, please.   The very last

5    sentence on that page which carries over to 36 says

6    "Each department, store, pharmacy, and facility

7    manager has a copy of the Policies and Procedures

8    Manual: A Manager's Guide to Company Practices and

9    Associate Relations."   Have you ever seen a copy of

10   that manual?

11        A    No.

12        Q    It goes on to refer to the policy and

13   procedures manual also being available online.

14             When you were employed at Rite Aid, was

15   there an intranet site at any time during your

16   employment?

17        A    Yes.

18        Q    Okay.   Do you remember when that was

19   instituted?

20        A    Since 1997.

21        Q    Okay.   And were the company's policies and

22   procedures available on the intranet?

**Michael P.  Checka**

1          A      I don't know offhand.

2          Q      Did you have access to the intranet?

3          A      Yes, I did.

4          Q      Okay.

5                 (Checka Deposition Exhibit Number 16 was

6      marked for identification.)

7                 BY MR. SCHROEDER:

8          Q      Have you ever seen Exhibit No. 16 before,

9      Mr. Checka?

10         A      No.

11         Q      Okay.  Did you ever see any version of the

12     workplace violence policy during your employment?

13         A      No.

14         Q      Okay.  Now, your termination resulted from

15     events that occurred on February 5th, 2005; is that

16     correct?

17         A      Correct.

18         Q      Could you just walk me through what

19     happened that day?

20         A      It was a Saturday -- the first Saturday of

21     the month.  Typically, the first week of every month

22     is much busier than any subsequent week in the month

**Michael P. Checka**

Page 70

1    in the drug store business.  The pharmacy was a

2    little busier than usual because it was a student

3    conference at the Hilton Hotel across the street.

4    Sometimes the Hilton will give us advance warning

5    that they're going to have a large group of people

6    so we can schedule more people to take care of the

7    influx of business.  Evidently, they didn't this

8    time or they did and nobody paid any attention to it

9    because it was very busy starting -- I started my

10   shift at 8:00 that morning, and at about 8:30, I

11   couldn't get to any of my pharmacy duties because

12   the lines upstairs had become so large, people were

13   coming downstairs into the pharmacy to get their

14   items rung up.

15          So it continued that way until about 10:00

16   when my pharmacy technician Christopher Green came

17   in, so he took over running the cashier -- or the

18   cash register.  And subsequently, he wasn't able to

19   do his duties as a pharmacy tech because almost

20   immediately and for a couple of hours, he had to run

21   the cash register.  So we fell a little bit behind,

22   which wasn't abnormal at that store, but it led to a

Michael P. Checka

1    little more pressure than usual.  So about 1:00,

2    Ashenafi, who typically didn't work on weekends --

3    he usually worked Monday through Friday -- he came

4    in and started -- his job was basically take the

5    totes and large merchandise from downstairs and

6    bring it upstairs so it could be put away.

7              So he came in at about 1:00 and almost

8    immediately started taunting.  What he did was I

9    refer to as a tongue wag, doing a type of lewd

10   dance.  And it was annoying, but no more so than

11   usual at that point.  So this went on 'til about

12   3:00, and the crowd started to die down a little bit

13   and Chris was able to go to the terminal on the

14   furthest end of the pharmacy towards the rest rooms

15   which if you've ever been in the pharmacy, you know

16   it has a big divide so that the person on the other

17   side of the pharmacy really can't see, so you don't

18   actually know if he's there.  So around 3:00, I

19   heard Ashenafi shouting, and Chris actually asked,

20   "What is he shouting about now?"  And when I looked

21   over to the ramp that comes down from the second

22   floor to the first floor, he was just doing his

Michael P. Checka

1    dance and sticking out his tongue and things of that

2    nature.

3              About 30 minutes later, I wanted to get a

4    couple of sodas for Chris and myself, so I walked

5    upstairs to get the sodas, and Ashenafi was not

6    following me, but was at the end of the aisle, so to

7    speak, you know, just peeking around and saying,

8    "Look, look." You know, things of that nature. So

9    after I got the sodas, while he was peeking at me, I

10   just made a motion like that (Indicating) like I was

11   going to go chase him. And typically what he does

12   when I do that is he starts giggling and runs away,

13   which is what he did.

14             So I went downstairs, Chris and I had our

15   sodas while we were working, and at about 4:00 --

16   there's a lot of pressure sometimes at that store,

17   so I was starting to develop GERD or gastro reflux.

18   So my stomach was upset, and I grabbed a couple of

19   paper towels just in case I couldn't make it to the

20   bathroom, walked into the break -- well, it's not a

21   break area, it's the back room where the bathrooms

22   are located. And as I made my way into the

Page 73

1    entrance -- it's about five feet from the men's

2    room -- I saw Ashenafi a little further in the

3    storeroom area. I'm not sure if he was talking on

4    his cell phone or what he was doing, but he said,

5    "Mike, Mike." So I looked. And since I saw him

6    right there and there was nowhere for him to go, I

7    said, "Oh. Well, what do you have to say to me

8    now?" At which point as I was saying it, I took a

9    couple of steps towards him. And at that point, he

10   turned and ran I believe probably towards the back

11   door which I'm sure he knew couldn't be opened, but

12   maybe he did think he could open it. And there was

13   a lot of clutter in the back room being a Saturday,

14   the trash hadn't been emptied yet, and since we're a

15   downtown D.C. store, space is at a premium, so not

16   only was trash stored back there, but -- it's

17   against federal law, but we kept prescription files

18   back there because it was really nowhere else to put

19   them and management kept a lot of store records back

20   there, so unless it's absolutely clean, it's just

21   terribly cluttered.

22            So he ran towards the back, tripped and

Michael P. Checka

1    fell over some milk crates which are also stored

2    back there because we do sell milk.  And his back

3    was towards me and he was moaning a little bit when

4    he got up, so I went over to see how he was.  And

5    when he came up, his nose was bleeding pretty

6    heavily.  I said, "Let me take you into the

7    bathroom."  And when he raised his head, he just

8    sort of spit, and quite a bit of blood came out from

9    his mouth because it was quite a nosebleed.

10      Q    Now, I mean did you feel like he was

11   spitting the blood at you?

12      A    Oh, no, no, no.  It was just a natural

13   reflex.  If you ever had a nosebleed and it goes

14   into your mouth, you just blow it out of your mouth.

15           So at that point, I asked him to come into

16   the bathroom with me so I could clean it, and he was

17   just infuriated.  He said I'm crazy, "I'm going to

18   call the police on you," pulled out his cell phone,

19   started throwing, like, two or three milk crates in

20   my direction, and started walking around the

21   storeroom area at which point I said again, "Come

22   on.  Let me take you to the bathroom and I'll clean

Page 75

1    you up." He just kept shouting, "I'm going to call

2    the police.  You're crazy," started to exit the

3    storeroom area at which point our key carrier, Donna

4    Brooks, and one of the clerks named Shakia came down

5    aisle 13 and said, "Oh, my God.  What happened?"

6    And Ashenafi said I hit him.  So Donna said, "Let's

7    go fill out an incident report."

8            While she said that, they started to leave

9    to go back upstairs, I returned to the pharmacy, and

10    much to my surprise, Ashenafi started knocking on

11    the pharmacy door.  It's against company policy to

12    allow anyone other than a pharmacist into the

13    pharmacy unless you're a member of management, but I

14    told Chris let him in since I figured now he wants

15    me to clean it up, clean up his mess, so he let

16    Ashenafi in, he came back to the sink area where I

17    was running some warm water and some soap, and just

18    as I was about to put it to his face, Donna and

19    Shakia who had come back and were in the patient

20    counseling area said, "No, no.  Come on.  Let's go

21    up to the manager's office and fill out an incident

22    report."  So he backed away, me applying no soap and

**Michael P. Checka**

1    water to his face, went up to the manager's office,

2    and about five minutes later, the assistant manager,

3    Mr. Macun, called down to the pharmacy to ask what

4    happened.  He said, "Ashenafi says that you hit

5    him."  I told him, "That's not true.  He fell down

6    and cut his nose on a milk tote," or carton or

7    whatever you want to call it.  So, again, he asked

8    me, "Well, he says that you hit him."  And I said,

9    "No, I didn't."  And that was the end of that

10   conversation.

11            About five minutes later about 4:30, some

12   D.C. police came.  Actually, about ten of them came.

13   The first thing they asked was, "It's easy to

14   resolve this dispute.  Just pull the tape from the

15   security cameras."

16            "Great.  That's all you have to do."

17            The security officer there -- I think his

18   name was Officer Sherry or Cherry -- said that's --

19   you can't do that because they never have any tape

20   in the cameras.  So the D.C. police said, "Well,

21   you've got some blood on your coat.  We're going to

22   have to arrest you," and that's what they did.  So I

Michael P. Checka

```
 1    told Chris Green, the pharmacy technician, "You have

 2    to call Mr. Shah, let him know what happened.  You

 3    know, the pharmacy's going to be closed for a while.

 4    I don't know what time I'm going to be back and

 5    you'll have to make plans to get Linda, the

 6    nighttime pharmacist, in early."

 7             So I went with the police to a station

 8    that's like, I guess, five or ten minutes from the

 9    store, and they took my picture and, you know, they

10    processed me and I was actually in jail for about an

11    hour.  I got arrested at 4:30, released at 6:30, was

12    back in the pharmacy at 6:45, which actually was a

13    surprise unto itself because when I came back -- you

14    know, by law, the pharmacy has to be closed since

15    there was no pharmacist there, but it was still

16    open.

17       Q    Okay.  Now, you said that when you saw him

18    in the back room and you told him that, you know,

19    "What do you have to say to me now," I think your

20    comment was that there was nowhere for him to go at

21    that point, correct?

22       A    Right.  I mean, there wasn't anywhere for
```

Michael P. Checka

1    him to go except out the back door, which no one has

2    permission to open that back door.

3        Q    And what's the significance of the fact

4    that there was nowhere for him to go?

5        A    Well, if he wanted to say something, you

6    know, like a man, say it to me now, you know, rather

7    than being able to say something and run.

8        Q    When he spit at you or spit not at you,

9    but when he spit, you said you got some blood on --

10   on what part of you at that point?

11       A    My smock.

12       Q    Okay.  Did you have blood on anywhere else

13   on your body?

14       A    No.  Just the smock.

15       Q    Okay.  Are you aware of any photographs

16   that exist that show the blood you had on you or

17   anything like that?

18       A    No.

19       Q    Okay.  I believe you then testified that

20   Shakia and was it Donna Marie Brooks came back to

21   the back, correct?

22       A    Well, they never actually entered the

**Michael P. Checka**

1    back.  They were about to enter the back.

2         Q    And that at that point, Ashenafi told them

3    that you had hit him, correct?

4         A    Right.

5         Q    And did you say anything at that point?

6         A    I told them that I hadn't.

7         Q    Okay.  You then said that when Ashenafi

8    came back and was let into the pharmacy, that you

9    were running some warm water and soap, correct?

10        A    Right.

11        Q    Why were you doing that?

12        A    To clean his face.

13        Q    Okay.  So you didn't start running it

14   until after he came in?

15        A    Right.

16        Q    Okay.  The things that he was doing that

17   day -- the tongue wag, the lewd dance as you

18   described it, saying things like "look, look" to

19   you -- had he ever done those to you before?

20        A    On a consistent basis for about -- ever

21   since he started working there.  It was at that

22   point about 14 months.

Michael P. Checka

Page 83

 1   assistant managers and to Mr. Kromm.

 2       Q    Did you ever report to Mr. Shah or any of

 3   your superiors that you were having problems with

 4   Mr. Legesse?

 5       A    Not formally, no.

 6       Q    Well, did you do it informally?

 7       A    Informally, I mentioned that there was

 8   some non-pharmacy personnel that were causing some

 9   issues.

10       Q    Did you identify him specifically?

11       A    I said his name, but since he wasn't there

12   and not a member of the pharmacy staff, I doubt they

13   knew who he was.

14       Q    And did you ask him to follow up on that?

15       A    No.

16       Q    Okay.  Did you elaborate on what issues it

17   was that he was causing?

18       A    I talked about the taunting and the

19   problems with the female customers, yes.

20       Q    And who did you have those conversations

21   with?

22       A    That was Mr. Shah.

**Michael P. Checka**

1     Q    Okay.  So you came back to the store I

2  think you said around 6:45 that evening, correct?

3     A    Right.

4     Q    And what happened after that?

5     A    I went back to filling some prescriptions

6  until the nighttime pharmacist arrived which was

7  about 7:30.

8     Q    And then what?

9     A    Then I went home.

10    Q    Okay.  And did you return to work the next

11  day or to your next scheduled shift?

12    A    Oh, no.  When I arrived at the store, the

13  first thing I did was call Mr. Shah to tell him I

14  was back.

15    Q    Okay.  And what's the next thing that

16  happened in regards to that event with Mr. Legesse?

17  Did you eventually hear from someone back in

18  management?

19    A    Well, I was told not to report to work the

20  next day.

21    Q    Okay.  Who told you that?

22    A    Mr. Shah.

**Michael P. Checka**

Page 85

1    Q    Okay.  What else did he tell you?

2    A    Well, initially, that night he told me,

3    you know, "Wait until I call you," then the next day

4    he called me and said, you know, I'm suspended upon

5    a meeting with Scott Zavinski and himself.

6    Q    He told you that he had had a meeting with

7    Scott Zavinski?

8    A    No.  My next meeting was to be with

9    Mr. Shah and Mr. Zavinski --

10    Q    Okay.

11    A    -- in Beltsville, Maryland, which I

12    believe was on the 9th or the 10th.  I believe it

13    was the week following that Saturday.

14    Q    And did that meeting occur then in

15    Beltsville?

16    A    Yes.

17    Q    Was anyone else present other than you,

18    Mr. Shah and Mr. Zavinski?

19    A    No.

20    Q    What was Mr. Zavinski's position?

21    A    HR vice president.

22    Q    Had you ever met him before?

**Michael P. Checka**

Page 86

```
 1      A    Yes.

 2      Q    Okay.  Under what circumstances?

 3      A    He was many times a speaker at

 4  get-togethers, meetings, and occasionally, he'd come

 5  into the store to see how things were progressing.

 6      Q    Did you ever have to interface with him in

 7  regard to any personnel issues?

 8      A    No.

 9      Q    Okay.  What happened at that meeting?

10      A    He asked me what happened, and I told him

11  verbally, and then he asked me to put it in writing.

12  That's what I did, and then they said, "A decision

13  will be made from corporate in the next few days, so

14  wait to hear from us."

15      Q    And were you being paid during this time?

16      A    No.

17      Q    So it was suspension without pay?

18      A    Right.

19      Q    What happened after that was the next you

20  heard from anyone?

21      A    On the 22nd, I had my court date, and I

22  went to the D.C. court, and after it started, they
```

Michael P. Checka

Page 87

1    just called my name and said the case had been no

2    papered, so I took those documents and brought them

3    that afternoon to Mr. Zavinski and Mr. Shah.

4        Q    You took them up to Beltsville?

5        A    Yes.

6        Q    Okay.  And what, if anything, did they say

7    to you at that time?

8        A    They weren't there, so I left the

9    paperwork with the secretary.

10       Q    Okay.  Did anyone from the prosecutor's

11   office or the police show up at that hearing which

12   you had?

13       A    No.

14       Q    Okay.  Did you have counsel with you?

15       A    No.  They literally just read my name and

16   gave me the piece of paper.

17       Q    Okay.  So that was February 22nd?

18       A    Yes.

19       Q    And when was the next you spoke with

20   someone at Rite Aid?

21       A    I never spoke verbally with anyone at Rite

22   Aid again.

**Michael P. Checka**

Page 88

1        Q      Okay.  What happened next?

2        A      Mr. Condon sent a letter to Rite Aid

3    asking them to reverse their decision.

4        Q      Well, when did you hear of the actual

5    decision?

6        A      I went there the 9th to Beltsville, and I

7    heard on the 11th that I was terminated.

8        Q      Who did you hear that from?

9        A      Mr. Shah.

10       Q      Okay.  And what exactly did he tell you?

11       A      "You've been fired for violating the zero

12   tolerance for violence policy."

13       Q      And what was your response?

14       A      I said, "Do I have any recourse?  Could I

15   talk to Ken Simmons?  Do you think it would do any

16   good," something, you know, along those lines.

17       Q      What did he tell you?

18       A      He said, "I don't think it will do any

19   good."

20       Q      Who is Ken Simmons?

21       A      Like an East Coast vice president in

22   charge of most of the East Coast.

Michael P. Checka

Page 89

1    Q    Did Mr. Shah tell you what investigation

2    Rite Aid had done before reaching its decision to

3    terminate your employment?

4    A    No.

5    Q    Okay.  Did Mr. Zavinski ever speak to you

6    regarding what investigation he might have

7    conducted?

8    A    No.

9    Q    Okay.  Did you ever speak directly with

10   anyone at Rite Aid regarding the nature of their

11   investigation?

12   A    No.

13   Q    The -- this is just to get the time frame.

14   You had your initial meeting with Mr. Zavinski and

15   Mr. Shah on February 9th, correct?

16   A    Right.

17   Q    Then Mr. Shah calls you on February 11th

18   to tell you you've been terminated, correct?

19   A    Right.

20   Q    On February 22nd, you took them the papers

21   regarding the dismissal of the charges against you,

22   correct?

Michael P. Checka

Page 94

1                    MR. SCHROEDER:   Thank you.   I appreciate

2      that.

3           Q      Any other employees come in to

4      Mr. Condon's office to speak to him that you're

5      aware of?

6           A      Past or present?

7           Q      Past or present, yes.

8           A      Harold Vizian.

9           Q      Okay.  Anyone else?

10          A      Sherry Persaud.

11          Q      Okay.  Anyone else?

12          A      Wendy Brown.

13          Q      Okay.  Were you present when Mr. Condon

14     spoke to those individuals?

15          A      Wendy Brown and Sherry Persaud.

16          Q      What did you discuss with -- you and/or

17     Mr. Condon discuss with Wendy Brown that day?

18          A      She wasn't there the day in question, so

19     basically just as to my character as a pharmacist.

20          Q      Okay.  Would the same be true as to Sherry

21     Persaud?

22          A      Yes.

Michael P. Checka

Page 95

```
 1        Q    And she wasn't present that day, correct?

 2        A    Correct.

 3        Q    Nor was Harold Vizian, correct?

 4        A    Correct.

 5        Q    Okay.  So of those individuals, the only

 6   one who was actually in the pharmacy that day was

 7   Chris Green, correct?

 8        A    Correct.

 9        Q    Okay.  When you spoke to Mr. Zavinski and

10   Mr. Shah on February 9th, did you identify for them

11   individuals who may have witnessed what happened

12   that they should talk to?

13        A    No.

14        Q    Okay.  Who is Norman Collins?

15        A    A Rite Aid customer.

16        Q    Okay.  Was Mr. Collins in the store on

17   February 5th, 2005?

18        A    Yes, he was.

19        Q    Did you see him there that day?

20        A    I didn't personally see him, no.

21        Q    Okay.  So how do you know he was there?

22        A    He says he was.
```

Page 96

1      Q     Okay.

2      A     Well, and also, he's got a -- he bought a

3   pack of syringes, so he had to sign for them, so his

4   signature's on the logbook.

5      Q     His signature would be on the logbook?

6      A     Yes.

7      Q     Do you have in your possession any copy of

8   that or any other documents that would show he was

9   in the pharmacy that day?

10     A     A copy of the logbook?

11     Q     Yes.  How about any receipts for the

12  purchases he made that day?

13     A     It's probably at Rite Aid.

14     Q     Okay.  So just to be clear, when you were

15  in the back room with Mr. Legesse at the time he

16  fell, you didn't see Mr. Collins at any time during

17  that period?

18     A     I never actually made it into the men's

19  room, no.

20     Q     But you didn't see Mr. Collins down around

21  there, correct?

22     A     No.

**Michael P. Checka**

Page 97

1      Q    Okay.  At the time -- I'm just going to

2   walk back through that.  Tell me again where you

3   were standing when Mr. Legesse fell.

4      A    I wasn't any further than the ladies'

5   room, and I guess that's about maybe 20 or 25 feet

6   from the back door.  He was almost to the back door

7   when he fell.

8      Q    Okay.  Well, was he in a separate room

9   from you or how did that work?

10     A    It's a big expanding room that's narrow at

11  the beginning and it spreads out.

12     Q    Okay.  And are the doors to the bathrooms

13  in that same room?

14     A    Right.  Right when you walk in is the

15  men's room, the ladies' room right next to it.

16     Q    Okay.  At the time he fell, was there

17  anyone else in that room that you saw?

18     A    No.  No one else.

19          MR. SCHROEDER:  Okay.  This is probably as

20  good a time as any to take that break for lunch.

21          MR. CONDON:  Okay.  How much longer do you

22  think you'll be?  Do you have any idea?

Michael P. Checka

Page 98

```
1              MR. SCHROEDER:  Maybe two hours, I guess.

2              MR. CONDON:  1:30?

3              MR. SCHROEDER:  Yeah.  You want to come

4    back at 1:30?  That's fine.

5              MR. CONDON:  Okay.

6              (Thereupon, a luncheon recess was taken at

7    12:28 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22
```

## Michael P. Checka

```
 1              A F T E R N O O N   S E S S I O N

 2                      1:25 p.m.

 3              (Checka Deposition Exhibit Number 17 was

 4     marked for identification.)

 5              BY MR. SCHROEDER:

 6     Q      Before I get to 17, Mr. Checka, did anyone

 7     from Rite Aid ever explain to you or tell you what

 8     the results of their investigation was?

 9     A      No.

10     Q      Okay.  Did Mr. Zavinski or Mr. Shah tell

11     you in what way that you had violated the violence

12     policy?

13     A      No.  They just said, "You violated the

14     zero tolerance for violence."

15     Q      Okay.  Did they ever tell you that they

16     believe that you had hit Mr. Legesse?

17     A      No.

18     Q      But you are aware that's what he claimed,

19     correct?

20     A      Right.

21     Q      Did anyone ever tell you who at Rite Aid

22     was responsible for the ultimate decision as to
```

Michael P. Checka

Page 100

1  whether or not you'd be terminated?

2      A    No.

3      Q    Okay.  Exhibit 15 is dated February 9,

4  2005.  Is this the written statement that you gave

5  to Mr. Zavinski on that date?

6      A    Yes.

7      Q    Okay.  And this is your handwriting?

8      A    Yes.

9      Q    Okay.  When's the last time you reviewed

10 this statement?

11     A    This morning.

12     Q    Okay.  When you reviewed it this morning,

13 did you see anything in there that you thought was

14 inaccurate?

15     A    No.

16     Q    Okay.  Now, if you look on the second page

17 about two-thirds of the way down it says, "I

18 motioned like I was going to catch him.  I chased

19 him for about five feet until he disappeared down

20 aisle 13."  Is that correct?

21     A    Yes.

22     Q    Now, how long was that before you then ran

Michael P. Checka

Page 101

1    into him in the back room and he fell?

2        A    Probably about 30 minutes.

3        Q    Okay.  You say "When I saw him in the back

4    room" -- I'm sorry.  I'm on the next page.  I think

5    you had discussed this before, but your statement

6    written here is "When I saw him in the back room, I

7    asked him, 'What do you have to say to me now,'

8    meaning now that you have nowhere to run, what

9    taunts will you come up with?"  Is that accurate?

10       A    Yes.

11       Q    Okay.  Do you understand how someone might

12   interpret that as a threat?

13       A    No.

14       Q    I mean, when you're saying he has nowhere

15   to run or nowhere to go, that suggested that he

16   can't get away from you, correct?

17       A    He had nowhere else to go, right.

18       Q    Right.  And would it be reasonable for

19   someone to feel threatened if they couldn't get away

20   from you in that situation?

21       A    No, I don't think so.

22       Q    Okay.  And then after you said that, you

**Michael P. Checka**

Page 102

```
 1    say you continued to approach him, correct?

 2         A    I took a couple of steps, yes.

 3         Q    Okay.  Put that aside.

 4              (Checka Deposition Exhibit Number 18 was

 5    marked for identification.)

 6              BY MR. SCHROEDER:

 7         Q    What is Exhibit 18?

 8         A    The affidavit I gave at EEOC.

 9         Q    Okay.

10         A    Actually OHR, the Office of Human Rights.

11         Q    Right.  And that's your signature on the

12    second page?

13         A    Yes.

14         Q    And you were under oath when you gave

15    this, correct?

16         A    Correct.

17         Q    When's the last time you reviewed this

18    document?

19         A    Last night.

20         Q    When you reviewed it last night, did you

21    see anything in there that you thought was

22    inaccurate?
```

Page 103

```
 1        A    No.

 2        Q    Now, you say on the second paragraph of

 3   the typed statement it says "I consistently

 4   performed my duties in a satisfactory manner."  Is

 5   that correct?

 6        A    Correct.

 7        Q    Did you believe that that should have had

 8   any bearing on Rite Aid's decision as to your

 9   employment status?

10             MR. CONDON:  I'm sorry.  Would you repeat

11   that?  I may have missed --

12             MR. SCHROEDER:  Sure.

13        Q    Do you think that's something Rite Aid

14   should have considered when it was deciding whether

15   or not to terminate you?

16             MR. CONDON:  Did he personally consider

17   that?  Is that what you're saying?

18             MR. SCHROEDER:  No.  Just --

19             MR. CONDON:  Did he personally feel that

20   way?

21             MR. SCHROEDER:  Yes, does he personally

22   feel that way.
```

**Michael P. Checka**

Page 104

1              MR. CONDON:  Okay.  Then I have no

2     objection.

3         A    So the question is do I feel they should

4     have taken that into account?

5         Q    Yes.

6         A    My past performance?

7         Q    Yes.

8         A    Yes.

9         Q    Okay.  I guess let me put it another way.

10    If Rite Aid concluded that you struck Mr. Legesse,

11    do you think that past satisfactory performance is a

12    reason not to terminate you?

13             MR. CONDON:  I'll object to the question.

14    It assumes that their decision is reasonable.  If

15    you add the word "reasonably concluded," then I

16    don't mind if he answers, so I don't know what his

17    answer would be.

18             MR. SCHROEDER:  Well, I'm not -- I'm going

19    to leave the question as asked, and he can answer it

20    subject to your objection.

21             MR. CONDON:  I'll object to it, then he

22    can answer it if he can.

**Michael P. Checka**

Page 105

```
 1        A    And the question again being?

 2             MR. SCHROEDER:  Can you read it back.

 3             (The following was read by the Reporter:)

 4             "Question:  Okay.  I guess let me put it

 5             another way.  If Rite Aid concluded that

 6             you struck Mr. Legesse, do you think that

 7             past satisfactory performance is a reason

 8             not to terminate you?"

 9        A    Is a reason not to terminate me because of

10   past satisfactory review?

11             BY MR. SCHROEDER:

12        Q    Right.

13        A    Yes, I do.

14        Q    Are you aware of any Rite Aid policy that

15   would require them to consider your past performance

16   in deciding whether or not to terminate you for what

17   they concluded was an act of violence toward another

18   employee?

19        A    No, because they seemed to be vacillating

20   decisions; for instance, Mr. Obidike at the Georgia

21   Ave. store.

22        Q    So you're not aware of any policy then?
```

Michael P. Checka

Page 106

```
 1        A     No.

 2        Q     Now, on the second page of this

 3   affidavit -- and we just referred to this -- but you

 4   state that "A pharmacist (Black) at another of

 5   respondent's stores had actually assaulted a female

 6   technician in full view of customers and employees,

 7   but he was only given a two-week suspension."  And

 8   you were referring to Mr. Obidike, correct?

 9        A     Right.

10        Q     Were you present for that alleged assault?

11        A     No, I wasn't.

12        Q     Okay.  So what was the basis for the facts

13   that you asserted in this affidavit?

14        A     Accounts from other employees.

15        Q     Okay.  From whom?

16        A     Mr. Vizian, Mr. Green.

17        Q     Okay.  Was Mr. Vizian present?

18        A     No.

19        Q     Was Mr. Green present?

20        A     No.

21        Q     Okay.  Do you know who they heard it from?

22        A     I believe they were good friends with the
```

Michael P. Checka

Page 111

1        A    No.

2        Q    Do you know why his employment with Rite

3    Aid ended?

4        A    No.

5        Q    You didn't discuss that with him when you

6    talked to him in October 2006?

7        A    No.

8             (Checka Deposition Exhibit Number 19 was

9    marked for identification.)

10            BY MR. SCHROEDER:

11       Q    What is Exhibit 19, Mr. Checka?

12       A    My rebuttal.

13       Q    Was this filed as part of the

14   administrative proceeding?

15       A    Yes.

16       Q    Okay.  When's the last time you reviewed

17   this document?

18       A    This morning.

19       Q    And is it -- is everything in it accurate?

20       A    In rebuttal 4 as to the exact positions of

21   the four gentlemen I named, the Rite Aid hierarchy,

22   I'm not positive those are the exact positions.

**Michael P. Checka**

Page 112

1        Q      Okay.  That's Mr. Grass, Mr. Bergonzi,

2    Mr. Noonan and Mr. Sorkin?

3        A      Right.

4        Q      Anything else?

5        A      No.

6        Q      Look on the first typed page in rebuttal

7    No. 1.  We're getting back to this issue of where

8    you were standing as opposed to Mr. Legesse.  You

9    say that he fell near the back door 20, 25 feet from

10   you, and then you say "I fail to see where this fact

11   can be construed as 'cornered.'"  Is that correct?

12       A      That's correct.

13       Q      Did he have any way to exit the room other

14   than going past you?

15       A      Well, he could have gone past me.

16       Q      That was his only way out, though, right?

17       A      Or he could have gone into one of the rest

18   rooms, yes.

19       Q      Okay.  On the bottom of -- the last three

20   paragraphs of this first rebuttal which start on the

21   bottom of that page and move on to the next page --

22   excuse me -- I guess it's only two paragraphs --

Page 113

1    some comments about Macun, what was the purpose of

2    those comments about him?  Why were you including

3    him?

4        A    Because Mr. Macun is saying that I told

5    him I may have hit Ashenafi.  I'm not sure.

6        Q    Uh-huh.

7        A    That's totally incorrect.

8        Q    So you didn't tell him that?

9        A    No.  And Chris Green was standing no more

10   than two feet from him when I was speaking to

11   Mr. Macun.  The telephone is directly next to the

12   cash register where he was standing.

13       Q    Well, what about Chris Green?  Would you

14   have any reason to doubt the veracity of any

15   statements he's made?

16       A    No, none whatsoever.

17       Q    If you could look at the second rebuttal,

18   the last paragraph of that document, I guess it's

19   just a few paragraphs long, but you say you told the

20   PDM, Anand Shah, that if Rite Aid incurred any cost

21   from the hospital for Ashenafi's nosebleed, they

22   could deduct it from your bonus; is that right?

**Michael P. Checka**

1      A     That's correct.

2      Q     And that you thought it was only fair and

3  honorable; is that right?

4      A     That's correct.

5      Q     Why did you believe that?

6      A     Because if they incurred 50 or a hundred

7  dollar deductible cost at GW where the police said

8  they were going to take him, I mean, it was my

9  question he responded to.

10      Q     What question is that?

11      A     "What do you have to say to me now?"

12      Q     Okay.  So you think it was your fault that

13  he got hurt or --

14      A     He responded to my question.  I wouldn't

15  say it was my fault.

16      Q     Okay.  If you could look at rebuttal

17  No. 3.  When you say -- this is about halfway down

18  the first page -- "If Christopher Green is the

19  pharmacy intern I told that I might have 'lunged' at

20  Ashenafi, please refer to his statement."

21           What do you mean by that, "please refer to

22  his statement"?

Michael P. Checka

Page 115

1       A       I believe he made a statement addressing

2   that.

3       Q       Okay.  And do you remember what he said in

4   that statement?

5               Well, let's just mark this.

6               (Checka Deposition Exhibit Number 20 was

7   marked for identification.)

8               BY MR. SCHROEDER:

9       Q       Is this the statement you're referring to?

10      A       Well, I haven't actually seen this since

11  Rite Aid's lawyers said in his statement that I had

12  lunged at him.

13      Q       Now, you see at the bottom of this first

14  page he says "Mike said that he lunged at Ashenafi

15  and Ashenafi ducked down and maybe hit his nose on

16  his knee or the tote.  Who knows."  Did you tell

17  Chris Green that?

18      A       I said that he fell.  That's all I told

19  him.

20      Q       So you did not tell him that you lunged at

21  Ashenafi?

22      A       No.  I did not use the word "lunged."



Form 188

## Rite Aid Prescription Department Manager's Duties

*As Prescription Department Manager for your store, you are in charge of the operation of your pharmacy and completely responsible for same. Additionally, in the absence of the Front End Manager of your store, you, in concert with the Assistant Manager, or if both are absent, are completely responsible for the total operation of the store and for the store's personnel.*

Your duties will consist of

1. Cashing registers
2. Making up daily prescription reports
3. Ordering merchandise
4. Adjusting customer complaints and making adjustments on returned merchandise
5. Deciding whether to accept customer checks
6. Supervising the cashiers in your department to See That the assigned work is completed
7. Making decisions as to requests for time off
8. Insuring that employees are prompt in reporting to work at their assigned hours
9. Instructing new employees in their duties

In the absence of the Front End Manager, you, in concert with the Assistant Manager, or if both are absent, are responsible for interviewing and recommending the hire of any job applicant who may report to your store for a job. The right to hire any employee for your department is within your sole discretion, based upon the allocated budget hour for your department.

In the event that the necessity may arise, you are responsible to discipline or terminate any employee in your department. In the absence of the Front End Manager, you will help the Assistant Manager to discharge this responsibility and authority which covers all store personnel even when the Front End Manager is present in the store. However, should a situation arise requiring discipline or termination, it is your responsibility to discuss this matter with your store's Front End Manager and make a recommendation.

The adjustment of employee grievance and personnel conflicts is within your discretion and responsibility.

Checka
EXHIBIT NO. 6
CJB 8/1/07

Revision March 23, 1995

**CONFIDENTIAL**

Page 1



**Form 188**

The combination to the safe and the keys to the store are also your responsibility.

The store operations manual is available for your use as Prescription Department Manager.

As a "Highly Paid Professional", Rite Aid exempts you and the position of Prescription Department Manager from the overtime provisions of the wage and hour section of the Fair Labor Standards Act. You will receive an agreed-upon salary, regardless of the quantity or quality of your work, as per the Labor Department's interpretation of the Act.

In your capacity as Prescription Department Manager, you will receive directly from the Central Office all bulletins pertaining to the above duties.

I hereby acknowledge receipt of a copy of the above, and shall endeavor to perform these duties to the best of my ability.

| Pharmacist Signature | |
|---|---|
| *Michael Chda* | |
| Date | |
| 05-19-97 | |

CONFIDENTIAL

## Rite Aid Job Description

All rights reserved. For internal use only. No part of this document may be reproduced or distributed to anyone outside Rite Aid Corporation without prior written consent.

# Pharmacist

| | |
|---|---|
| Reports To: | Pharmacy Manager (direct) |
| | Pharmacy Development Manager / Store Manager (indirect) |
| Group: | NA |
| Division: | East, Central, and West |
| Region: | Various |
| Section/Cost Center: | Various |
| Location: | Retail store |
| Job Number: | 56 / 79 |
| Job Type: | Salary |
| Work Status: | Full time |
| FLSA Status: | Exempt |
| Level of Supervision Received: | Moderate |
| Work Pace: | Based on customer flow and prescription volume |
| Internal Customer Contact: | Regularly |
| External Customer Contact: | Regularly |
| Creation/Revision Date: | February 2001 |

## SUMMARY

The primary purpose of this position is to increase pharmacy revenue by filling prescriptions and providing excellent customer service. Frequent independent judgments are essential. The incumbent is also required to perform all tasks in a safe manner consistent with corporate policies and state and federal laws.

## ESSENTIAL DUTIES AND RESPONSIBILITIES

The associate is responsible for the functions below, in addition to other duties as assigned:

- Fill and verify prescriptions for customers.
- Provide excellent customer service by assisting customers with medical-related issues and providing healthcare counseling.
- Supervise the work completed by Pharmacy Technicians and support staff while on duty.
- Maintain appropriate security of the Pharmacy department.
- Handle customer issues such as customer complaints and questions regarding insurance coverage.
- Interact with physicians and utilize reference material to gain information on customers and prescriptions and to resolve any issues that arise.
- Assist with maintaining the Pharmacy department by keeping it clean and in order.
- Assist with cycle counts, inventory reports, and will-calls to customers.
- Interact with the Pharmacy Manager to build customer loyalty.
- Complete quality assurance duties applicable to state and federal Board of Pharmacy regulations.
- Comply with all federal and state laws and regulations.

## SUPERVISORY RESPONSIBILITIES

This position currently has no supervisory responsibilities.

## QUALIFICATION REQUIREMENTS

To perform this job successfully, the associate must be able to perform each essential duty satisfactorily. The requirements listed below are representative of the knowledge, skills, and/or abilities required:

### Education and/or Experience

A Bachelor's degree (BS), Doctoral degree (PHARM.D.), or equivalent in Pharmacy is required.

Checka
EXHIBIT NO. 7
CJB 8/1/07

**CONFIDENTIAL**

DCOHR 0258

#### Language Skills

Ability to read and interpret documents such as safety rules, operating and maintenance instructions, and procedure manuals. Ability to write routine reports and correspondence. Ability to speak effectively before groups of customers or associates. Ability to read, write, and speak English fluently.

#### Mathematical Skills

Ability to add, subtract, multiply, and divide in all units of measure, using whole numbers, common fractions, and decimals. Ability to compute rate, ratio, and percent and to draw and interpret bar graphs.

#### Reasoning Ability

Ability to define problems, collect data, establish facts, and draw valid conclusions. Ability to interpret an extensive variety of technical instructions in mathematical or diagram form and deal with several abstract and concrete variables.

#### Other Skills, Abilities, and/or Training

The following qualities are required:

- Minimum age of 18, 19, or 21 years old as required by state law.
- Ability to pass drug test.
- Committed to providing customer service that makes both internal and external customers feel welcome, important, and appreciated.
- Ability to preserve confidentiality of information.
- Ability and willingness to move with purpose and a strong sense of urgency.
- Ability to work weekends and extended days on a frequent basis.
- Ability to work day, evening, and/or night shift.
- Accuracy and attention to detail.
- Ability to organize and prioritize a variety of tasks/projects.
- Familiarity with industry/technical terms and processes.
- Ability to work within strict time frames and resolute deadlines.
- Excellent communication and customer service skills.

The following qualities are helpful:

- Ten-key punch speed of four thousand (4,000) SPH.
- Typing speed of forty (40) WPM.
- Proficiency with the Microsoft® Office Suite (Word, Excel, PowerPoint, and Access).

### CERTIFICATES, LICENSES, AND/OR REGISTRATIONS

This position requires a valid Pharmacist's license.

### PHYSICAL DEMANDS

The physical demands described below are representative of those that must be met to successfully perform the essential functions of this job. The associate is:

- Regularly required to do the following activities:
  - Stand statically for long periods without a break.
  - Walk about.
  - Talk and hear; verbally express ideas and impart information or instructions.
  - Use hands to finger, handle, and/or feel; the ability to type, pick, pinch with fingers, seize, hold, grasp or turn with hands, and perceive attributes of objects and materials, such as size, shape, temperature, or texture, by touching with fingertips.
  - Maintain balance while walking, standing, crouching, or running.
  - Twist upper torso.
  - Reach up and out with hands and arms.

- Frequently required to do the following activities:
  - Stand dynamically for long periods without a break.
  - Lift and push/pull up to ten (10) pounds a distance of five (5) feet.

DCOHR 0259

CONFIDENTIAL

- Occasionally required to do the following activities:
  - Remain seated in a normal position for long periods.
  - Climb stairs and/or ladders.
  - Stoop, kneel, crouch, and/or crawl.
  - Recognize flavors or odors and distinguish differences or similarities in intensity or quality of flavors or odors.
- Specific vision abilities required for this job include:
  - Close vision (clear vision at 20 inches or less).
  - Color vision and the ability to identify and distinguish colors.
  - Adjustable focus.

## WORK ENVIRONMENT

The work environment characteristics described here are representative of those encountered while performing the essential functions of this job. The associate is:

- Regularly exposed to indoor conditions with a moderate noise level.
- Rarely exposed to:
  - Fumes or airborne particles.
  - Toxic or caustic chemicals.

DCOHR 0260

CONFIDENTIAL

## Rite Aid Job Description

All rights reserved. For internal use only. No part of this document may be reproduced or distributed to anyone outside Rite Aid Corporation without prior written consent.

# Pharmacy Manager

| | |
|---|---|
| Reports To: | Store Manager |
| Group: | NA |
| Division: | East, Central, West |
| Region: | Various |
| Section/Cost Center: | Various |
| Location: | Retail store |
| Job Number: | 53 / 78 |
| Job Type: | Salary |
| Work Status: | Full time |
| FLSA Status: | Exempt |
| Level of Supervision Received: | Limited |
| Work Pace: | Based on customer flow and prescription volume |
| Internal Customer Contact: | Regularly |
| External Customer Contact: | Regularly |
| Creation/Revision Date: | February 2001 |

## SUMMARY

The primary purpose of this position is to oversee the daily activities of the Pharmacy department within a retail store. Frequent independent judgments are essential. The incumbent is also required to perform all tasks in a safe manner consistent with corporate policies and state and federal laws.

## ESSENTIAL DUTIES AND RESPONSIBILITIES

The associate is responsible for the functions below, in addition to other duties as assigned:

- Oversee the daily activities of the Pharmacy department.
- Counsel customers with regard to medications filled at the pharmacy.
- Handle customer issues such as customer complaints and questions regarding insurance coverage.
- Interact with physicians to gain additional information about customers and prescriptions to be filled.
- Maintain a clean and efficient Pharmacy department.
- Maintain reports for controlled, outdated, and recalled medications; cycle counts; prescription and customer files; and will-calls.
- Fill customer prescriptions.
- Manage the inventory of medication and the control drug ledger in the Pharmacy department.
- Ensure excellent customer service by Pharmacy associates.
- Maintain appropriate security of the Pharmacy department.
- Complete quality assurance duties applicable to state and federal Board of Pharmacy regulations.
- Provide leadership and development for associates by communicating career opportunities, providing regular performance feedback, and demonstrating RAPTAR (Recognition, Appreciation, Praise, Treat Associates Respectfully) behaviors.

## SUPERVISORY RESPONSIBILITIES

This position directly supervises Pharmacists, Pharmacy Technicians, Pharmacy Interns, and Pharmacy support personnel and carries out supervisory responsibilities in accordance with Rite Aid policies and applicable laws. Responsibilities include interviewing, hiring, training, directing, rewarding, and disciplining associates; appraising associate performance; and resolving complaints.

Checka

EXHIBIT NO. 8

CJB 8/1/07

RITE AID CORPORATION



## QUALIFICATION REQUIREMENTS

To perform this job successfully, the associate must be able to perform each essential duty satisfactorily. The requirements listed below are representative of the knowledge, skills, and/or abilities required:

### Education and/or Experience

Bachelor's degree (BS), Doctoral degree (PHARM.D.), or equivalent in Pharmacy, plus a minimum of one (1) year experience as a licensed Pharmacist; or equivalent combination of education and experience. In addition, the associate should have experience in a retail environment.

### Language Skills

Ability to read and interpret documents such as safety rules, operating and maintenance instructions, and procedure manuals. Ability to write routine reports and correspondence. Ability to speak effectively before groups of customers or associates. Ability to read, write, and speak English fluently.

### Mathematical Skills

Ability to add, subtract, multiply, and divide in all units of measure, using whole numbers, common fractions, and decimals. Ability to compute rate, ratio, and percent and to draw and interpret bar graphs.

### Reasoning Ability

Ability to define problems, collect data, establish facts, and draw valid conclusions. Ability to interpret an extensive variety of technical instructions in mathematical or diagram form and deal with several abstract and concrete variables.

### Other Skills, Abilities, and/or Training

The following qualities are required:

- Minimum age of 18, 19, or 21 years old as required by state law.
- Ability to pass drug test.
- Committed to providing customer service that makes both internal and external customers feel welcome, important, and appreciated.
- Ability to preserve confidentiality of information.
- Ability and willingness to move with purpose and a strong sense of urgency.
- Ability to work weekends and extended days on a frequent basis.
- Ability to work day, evening, and/or night shift.
- Accuracy and attention to detail.
- Ability to organize and prioritize a variety of tasks/projects.
- Familiarity with industry/technical terms and processes.
- Ability to work within strict time frames and resolute deadlines.
- Excellent communication and customer service skills.

The following qualities are helpful:

- Ten-key punch speed of four thousand (4,000) SPH.
- Typing speed of forty (40) WPM.
- Proficiency with the Microsoft® Office Suite (Word, Excel, PowerPoint, and Access).

## CERTIFICATES, LICENSES, AND/OR REGISTRATIONS

This position requires a valid Pharmacist's license.

CONFIDENTIAL

## PHYSICAL DEMANDS

The physical demands described below are representative of those that must be met to successfully perform the essential functions of this job. The associate is:

- Regularly required to do the following activities:
  - Stand statically for long periods without a break.
  - Walk about.
  - Talk and hear; verbally express ideas and impart information or instructions.
  - Use hands to finger, handle, and/or feel; the ability to type, pick, pinch with fingers, seize, hold, grasp or turn with hands, and perceive attributes of objects and materials, such as size, shape, temperature, or texture, by touching with fingertips.
  - Maintain balance while walking, standing, crouching, or running.
  - Twist upper torso.
  - Reach up and out with hands and arms.
- Frequently required to do the following activities:
  - Stand dynamically for long periods without a break.
  - Lift and push/pull up to ten (10) pounds a distance of five (5) feet.
- Occasionally required to do the following activities:
  - Remain seated in a normal position for long periods.
  - Climb stairs and/or ladders.
  - Stoop, kneel, crouch, and/or crawl.
  - Recognize flavors or odors and distinguish differences or similarities in intensity or quality of flavors or odors.
- Specific vision abilities required for this job include:
  - Close vision (clear vision at 20 inches or less).
  - Color vision and the ability to identify and distinguish colors.
  - Adjustable focus.

## WORK ENVIRONMENT

The work environment characteristics described here are representative of those encountered while performing the essential functions of this job. The associate is:

- Regularly exposed to indoor conditions with a moderate noise level.
- Rarely exposed to:
  - Fumes or airborne particles.
  - Toxic or caustic chemicals.

CONFIDENTIAL

```
*************************** *************************** ***************************
*** REQUESTOR: PDMLAN - NEWMAN, LINDA A.        MARKET 06 - 01              ***
*************************** *************************** ***************************
***               S Y S M   I N B A S K E T   P R I N T                     ***
```

MESSAGE ID: 343589      DATE: 12/24/97  TIME: 10:30    PRIORITY: 000

TO:        PDMLAN - NEWMAN, LINDA A.
           PHARMACY DEVELOPMENT MANAGER
           MARKET 06 - 01

FROM:      RXPJAW1 - WATSON, JAMES A.
           RX - RPH
           MARKET 06 - STR 03873

SUBJECT:   STAFF PHARMACIST MIKE


GOOD MORNING,
IN ADDITION TO OUR CONVERSATION YESTERDAY AND TO THE PAPER WHICH
IAM GOING TO FAX LATER,HERE ARE SOME OTHER OBSERVATIONS:
1-HE THROWS A LOT OF EMPTY RXS BAGS AWAY AFETR PICKING UP THINGS
FROM PEOPLE WITH THEM.
2-HE DOESN'T CLOSE DRUGS BOTTLES PERFECTLY BECAUSE HE IS SCARED!
AND MANY TIMES DRUGS SPILL ON THE FLOOR WHEN ME OR JIM TRY TO
PICK THEM.
3-HE IS NOT FILING C11 RXS BUT LEAVES THEM SCATTERED ON THE CABINET
TOP.
4-HE DOESN'T ORDER DRUGS FROM THE WAREHOUSE BECAUSE HE SCARES FROM
TOUCHING THE ORDERING BOOK.
5-I HAVE NEVER SEEN HIM ENTERING OR REGISTERING ANY ITEM FROM THE
FRONT END FOR THE STORE USE, ALTHOUGH HE IS USING DOZENS OF THEM.
6-HE SPITS FREQUENTLY AND UBNORMALLY IN THE SINK AS IF HE IS SUFFERING
FROM SOME ILLNESS.
7-HE CAN'T TOUCH THE CASH REGISTER OR ANYTHING ELSE UNLESS HE
IMPREGNATES IT WITH ALCOHOL.
8-IF YOU ARE PLANNING OR THINKING OF SENDING SOME TECH. OF BLACK
ORIGIN TO THIS STORE YOU BETTER NOT DO IT BECAUSE HE OR SHE IS NOT
GOING TO SURVIVE!
9-HE IS ABLE TO CONSEAL THOSE DEFECTS FROM MANAGERS,BUT I SAW HIM
WASHING HIS HANDS MANYTIMES WITH ALCOHOL AFTER TAKING SOMETHING
FROM YEVETTE!
10-IT IS QUITE OBVIOUS THAT THIS GUY IS SUFFERING FROM SOME ILLNESS
AND/OR RACIAL PROBLEMS.
11-FINALLY,THAT BEHAVIOR OR THOSE DEFECTS MAY HAVE NO DIRECT EFFECTS
ON THE BODY BUT THEY MAY HAVE SERIOUS SEQUENTIA OR IMPACTS SOCIALLY,
PSYCHOLOGICALLY OR MENTALLY.
THANK YOU AND YOU HAVE NICE HOLIDAYS,
IBRAHIM
STORE 3873

Sent to:   PDMLAN              NEWMAN, LINDA A.            (to)


Checka
EXHIBIT NO. 12
CJB 8/1/07

DEC 29 '97  9:25                                          PAGE.001

PAGE.001

DATE: 12/26/97        RITE AID PHARMACY, STORE # 3873        PAGE 1

This SURVEY is about staff pharmacist MIKE. The result of this SURVEY
will be submitted to the HEADOFFICE only and to no any other authority.
So please answer the QUESTIONS below, honestly, by stating YES or NO and
print, sign your NAME and POSITION:
A-CO-WORKER:
Do you think that the above-mentioned person is suffering from somekind
of ILLNESS and/or a RACIAL problem ?

| RESPONSE | NAME | SIGNATURE | POSITION |
|---|---|---|---|
| I - YES | IBRAHIM | | PHARMACY INTERN |
| II - YES!! | d. Powell | d. Powell | co-worker/pharmacy clerk |
| III YES | A. DAVE | Annette Day | co-worker/pharmacy clerk |
| IV YES | H. Gentry | H. Gentry | driver |
| 5 - YES | C. Barnes | Carolyn Barnes | clerk/c |

DATE: 12/26/97        RITE AID PHARMACY, STORE # 3873        PAGE 2

B-MANAGER.
Have you received any written COMPLAINTS or heard COMPLAINTS about the
above-mentioned DEFECTS from more than 3 different EMPLOYEES who worked
with that PERSON during the last 4 MONTHS ?

| RESPONSE | NAME | SIGNATURE | POSITION |
|---|---|---|---|
| 1 - yes | Jim | | mgr |
| 2 - Yes | Yvette | Y. Tilley | FE Manager |
| 3 - yes | Dineen | | FE asst Manager |

**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

| ON FILING CHARGE |
|---|
| Checka, Michael P |

THIS PERSON (check one)

[X] CLAIMS TO BE AGGRIEVED

[ ] IS FILING ON BEHALF OF ANOTHER

Ms. Marilyn - McClure-Demers
Hr Employment Law Counselor
Rite Aid Corporation
30 Hunter Lane
Camp Hill, PA 17011

DATE OF ALLEGED VIOLATION

| Earliest | Most Recent |
|---|---|
| 02/05/2005 | 02/11/2005 |

PLACE OF ALLEGED VIOLATION

Camp Hill, PA

EEOC CHARGE NUMBER

10CA600061

FEPA CHARGE NUMBER

06-071-P(CN)

## NOTICE OF CHARGE OF DISCRIMINATION  IN JURISDICTIONS WHERE A FEP AGENCY WILL INITIALLY PROCESS
*(See attached information sheet for additional information)*

YOU ARE HEREBY NOTIFIED THAT A CHARGE OF EMPLOYMENT DISCRIMINATION UNDER

[X] Title VII of the Civil Rights Act of 1964

[ ] The Age Discrimination in Employment Act of 1967 (ADEA)

[ ] The Americans with Disabilities Act

HAS BEEN RECEIVED BY

[ ] The EEOC and sent for initial processing to _____ .
*(FEP Agency)*

[X] The <u>D.C. Office Of Human Rights</u>   and sent to the EEOC for dual filing purposes.
*(FEP Agency)*

While EEOC has jurisdiction (upon the expiration of any deferral requirement if this is a Title VII or ADA charge) to investigate this charge, EEOC may refrain from beginning an investigation and await the issuance of the Agency's final findings and orders. These final findings and orders will be given weight by EEOC in making its own determination as to whether or not reasonable cause exists to believe that the allegations made in the charge are true.

You are therefore encouraged to cooperate fully with the Agency. All facts and evidence provided by you to the Agency in the course of its proceedings will be considered by the Commission when it reviews the Agency's final findings and orders. In many instances the Commission will take no further action, thereby avoiding the necessity of an investigation by both the Agency and the Commission. This likelihood is increased by your active cooperation with the Agency.

[X] As a party to the charge, you may request that EEOC review the final decision and order of the above named Agency. For such a request to be honored, you must notify the Commission in writing within 15 days of your receipt of the Agency's final decision and order. If the Agency terminates its proceedings without issuing a final finding and order, you will be contacted further by the Commission. Regardless of whether the Agency or the Commission processes the charge, the Recordkeeping and Non-Retaliation provisions of Title VII and the ADEA as explained in the "EEOC Rules and Regulations" apply.

For further correspondence on this matter, please use the charge number(s) shown.

[ ] An Equal Pay Act investigation (29 U.S.C. 206(d)) will be conducted by the Commission concurrently with the Agency's investigation of the charge.

[X] Enclosure: Copy of Charge

BASIS OF DISCRIMINATION

[X] RACE   [ ] COLOR   [ ] SEX   [ ] RELIGION   [ ] NAT. ORIGIN   [ ] AGE   [ ] DISABILITY   [ ] RETALIATION   [ ] OTHER

CIRCUMSTANCES OF ALLEGED VIOLATION

See enclosed Form 5, Charge of Discrimination.

*Checka*

EXHIBIT NO. 24

CJB  8/1/07

| DATE | TYPED NAME/TITLE OF AUTHORIZED EEOC OFFICIAL | SIGNATURE |
|---|---|---|
| 12/06/2005 | Tulio L Diaz Director | |

EEOC FORM 131-A (Rev. 06/92)

**RESPONDENT'S COPY**

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

| AGENCY | CHARGE NUMBER |
|---|---|
| ☒ FEPA | 06-071-P(CN) |
| ☐ EEOC | 10CA600061 |

D.C. Office Of Human Rights _____ and EEOC
*State or local Agency, if any*

| NAME *(Indicate Mr., Ms., Mrs.)* | HOME TELEPHONE *(Include Area Code)* |
|---|---|
| Mr. Michael P. Checka | (703) 866-1059 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| 5836 Rexford Drive, Springfield, VA 22152 | | 09/22/1956 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME *(If more than one list below.)*

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE *(Include Area Code)* |
|---|---|---|
| Rite Aid Corporation | Cat D (501 +) | (717) 730-7729 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 30 Hunter Lane, Camp Hill, PA 17011 | | 041 |

| NAME | TELEPHONE NUMBER *(Include Area Code)* |
|---|---|
| | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| | | |

CAUSE OF DISCRIMINATION BASED ON *(Check appropriate box(es))*

☒ RACE  ☐ COLOR  ☐ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☐ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ OTHER *(Specify)*

| DATE DISCRIMINATION TOOK PLACE | |
|---|---|
| EARLIEST | LATEST |
| 02/05/2005 | 02/11/2005 |
| ☐ CONTINUING ACTION | |

THE PARTICULARS ARE *(If additional space is needed, attach extra sheet(s)):*

I believe that I have been discriminatd against on the basis of my race (White) in the terms, conditions, privileges, and in the involuntary termination of my employment because:

Respondent hired me as a Pharmacist in April 1997, and I was later promoted to Pharmacy Manager. I consistently performed my duties in a satisfactory manner. In fact, because of the outstanding performance of the pharmacy that I managed, I was due to receive a bonus of approximately $12,000 -- I did not receive the bonus because of my termination.

On February 5, 2005, I assumed my customary duties as Pharmacy Manager in Respondent's store. An employee (Black), a porter or stock-boy, who often engaged in "horseplay" and in teasing customers and employees (especialy females), was also on duty. At one point on February 5, 2005 this employee was walking behind me and calling my name repeatedly just to be annoying. I would stop as if I was going back towards him, and he would run away.

Later that same day, I went to the rest room which is located off a back room which was cluttered with boxes, cartons, and milk crates. As I walked in, I saw the employee who had been annoying me earlier and addressed him saying, "What do you have to say to me now?" The employee turned and headed for the back of the room and, because of

** Text is Continued on Attached Sheet(s) **

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the foregoing is true and correct.

NOTARY *(When necessary for State and Local Requirements)*

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

SIGNATURE OF COMPLAINANT

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(Month, day and year)*
11/01/05

| Date | Charging Party *(Signature)* |
|---|---|

EEOC FORM 5 (Rev. 07/99)

**RESPONDENT'S COPY**

Dec 01 08:20 2005  CP Initials $MPC$  Chg # , Attachment Page 1

------------------------------------------------------------------------
Equal Employment Opportunity Commission
Form 5 - Charge of Discrimination, Additional Text
------------------------------------------------------------------------

all the clutter, tripped over something and fell.  He injured and
bloodied his nose when he fell.  I asked the employee to follow me
into the rest room so that I could help him clean up.  He responded,
"You are crazy, I'm going to have you arrested."  When I again asked
him to let me help him, he threw about three milk crates at me.

Eventually, the employee went with another employee to fill out an
incident report.  My Assistant Manager called me to ask what had
happened.  I explained that the employee had fallen in the back
room.  About ten minutes later the police arrived and arrested me.
I spent about two hours in custody, and was given a court date.  When
I went to court, my case was "No Papered".

I returned to Respondent's pharmacy after being released on February
5, 2005 and finished my shift.  At the end of the shift I called my
supervisor and told him what had happened.  He told me not to return to
work until further notice.  At a meeting with Respondent on February 11,
2005, I was told that I was being terminated due to Respondent's zero
tollerance of violence in the work place.

I found this hard to believe.  A Pharmacist (Black) at another of
Respondent's stores had actually assaulted a female technician in
full view of customers and employees, but he was only given a two-
week suspension.  I believe that I was treated more harshly and
terminated based on my race.

Therefore, I charge Respondent with an unlawful discriminatory act
on the basis of my race in violation of the DC Human Rights Act of
1977, as amended, and Title VII of the Civil Rights Act of 1964, as
amended.  I have not commenced any action, civil, criminal or
administrative, based on the above allegations, other than the
following: CROSS FILED WITH THE EEOC.

# GOVERNMENT OF THE DISTRICT OF COLUMBIA
## Office of Human Rights



Judiciary Square Office
441 4th Street, NW, Suite 570N
Washington, DC 20001
Phone: (202) 727-4559 Fax: (202) 727-9589

Penn Branch Office
3220 Pennsylvania Avenue, SE, 1st Fl.
Washington, DC 20020
Phone: (202) 727-4559 /Fax: (202) 645-6390

## LETTER OF DETERMINATION

August 28, 2006

Robert F. Condon, Esq.
Attorney at Law
Re: Michael P. Checka
818 18th Street N.W.
Washington, DC 20006

Reference:    ***Michael P. Checka vs. Rite Aid Corporation***
***Docket No.: 06-071-P (CN)***
***EEOC No.: 10C-A600061***

Dear Mr. Checka:

The Office of Human Rights (hereinafter "the OHR") has completed its investigation of
the above-captioned complaint.

You are hereinafter referred to as **"COMPLAINANT."**  The Rite Aid Corporation
is referred to as **"RESPONDENT."**  Complainant's charge set forth the
following issue(s), which were investigated by the OHR.

## ISSUES PRESENTED

Whether Complainant was subjected to disparate treatment on the basis of his race
(White) when he was terminated in February 11, 2005 due to the Respondent's *Zero
Tolerance Policy for Violence in the Workplace.*

## JURISDICTION

Respondent is located at 1015 15th Street NW, Washington, DC 20005.  The alleged
discriminatory acts occurred in the District while the Complainant was employed by
Respondent.  Therefore, Respondent is subject to the enforcement jurisdiction of the
OHR and is not exempt for any known reasons from the laws of the District of Columbia
prohibiting unlawful discrimination.

*Checka*
EXHIBIT NO. 27
CJB 8/1/07

*Michael P. Checka vs. Rite Aid Corporation*
*Docket No.: 06-071-P (CN)*
*EEOC No.: 10C-A600061*
*Page 2 of 11*

## FINDINGS OF FACT

The OHR's findings of facts were obtained from the following: (1) Complainant's sworn statement; (2) Respondent's Position Statement; (3) Complainant's Rebuttal, (4) Respondent's sworn response to the OHR's Request for Documents; (5) Respondent's Answers to Interrogatories and requested documents.

Complainant (White) commenced employment with Respondent as a Pharmacist in April 1997.

## TERMINATION

### Complainant's Allegations

Complainant alleges that the Respondent discriminated against him on the basis of his race (White) when he was terminated on February 20, 2005 due to the *Zero Tolerance Policy for Violence in the Workplace*. Complainant contends that no physical altercation ever occurred between the Cited Employee (Black) and himself. Complainant also asserts that a Pharmacist (Black) at another store location actually assaulted a female technician in full view of customers and employees, but was given only a two-week suspension.

### Respondent's Defense or Response

Respondent contends that the Store Manager called Complainant on the store phone and asked what happened. According to the Respondent's Store Manager, Complainant initially said that the Cited Employee had fallen in the restroom, but later the Complainant informed the Store Manager that he may have hit him, but was not sure.[1]

Respondent asserts that shortly after speaking with Complainant regarding his version of the events, a Police Officer who happened to be in the store at the time, arrested Complainant. According to Respondent, Complainant was booked for assault and battery and released on his own recognizance later that day.

Respondent declares that an exhaustive investigation of the incident was conducted by Respondent's Human Resource Manager for the store involved. Respondent professes that Complainant conceded that he was alone with the Cited Employee, and told the Cited Employee, "If you have something to say then say it to now," and "If you have something to say then say it to my face." Respondent proffers that Complainant also conceded that

---

[1] Complainant denies Respondent's allegations by asserting, "[T]o this prevarication, I will respond to by saying that facts are stubborn things and whatever may be our wishes, our inclinations, or the dictums of our passions, they cannot alter the state of facts and evidence."

at a minimum, he was engaged in "horseplay" with the Cited Employee, and admitted fault to engaging in horseplay.

But, Complainant claims that when he noticed the Cited Employee looking at him, he asked him, "What do you have to say to me now?" Complainant proffers that he fails to see how this line of questioning could be interpreted has threatening and physically aggressive. Further, Complainant rebuts the Respondent's contention that he said "If you have something to say than say it to my face," or that he mentioned the word "horseplay," or conceded fault. Complainant defends that in his statement he admitted calling the Cited Employee "a freak," but not to his face.

Respondent's Human Resource Manager claimed that Complainant told a pharmacy intern that he might have lunged at the Cited Employee which according to the Respondent, is in violation of the Policy that prohibits violent and inappropriate behavior and particularly for "displaying threatening, physically aggressive or violent behavior that intimidate or instills fear in others." Again, Complainant denies Respondent's contention the he told a pharmacy intern that he might have lunged at the Cited Employee. According to the Complainant, "lunged" is a fencing term and a sport in which he has never engaged.

Respondent also responds to Complainant's allegation that another Pharmacist (Black) at another store location actually assaulted a female but was only given a two (2) week suspension. Respondent argues that while statements were taken regarding this alleged incident, nobody witnessed the incident or could provide any corroborating information. Respondent further proclaims that in particular, this Cited Employee denied engaging in any such conduct, and claimed that the allegations against him were entirely fabricated and fueled by his race (Black). Respondent asserts that unlike the Complainant, this Cited Employee did not admit that he had actually grabbed, much less confronted the female technician; Respondent notes that Complainant conceded that he "lunged" at the Cited Employee.

## POLICIES

Respondent has an *EEO Policy* that states that the organization subscribes not only to the legal requirements set forth but also to the spirit of equal opportunity as well.

Respondent's *Violence in the Workplace Policy* reveals that engaging in threatening and violent behavior in the workplace is a serious matter. Such conduct places the safety and health of the organization's associates, customers, visitors, and suppliers in jeopardy and will not be tolerated. Associates engaging in such activities will be subject to appropriate action up to and including discharge. Respondent's *Violence in the Workplace Policy* outlines the following behavior but not limited to: Displaying threatening, physically aggressive, or violent behavior that intimidates or instills fear in others. Making threats of any kind whether verbally, physically, or in writing. Engaging in other hostile behavior, including belligerent speech, excessive arguing, or provoking another.

Respondent's *Termination Policy* states that employment at Rite Aid is "at will" which means both the Associate and Rite Aid have the right to terminate their employment at any time, with or without advance notice, and with or without cause.

## PERSONNEL FILE

Respondent submitted the following regarding Complainant's termination allegation:

- A Consent Order dated March 31, 1989 from the Complainant's personnel file.
- Deferred Message Review dated July 21, 2004 from the Comparable Employee's personnel file.

Respondent submitted a consent order from the Department of Consumer and Regulatory Affairs Occupational Licensing Administration Board of Pharmacy that suspended Complainant's license for eighteen (18) months on March 31, 1989.[2]

## DOCUMENTS[3]

The Complainant submitted the following documents regarding the Complainant's allegation that he was discriminated against on the basis of his race when he was terminated due to the Respondent's *Zero Tolerance Policy*:

- A Witness Declaration dated June 9, 2005, from a Pharmacy Intern.
- A Witness Declaration dated August 16, 2005, from a former Employee.
- A Witness Declaration dated May 20, 2005, from a customer.

The Witness Declaration dated June 9, 2005 revealed that the Cited Employee was notorious throughout the store for his "horseplay," which consisted mostly of teasing female employees and customers. The Declaration also stated that the Pharmacy Intern, who worked with Complainant for five (5) years, could say with confidence that the Complainant is a total professional. Within the Declaration, the Pharmacy Intern asserted that although he did not witness the alleged violent incident, it is beyond his imagination that Complainant would strike a fellow employee, especially the Cited Employee for any reason.

The Witness Declaration dated August 16, 2005 revealed that the Cited Employee was constantly teasing Complainant because of Complainant's "germophobic" attitude around

---

[2] The Respondent submitted on July 26, 2006 a response to an Order (dated June 14, 2006 with a deadline of June 21, 2006) with the Complainant's Comparable Employee's disciplinary information but the information was not included because it surpassed the "June 21, 2006" deadline as annotated within the Order.

[3] An OHR Investigator requested in an Order dated June 14, 2006 a list of employees who were terminated from February 2004 – February 2005 to include the race of each listed employee but this request was refused by the Respondent's Attorney at this time. The Respondent's Attorney stated that the aforementioned information will be submitted to the Commission on Human Rights if necessary.

his work space. Within the Declaration, the former employee declared that the Cited Employee had to be counseled regarding several incidents of inappropriate behavior towards several female employees, and for breaking other rules of behavior. The former employee asserted that knowing Complainant as she did, the former employee could not have imagined Complainant striking the Cited Employee or any other employee.

The Witness Declaration from a Rite Aid Customer that was present at the scene of the alleged incident dated May 20, 2005 revealed that "a small Black man rushed past him heading toward the back of the storage area." Within the Declaration, the Customer further acknowledged that he saw the Cited Employee trip on some milk cartons and cardboard boxes that was stacked on the floor." The Customer also contends in his Declaration that the Cited Employee had fallen face first on the floor rather hard.

The Respondent submitted the following documents regarding the Complainant's allegation that he was discriminated against on the basis of his race when he was terminated due to the Respondent's *Zero Tolerance Policy* for violence in the workplace:

- The Position Description for the Complainant's position (Pharmacy Manager).
- A Deferred Message Review #576468, dated February 10, 2005 sent from the Respondent's Human Resource Manager.
- A Deferred Message Review #571578, dated February 10, 2005 sent from the Respondent's Human Resource Manager.

The Position Description reveals that the primary responsibility of the Pharmacy Manager is to oversee the daily activities of the Pharmacy Department within the retail store. According to the Position Description, frequent independent judgments are essential, and the incumbent is also required to perform task in a safe manner.

The Deferred Message Review #576468 revealed that the Respondent's Human Resource Manager spoke with an employee regarding her knowledge of the incident between the Complainant and the Cited Employee. According to the Message, the employee stated she saw the Cited Employee coming towards the One Hour Photo counter with blood on his nose and hands. The Employee also stated within the message that the Cited Employee told her that the Complainant punched him in the face.

The Deferred Message Review #571578 revealed that the Respondent's Human Resource Manager spoke with an employee regarding her knowledge of the incident between the Complainant and the Cited Employee. According to the Message, the Employee stated she saw the Cited Employee on the salesfloor with a bloody nose and blood on his hands. The Employee stated the Cited Employee acknowledged that the Complainant had punched him in the face.

## INTERVIEWS

An OHR investigator conducted interviews with the following with regard to Complainant's allegation that he was discriminated against on the basis of his race when he was terminated for violating the Respondent's *Zero Tolerance in the Workplace Policy*:

- The Cited Employee the Complainant alleged assaulted.
- The Complainant's Supervisor

During the interview, the Cited Employee asserted that Complainant would often bully and threaten him. The Cited Employee professes that he often complained to management that Complainant was threatening him throughout the day. The Cited Employee denied engaging in horseplay with Complainant, and proffered that Complainant tried to bully and threaten the Cited Employee.

The Cited Employee disputed Complainant's allegation that he called Complainant's name repeatedly or attempted to provoke Complainant in any manner. According to the Cited Employee, he sustained injuries to the nose from Complainant, and not accidentally falling down over cluttered boxes.

Complainant's Supervisor stated that Complainant did not call him as prescribed by Complainant. The Supervisor asserted that he found out about the incident from another Associate. According to the Supervisor, the Associate stated that Complainant had punched the Cited Employee in the nose, and the Cited Employee's nose was bleeding.

The Supervisor affirms that he met with his Supervisor and Complainant regarding the incident. The Supervisor claims that the Complainant conceded that he was involved in "horseplay" with the Cited Employee, and then the Cited Employee fell down.

The Supervisor confirmed that he had never witnessed any other employees at that store engaging in horseplay. The Supervisor conceded that another Pharmacist at another store was charged with assaulting another employee, but the Pharmacist denied the charges, and there were not any other witnesses to corroborate "for" or "against" the Pharmacist.

## STANDARD OF REVIEW

In this forum, in order for Complainant to prevail, the OHR record must contain credible, probative and substantial evidence from which a reasonable person would conclude that Complainant met the *prima facie* elements of discriminatory or retaliatory behavior, and that a legitimate, nondiscriminatory or non-retaliatory explanation for the behavior does not exist. 4 DCMR § 715.1; 4 DCMR § 499.1.

## LEGAL ANALYSIS

The DCHRA makes it unlawful to "…discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's age, race, color, religion, sex, disability, personal appearance, family responsibilities or national origin," among other protected categories. D.C. Official Code § 2-1402.11(a)(1) (2001 Edition).

In a case brought under the DCHRA, the same three-part test applicable to Title VII cases applies. *Atlantic Richfield Co. v. District of Columbia Comm'n on Human Rights,* 515 A.2d 1095, 1099 (D.C. 1986). The initial burden is on the employee to prove her *prima facie* case of discrimination. *Arthur Young & Co., v. Sutherland,* 631 A.2d 354, 361 (D.C. 1993); *see Texas Department of Community Affairs v. Burdine,* 450 U.S. 248 (1981).

Guided by the Supreme Court's analysis in *McDonnell Douglas,* the elements of the *prima facie* case of discrimination are: (1) Complainant belongs to one or more protected classes; (2) Complainant was qualified for his position and meeting his employer's legitimate expectations; (3) Complainant was subjected to an adverse action; and (4) a substantial factor in Respondent's decision to take the adverse action was Complainant's membership in a protected class. *McDonnell Douglas, Inc. v. Green,* 411 U.S. 792, 802 (1973); *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506 (1993); *Arthur Young,* 631 A.2d at 361.

An adverse action in a disparate treatment or retaliation claim is one that "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *See, Brown v. Brody,* 339 U.S. App. D.C. 233, 199 F.3d 446, 456 (D.C. Cir. 1999) citing *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 761 (1999).

In the absence of an action resulting in a diminution of pay or benefits, a Plaintiff must establish the occurrence of an action with "materially adverse consequences affecting the terms, conditions, or privileges of [her] employment. *Brown,* 199 F.3d at 457. An "employment decision does not rise to the level of an actionable adverse action…unless there is a tangible change in the duties or working conditions constituting a material employment disadvantage." *Walker v. WMATA,* 102 F. Supp. 24, 29 (D.D.C. 2000). An action that the Plaintiff establishes as undermining his ability to perform his job satisfactorily, or that threatens his future employment prospects, would be an adverse consequence, and create a material employment disadvantage. *See, Mack v. Strauss,* 134 F. Supp. 2d 103; 2001 U.S. Dist. LEXIS 2341 (D.D.C. 2001).

While an adverse employment action is not limited to a particular type of personnel action, *Cones v Shalala,* 339 U.S. App. D.C. 299, 199 F.3d 512 (D.C. Cir. 2000); *Passer v. American Chemical Society,* 290 U.S. App. D.C. 156, 935 F.2d 322 (D.C. Cir. 1991),

not all personnel actions are adverse actions under Title VII. *Brown*, 199 F.3d at 453.
Minor changes in work-related duties or opportunities are not actionable unless
accompanied by "some other adverse change in the terms, conditions or privileges of
employment." *Stewart v. Evans*, 275 F.3d 1126, 1135 (D.C. 2002). Examples of
personnel actions that, without more, are not actionable under Title VII are employee
inconvenience, an increased workload, a change in assignments and work-related duties,
a lateral transfer or denial of a lateral transfer, temporary designation in a position and
the delay of a temporary designation. *Stewart*, 275 F.3d at 1135-36; *Brown*, 199 F.3d at 457;
*Mungin v. Katten*, 325 U.S. App. D.C. 373, 116 F.3d 1549, 1557 (D.C. Cir. 1997).
Neither a negative performance evaluation, false accusation, nor reprimand is an adverse
employment action in the absence of some material employment disadvantage. *Stewart*,
275 F.3d at 1137; *Mack*, 134 F. Supp. 2d at 112, citing *Childers v. Slater*, 44 F. Supp. 2d
8, 20 (D.D.C. 1999). Subjective injuries such as damage to an employee's reputation,
and public humiliation are not, in and of themselves, necessarily adverse employment
actions. *Forkio v. Powell*, 306 F.3d 1127 (D.C. Cir. 2002); *Stewart*, 275 F.3d at 1137;
*Mack*, 134 F. Supp 2d at 113, citing *Childers*, 44 F. Supp. 2d at 20. The same is true of
mere investigations of an employee, *Mack*, 134 F. Supp. 2d at 114, citing *Yerdon v.
Henry*, 91 F.3d 370, 378 (2d Cir. 1996), or workplace ostracism. *Mack* at 114, citing
*Strother v. S. Cal. Permanente Med. Group*, 79 F.3d 859, 869 (9th Cir. 1996).

Finally, not "[every employment action] that makes an employee unhappy is an
actionable adverse action." *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996).
"Mere idiosyncrasies of personal preference are not sufficient to state an injury." *Brown*,
199 F.3d at 339. If the foregoing were the case, any action an "irritable, chip-on-the-
shoulder employee did not like would form the basis of a discrimination suit." *Brodetski
v. Duffey*, 141 F. Supp. 2d 35, 46 (D.C.D.C. 2001). Moreover, the DCHRA is not
intended to be an avenue for "judicial review of business decisions," or for Courts to act
as "super-personnel departments." See, *Brodetski*, 141 F. Supp. 2d at 45.

In proving that the protected classes were substantial factors in the adverse action, a
Complainant may be introduce evidence that a "similarly situated" person outside
Complainant's protected class was treated more favorably. See, *Hollins v. Federal
National Mortgage Association*, 760 A.2d 563, 578 (2000). A "similarly situated" person
is one who is similar to the Complainant in all "relevant aspects." *Id*. Relevant aspects
include their respective employment situations and the circumstances generating the
allegation of discrimination. *Id*. In short, the Complainant and the other employee must
have a comparable employment status, and must have engaged in the same conduct
without such differentiating or mitigating circumstances that would distinguish their
conduct or the employer's response to it. *Id*. To demonstrate that membership in
Complainant's protected class was a substantial factor in her termination/failure to hire,
evidence can be introduced that the Respondent advertised for the vacant position, or
hired a person into the position who was outside of the Complainant's protected
categories.

If the employee satisfies her burden, i.e., *prima facie* case, she raises a rebuttable presumption that the employer's conduct is unlawful discrimination. *Arthur Young*, 631 A.2d at 361. After this rebuttable presumption is raised, the employer must then articulate "some legitimate, nondiscriminatory reason for the employment action." *Atlantic Richfield*, 515 A.2d at 1099 (citing *Burdine*, 450 U.S. at 254). The employer can "satisfy its burden by producing admissible evidence from which the trier of fact [can] rationally conclude that the employment action [was not] motivated by discriminatory animus." *Atlantic Richfield*, 515 A.2d at 1099-1100. The employer need not persuade the "[trier of fact] that it was actually motivated by the proffered reasons." *Burdine*, 450 U.S. at 254.

If the employer articulates a legitimate, nondiscriminatory reason for the employment action, "the burden shifts back to the employee to prove…that the employer's stated justification for its action 'was not its true reason but was in fact merely a pretext' to disguise discriminatory practice." *Arthur Young*, 631 A.2d at 361 (citation omitted). "This burden merges with the ultimate burden of persuasion on the question of intentional discrimination." *Atlantic Richfield*, 515 A.2d at 1100. "[A]lthough the *McDonnell Douglas* presumption shifts the burden of production to the defendant, 'the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *St. Mary's Honor Ctr.*, 509 U.S. at 507 (1993)(quoting *Burdine*, 450 U.S. at 253). Thus, once the employer satisfies its burden of producing a nondiscriminatory reason for its action, the employee must show "both that the reason was false, and that discrimination was the real reason." *St. Mary's Honor Ctr.*, 509 U.S. at 515 (emphasis in original).

It is not enough for the employee simply to show that the employer's proffered reason for the employment action was pre-textual, although that will "often considerably assist him in doing so." *St. Mary's Honor Center*, 509 U.S. at 517; *see also Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000). The employee must also prove "that the employer has unlawfully discriminated." *St. Mary's Honor Center*, 509 U.S. at 514. While pretext in the proffered reason for the employment action may, "in appropriate circumstances" justify an "inference" of discrimination, *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147 (2000), a Complainant is never relieved of the burden of proving "that the employer has unlawfully discriminated." *St. Mary's Honor Center*, 509 U.S. at 514. In fact, judgment as a matter of law would be appropriate for the employer (i) "…if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision…," or (ii) the plaintiff's factual challenge to the employer's articulated reasons was "weak" and there was "abundant and uncontroverted" independent evidence that no discrimination had occurred. *Reeves*, 530 U.S. at 148.

*Complainant fails to demonstrate that he was subjected to disparate treatment on the basis of his race (White) when he was terminated in February 11, 2005 due to the Respondent's Zero Tolerance Policy for Violence in the Workplace.*

Complainant fails to establish a *prima facie* case. Complainant meets the first element by virtue of his membership in his protected class. Complainant also meets the second element. Except for the terminating event, there is no information in the OHR record that Complainant was not qualified for his position and meeting Respondent's legitimate expectations. Complainant also meets the third element. Complainant's termination on February 20, 2005 constitutes an adverse action. But, Complainant fails to establish the final element. Complainant has not proffered credible evidence that a substantial factor in Respondent's decision to determine him was his race (White).

As analyzed *supra*, in proving that the protected classes were substantial factors in the adverse action, a Complainant may be introduce evidence that a "similarly situated" person outside Complainant's protected class was treated more favorably. See, *Hollins, supra*. A "similarly situated" person is one who is similar to the Complainant in all "relevant aspects." *Id*. Relevant aspects include their respective employment situations and the circumstances generating the allegation of discrimination. *Id*. In short, the Complainant and the other employee must have a comparable employment status, and must have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's response to it. *Id*. Complainant asserts that a Pharmacist (Black) at another store location assaulted a female technician in full view of customers and employees, but was given only a two-week suspension. But, Respondent argues that while statements were taken regarding this alleged incident, nobody witnessed the incident or could provide any corroborating information. Respondent further proclaims that in particular, this Cited Employee denied engaging in any such conduct, and claimed that the allegations against him were entirely fabricated and fueled by his race (Black). Respondent asserts that unlike the Complainant, this Cited Employee did not admit that he had actually grabbed, much less confronted the female technician; Respondent notes that Complainant conceded that he "lunged" at the Cited Employee. Therefore, the Cited Employee was not similarly situated because he was not comparable in all relevant respects. As such, Complainant's *prima facie* case must fail.

Even if Complainant had established a *prima facie* case, Complainant's case would still fail because Respondent articulates a legitimate nondiscriminatory reason for its actions. Respondent terminated Complainant for violating its *Zero Tolerance Policy for Violence in the Workplace*. Complainant allegedly punched/assaulted a fellow coworker and made intimidating or threatening comments. Although the OHR agrees that there is conflicting testimony as to the reported events,[4] Respondent conceded that its policy allows it to terminate Complainant for engaging in threatening communication with employees. Complainant has not proffered any credible evidence that Respondent's reasons are pretext and the actual reason is discrimination. As such, Complainant's claim that he was subjected to disparate treatment on the basis of his race when he was terminated must fail.

---

[4] As to whether or not the cited person was punched (assaulted), fell, or both.

## DETERMINATION/CONCLUSION

For the foregoing reasons, the OHR finds:

**NO PROBABLE CAUSE** to believe Complainant was subjected to disparate treatment on the basis of his race (White) when he was terminated in February 11, 2005 due to the Respondent's *Zero Tolerance Policy for Violence in the Workplace.*

**IT IS SO ORDERED.**

## RIGHT TO APPLY FOR RECONSIDERATION

Complainant may apply for reconsideration pursuant to 4 DCMR § 719. Such application along with all supporting documentation must be submitted to the Director of the Office of Human Rights in writing within, thirty (30) days from the following date
8/28/06 .

The grounds for reconsideration are limited to: new evidence, misapplication of laws, or misstatement of material facts. The request must, therefore, be based on one or more of these grounds. If the request is not based on one of these grounds, or not timely filed, it will be subjected to dismissal. **COMPLAINANT MUST INCLUDE ALL SUPPORTING DOCUMENTATION AND REASONS FOR THE APPEAL IN THE ORIGINAL REQUEST FOR RECONSIDERATION.**

This Office will forward a copy of any request for reconsideration along with all supporting documentation to the other party for a response.

## RIGHT TO SUBSTANTIAL WEIGHT REVIEW

Complainant has a right to a "Substantial Weight Review" from the U.S. Equal Employment Opportunity Commission. If Complainant wishes to obtain such a review, please submit your request to the State and Local Coordinator, Equal Employment Opportunity Commission, 1801 "L" Street, N.W., 2nd Floor, Washington, D.C. 20005, within 15 days from receipt of this letter.

Sincerely,

Kenneth L. Saunders
Director

*Michael P. Checka vs. Rite Aid Corporation*
*Docket No.: 06-071-P (CN)*
*EEOC No.: 10C-A600061*
*Page 12 of 12*

cc:    Stephen W. Mooney, Esq.
        Weinberg, Wheeler, Hudgins, Gunn & Dial, LLC
        950 East Paces Ferry Rd.
        Suite 3000
        Atlanta, GA 30326

U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

| To: Michael P. Checka | From: Washington Field Office - 570 |
|---|---|
| 5836 Rexford Drive | 1801 L Street, N.W. |
| Springfield, VA 22152 | Suite 100 |
| | Washington, DC 20507 |

☐ On behalf of person(s) aggrieved whose identity is
CONFIDENTIAL (29 CFR § 1601.7(a))

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| | David Gonzalez, | |
| 10C-2006-00061 | State & Local Coordinator | (202) 419-0714 |

**THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:**

☐ The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐ Your allegations did not involve a disability as defined by the Americans with Disabilities Act.

☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐ Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge.

☐ Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge.

☐ While reasonable efforts were made to locate you, we were not able to do so.

☐ You were given 30 days to accept a reasonable settlement offer that affords full relief for the harm you alleged.

☐ The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

☒ The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐ Other (briefly state)

## - NOTICE OF SUIT RIGHTS -

*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt of this Notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

*Dana R. Hutter* (signature)                                      **OCT 2 0 2006**

| Enclosure(s) | Dana Hutter, Director | (Date Mailed) |
|---|---|---|

cc:  Marilyn -. McClure-Demers
Rite Aid Corporation
30 Hunter Lane
Camp Hill, PA 17011

*Checka*
EXHIBIT NO. 28
CJB 8/1/07

Enclosure with EEOC
Form 161 (3/98)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS --**     **Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA),**
                              **or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days** of the date you *receive* this Notice. Therefore, you should **keep a record of this date**. Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope, and tell him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was** *mailed* **to you** (as indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office. If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

## PRIVATE SUIT RIGHTS -- Equal Pay Act (EPA):

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred more than **2 years (3 years)** before you file suit may not be collectible. For example, if you were underpaid under the EPA for work performed from 7/1/00 to 12/1/00, you should file suit *before* 7/1/02 – *not* 12/1/02 – in order to recover unpaid wages due for July 2000. This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice **and** within the 2- or 3-year EPA back pay recovery period.

## ATTORNEY REPRESENTATION -- Title VII and the ADA:

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above, because such requests do not relieve you of the requirement to bring suit within 90 days.

## ATTORNEY REFERRAL AND EEOC ASSISTANCE -- All Statutes:

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge file, **please make your review request within 6 months of this Notice.** (Before filing suit, any request should be made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*

# EXHIBIT C

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MICHAEL P. CHECKA )
5836 Rexford Drive )
Springfield, Virginia 22152, )
)
          **Plaintiff** )    **C.A. No.: 1:07CV00099**
)
vs. )    **Judge Gladys Kessler**
)
**RITE AID CORPORATION** )
30 Hunter Lane )
Camp Hill, Pennsylvania 17011 )
Serve: )
CT Corporation )
Corporation Trust Centers )
1209 Orange Street )
Wilmington, Delaware )    **JURY TRIAL DEMANDED**
And )
**RITE AID OF WASHINGTON,** )
**D.C., INC.** )
Serve: )
CT Corporation )
1015 15th Street, N.W. )
Suite 1000 )
Washington, D.C. 20005 )
)
          **Defendants.** )
_____ )

## AMENDED COMPLAINT FOR DISCRIMINATION UNDER TITLE VII

Plaintiff, Michael P. Checka, by undersigned counsel, hereby brings this

Amended Complaint against Defendants, Rite Aid Corporation and Rite Aid of

Washington, D.C., Inc., for racial discrimination, pursuant to the provisions of Title VII

of the Civil Rights Act of 1964, as amended by the Equal Employment Opportunity Act

of 1972, 42 U.S.C. §§ 2000e, et seq., and in support thereof alleges as follows:

## JURISDICTION AND VENUE

1.    This Honorable Court has jurisdiction over this matter that is brought

pursuant to provisions of 42 U.S.C. §§ 2000e, et seq. and venue is proper in the District

of Columbia in that Defendant transacts and at all times concerned herein did transact

business in the District of Columbia and all actions complained of herein took place in

the District of Columbia.

## PARTIES

2.    Plaintiff, Michael P. Checka, (hereinafter "Plaintiff") is an adult,

Caucasian male residing in the Commonwealth of Virginia and, at all times concerned

herein, was a licensed Pharmacist in the District of Columbia employed by Defendant,

Rite Aid Corporation or Rite Aid of Washington, D.C. Inc..

3.    Defendant, Rite Aid Corporation, (hereinafter "Rite Aid" or "Co-

Defendant") is a corporation that transacts business in the District of Columbia on a

regular basis, either directly or through affiliated Defendant, Rite Aid of Washington,

D.C., Inc. (hereinafter "Rite Aid of D.C." or "Co-Defendant.") Upon information and

belief, Rite Aid of D.C. is either a wholly owned subsidiary of or otherwise affiliated

with Co-Defendant Rite Aid.

## FACTUAL BACKGROUND

4.    In or about February 2005, Plaintiff was employed as a pharmacist at the

Rite Aid store located at 1815 Connecticut Avenue, N.W., Washington, D.C. 20009 and

had been so employed for many years.

5.    On or about February 5, 2005, another employee at the store, one Alene Ashenafi, who is a black, native African male, complained that Plaintiff had struck him during a confrontation in a storeroom in the back of the store.  Plaintiff denied any such striking and contended that Mr. Ashenafi, who had a reputation for taunting and mischievous conduct in the workplace, fell over some boxes in the storeroom and sustained a bleeding nose, as Plaintiff went in to use the men's room located there.

6.    Despite Plaintiff's absolute denial of any assault, the police were called and he was arrested.  The case was "no papered" by the United States Attorney and all charges were dropped without a formal complaint being filed.

7.    Despite this fact and despite the fact that the only witness to the incident, an elderly customer, who had entered the storeroom at the time to use the bathroom, verified that Plaintiff did not strike or otherwise physically threaten Mr. Ashenafi, Plaintiff was suspended and ultimately discharged on or about February 20, 2005.  Upon information and belief, no adverse action was taken against Mr. Ashenafi based upon the wrongful accusation or otherwise as a result of the incident.

8.    All efforts by Plaintiff, through his counsel, to obtain reinstatement were fruitless, despite sworn statements from the above witness and other employees and witnesses whose statements corroborated those of Plaintiff, both as to the events of that day, the general professional decorum and peaceful conduct of Plaintiff in discharging his duties as pharmacist and the mischevious and belligerent nature of his accuser.

## **CAUSE OF ACTION**

### **(Discrimination based on Disparate Treatment)**

9.    Plaintiff repeats and reiterates each allegation set forth above in

paragraphs 1 through 8 of the Complaint.

10.    Pursuant to the provisions of 42 U.S.C. §§ 2000e et seq., it is unlawful for an employer to …"discharge any individual or to otherwise discriminate against any individual with respect to his… privileges of employment because of such individual's race…"

11.    Several months before the termination of Plaintiff, at another Rite Aid store in the District of Columbia, a black native African pharmacist named Steve Obidike was accused by a female employee of striking her in that store. That pharmacist was likewise arrested and shortly thereafter the case was "no papered" by the United States Attorney and all charges were dismissed. That black employee received a two-week suspension and was returned to full duty thereafter.

12.    Plaintiff alleges that Defendant has treated him less favorably than his peers because of his race, which is Caucasian. Plaintiff believes that this disparate treatment by Defendant is the result of an intent to discriminate against Plaintiff on the basis of his race.

13.    Defendant has engaged in disparate treatment against Plaintiff as an act of reverse discrimination, Plaintiff being a Caucasian male and the other peer pharmacist similarly situated being black, as well as is the individual who falsely accused Plaintiff.

14.    Plaintiff has exhausted his administrative remedies at the state and federal level and has received a "Right to Sue" letter from the U.S. Equal Employment Opportunity Commission, which letter is dated October 20, 2006 and was received by Plaintiff on October 22, 2006. (Copy attached as Exhibit 1.)

WHEREFORE, Plaintiff respectfully demands judgment against Defendant as follows:

1.    Full reinstatement and retroactive promotions to which he would have been entitled;

2.    Full back pay consisting of salary loss, lost overtime, shift differential and fringe and other benefits;

3.    All costs and reasonable attorney's fees incurred by Plaintiff; and

4.    Such other and further relief as the Court deems just and proper.

**Plaintiff demands a jury trial on all issues.**

Respectfully submitted,

Robert F. Condon, Bar No. 108290
818 18th Street, N.W., Suite 410
Washington, D.C. 20006
(202) 861-0070
Fax (202) 861-0070
E-Mail rfcondon@artabane-belden.com

EEOC Form 161 (3/98)

U.S EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

To: Michael P. Checka
5836 Rexford Drive
Springfield, VA 22152

From: Washington Field Office - 570
1801 L Street, N.W.
Suite 100
Washington, DC 20507

| | On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR § 1601.7(a)) |

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 10C-2006-00061 | David Gonzalez, State & Local Coordinator | (202) 419-0714 |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

[ ] The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ] Your allegations did not involve a disability as defined by the Americans with Disabilities Act.

[ ] The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

[ ] Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge.

[ ] Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge.

[ ] While reasonable efforts were made to locate you, we were not able to do so.

[ ] You were given 30 days to accept a reasonable settlement offer that affords full relief for the harm you alleged.

[ ] The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

[X] The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[ ] Other (briefly state)

### - NOTICE OF SUIT RIGHTS -

(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this Notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

*Dana R Hutter*

OCT 2 0 2006

Enclosure(s)

Dana Hutter,
Director

(Date Mailed)

cc: Marilyn -. McClure-Demers
Rite Aid Corporation
30 Hunter Lane
Camp Hill, PA 17011


EXHIBIT

# EXHIBIT D

## Scott Zavinski

**From:**  Robert F. Condon [rfcondon@artabane-belden.com]

**Sent:**  Friday, July 08, 2005 3:24 PM

**To:**  szavinski@riteaid.com

**Subject:**  RE: Michael Checka

Mr. Zavinski:

Thanks for your message.  I will check with Mr Norman Collins, who is not my client but a witness to the matter, and determine if we can meet at the Florida Avenue store on Wed. am on the 13th of July. Suggest 10:30 0r 11 am.  Okay?

Robert F. Condon.

-----Original Message-----
**From:** Scott Zavinski [mailto:szavinski@riteaid.com]
**Sent:** Saturday, July 09, 2005 2:12 PM
**To:** rfcondon@artabane-belden.com
**Cc:** szavinski@riteaid.com
**Subject:** RE: Michael Checka

Mr. Condon,

I received an e-mail from our VP of Human Resources Wayne LeClair regarding an interview of a client of yours.
I did leave you a message at your office but also wanted to write and notify you of my upcoming schedule and see if that allows for me to meet with Mr. Collins (customer).  My availability for week ending 7/16/05 is:

WEDNESDAY  7/13  (AM HOURS)
FRIDAY 7/15  (AM TO MID-DAY HOURS)

I would be able to meet this associate at any of our stores in the DC metro area.  Please let me know if such a schedule may be available for Mr. Collins by calling me at 804-272-0696, ext 230.  At that time we can discuss further details.

Sincerely,

Scott Zavinski
Human Resource Manager

Disclaimer: This e-mail message is intended only for the personal use of the recipient(s) named above. If you are not an intended recipient, you may not review, copy or distribute this message. If you have received this communication in error, please notify us immediately by e-mail and delete

the original message.
This e-mail expresses views only of the sender, which are not to be attributed to Rite Aid Corporation and may not be copied or distributed without this statement.

7/9/2005                                                                                                  D-00138

```
*********************************************************************
*** REQUESTOR: HRMSAZ - ZAVINSKI, SCOTT A.      RGN 60           ***
*********************************************************************
***               S Y S M   I N B A S K E T   P R I N T         ***
```

MESSAGE ID: 710061     DATE: 07/18/05  TIME: 16:47    PRIORITY: 000

TO:        HRMSAZ - ZAVINSKI, SCOTT A.
           HUMAN RESOURCES MGR.
           RGN 60

FROM:      HRMSAZ - ZAVINSKI, SCOTT A.
           HUMAN RESOURCES MGR.
           RGN 60

SUBJECT:   STORE 3845


Wayne,

I did meet with customer Norman Collins on 7/13/05
who was identified by Attorney Robert Condon as
having been present when an assault on associate
Ashenafi Alene from Michael Checka.   (store 3845, Feb 2005).

Mr. Collins was interviewed by myeslf and Linda Hall
took notes.   The attorney left w/o question when I asked
to speak to Mr. Collins alone.  Here are the comments taken:


1)  I asked why he was there that day to meet with me.

    He stated that he was asked by attorney Robert Condon
    to meet with me regarding information he knew resulting
    in an incident involving Michael Checka.

2)  I asked how he came forward to present information to
    the attorney.

    He stated that he called the store one day (after Michael
    had been termed) to speak to Michael about his diabetes.
    Mr. Collins stated that he liked speaking to Michael
    about his diabetes and besides going to our store #3831,
    he found satisfaction going to meet Michael.

    He said he called the store and was told by the staff that
    Michael had been termed over a fight.  He did not state
    who had told him.  He said he did not think that was true and
    was given Michaels' phone number.  He called him and
    discussed the events at hand.  Mr. Collins remembered talking
    to Michael and saying that he was at the store on 2/5/05
    and did not see any dispute.  Michael informed Mr. Collins
    to call his attorney (Robert Condon) and tell him what he

D-00139

knew.

3)  I asked Mr. Collins to elaborate on what he told the
    attorney:

    Mr. Collins stated that he came out of the bathroom
    in the stores' backroom and saw Ashenafi Alene
    (he described him pretty well) rush by him pretty fast and
    fell onto some cardboard boxes or milk crates.  This was
    around 3 PM.  He then stated that he saw Michael Checka
    leaning up against the doorway to the backroom facing
    into the stockroom and where the associate fell.
    Mr. Collins stated that he walked by Michael and exited the
    store without talking to anyone except a Security Guard
    at the entrance to the store.  He said he told the Guard
    that an associate may be hurt in the backroom of the store.
    He said he did not know if the Guard paid any attention to
    him or not as the Guard was talking to someone.

4)  I asked Mr. Collins is he heard anything when he was
    in the bathroom:

    He said no.  He recited the incident by saying he just
    saw the young guy rushing by him, fall and then see
    Michael in the doorway.

Sent to:    HRSWML              LECLAIR, WAYNE              (to)
            HRMSAZ              ZAVINSKI, SCOTT A.         (to)

## Scott Zavinski

**From:** Wayne LeClair [wleclair@riteaid.com]
**Sent:** Tuesday, July 05, 2005 12:46 PM
**To:** szavinski@riteaid.com
**Subject:** FW: Michael Checka

---

**From:** Robert F. Condon [mailto:rfcondon@artabane-belden.com]
**Sent:** Monday, June 27, 2005 2:54 PM
**To:** Wayne LeClair
**Subject:** RE: Michael Checka

Mr. LeClair:

    I have finally reached Mr. Collins, who has agreed to be interviewed by your HR person. He is generally available next week, as am I. I would ask Mr. Zavinski to call me to set up a time and place for him to question Mr. Collins. My telephone number is 202 861-0070. I am in tomorrow morning, wed. morning and thurs. morning. Thank you. Robert F. Condon

        -----Original Message-----
        **From:** Wayne LeClair [mailto:wleclair@riteaid.com]
        **Sent:** Tuesday, June 14, 2005 11:28 AM
        **To:** rfcondon@artabane-belden.com
        **Cc:** szavinski@riteaid.com
        **Subject:** Michael Checka

        Mr. Condon,

        I was surprised to hear that a witness had come forward to support Mr. Checka's story. Neither Mr. Checka nor any other associate interviewed had mentioned such a witness. I have asked our region human resources manager, Scott Zavinski, for additional information based on your letter. I would also request that Mr. Norman Collins make himself available for an interview with our region human resources manager. As you have had contact with Mr. Collins do you think he would be agreeable to meeting with Mr. Zavinski ?

        Sincerely,

        Wayne LeClair

Disclaimer: This e-mail message is intended only for the personal use of the recipient(s) named above. If you are not an intended recipient, you may not review, copy or distribute this message. If you have received this communication in error, please notify us immediately by e-mail and delete

the original message.
This e-mail expresses views only of the sender, which are not to be attributed to Rite Aid Corporation and may not be copied or distributed without this statement.

D-00141



**RITE AID Corporation**

• **MAILING ADDRESS**
P.O. Box 3165
Harrisburg, PA 17105

• **GENERAL OFFICE**
30 Hunter Lane
Camp Hill, PA 17011

• **(717) 761-2633**

December 8, 2005

*VIA CERTIFIED MAIL 7004 1160 0002 2609 0505*

Robert F. Condon, Esquire
818 18th Street, N.W.
Suite 410
Washington, D.C.  20006

RE:  Michael Checka

Dear Mr. Condon:

     Please consider this the Company's final response to your letter dated August 17, 2005, wherein you requested that the Company reconsider Mr. Checka's termination of February 20, 2005.  I understand that you made this same or similar request of Wayne LeClair, Vice President of Human Resource Administration in the Summer of 2005.

     Pursuant to the review process embodied in the Associate Complaint Resolution Procedure, Mr. LeClair advised you that Mr. Checka's termination was upheld.  Nothing has changed.  While Rite Aid greatly appreciates Mr. Checka's past years of service, a review of the facts giving rise to his termination serve only to further support the Company's conclusions as Mr. LeClair related in his letter to you dated August 10, 2005.

     Very truly yours,

Marilyn T. McClure-Demers
Employment Law Counsel

MTM/apy

cc:    Wayne LeClair, Vice President of Human Resource Administration
      Personnel File

*Marilyn T. McClure-Demers*
*717.731.3825*
*mmccluredemers@riteaid.com*

D-00149

## DECLARATION OF NORMAN B. COLLINS

I, Norman B. Collins, residing at 603 Twinbrook Parkway, Rockville, Maryland 20851, being over the age of 18 years and competent to make this Declaration, under penalty of perjury declares as follows:

1. I am a diabetic and I utilize the services of the Rite Aid Pharmacy located at 1815 Connecticut Avenue, N.W., Washington, D.C. 20009 on occasion to purchase syringes and other medical needs.

2. I am familiar with Mr. Michael Checka in his capacity as a Pharmacist at the above Rite Aid store. I do not know Mr. Checka in any other capacity.

3. On February 5, 2005, I purchased some syringes from Mr. Checka at the Pharmacy at about 1:30 pm on that date. I left and went to a nearby restaurant.

4. At between 3:30 –4:00 pm, I left the restaurant and got in my car. I decided to relieve myself prior to the trip home and double-parked my car outside the Rite Aid. I went to the back of the store and into the Men's Room in the storage area. As I left the Men's Room, a small black man rushed past me heading toward the back of the storage area. I witnessed him trip on some milk cartons and cardboard boxes that was stacked on the floor. He went down face first and struck the floor rather hard. At the time, I noticed Mr. Checka standing about 15-20 feet away near the entrance to the Ladies Room. He was not anywhere near the small man when he fell.

5. I left the room and the store immediately without having or hearing any conversation with any of the two men. Some time later, I went to the Rite Aid store and inquired of Mr. Checka. I was informed that he was terminated and no longer working for Rite Aid.

6. I am making this statement of my own free will, having been promised or given nothing in return. I have no personal relationship with Mr. Checka or any other person connected with this matter, but am only relating what I witnessed.

Signed this date under penalty of perjury.

Dated: 5/20/05

Norman B. Collins

D-00172

# EXHIBIT E

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **MICHAEL P. CHECKA** | ) | |
| **5836 Rexford Drive** | ) | |
| **Springfield, Virginia 22152,** | ) | |
| | ) | |
| **Plaintiff** | ) | **C.A. No.:** |
| **vs.** | ) | |
| | ) | |
| **RITE AID CORPORATION** | ) | |
| **30 Hunter Lane** | ) | |
| **Camp Hill, Pennsylvania 17011** | ) | |
| **Serve:** | ) | |
| **CT Corporation** | ) | |
| **1015 15th Street, N.W.** | ) | |
| **Suite 1000** | ) | |
| **Washington, D.C. 20005** | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| **Defendant.** | ) | |

_____)

## COMPLAINT FOR DISCRIMINATION UNDER TITLE VII

Plaintiff, Michael P. Checka, by undersigned counsel, hereby brings this

Complaint against Defendant, Rite Aid Corporation, for racial discrimination, pursuant to

the provisions of Title VII of the Civil Rights Act of 1964, as amended by the Equal

Employment Opportunity Act of 1972, 42 U.S.C. §§ 2000e, et seq., and in support

thereof alleges as follows:

### JURISDICTION AND VENUE

1.  This Honorable Court has jurisdiction over this matter that is brought

pursuant to provisions of 42 U.S.C. §§ 2000e, et seq. and venue is proper in the District

of Columbia in that Defendant transacts and at all times concerned herein did transact

business in the District of Columbia and all actions complained of herein took place in the District of Columbia.

## PARTIES

2.    Plaintiff, Michael P. Checka, (hereinafter "Plaintiff") is an adult, Caucasian male residing in the Commonwealth of Virginia and, at all times concerned herein, was a licensed Pharmacist in the District of Columbia employed by Defendant, Rite Aid Corporation.

3.    Defendant, Rite Aid Corporation, (hereinafter "Rite Aid" or "Defendant") is a corporation that is authorized to transact business in the District of Columbia and does transact business in the District of Columbia on a regular basis.

## FACTUAL BACKGROUND

4.    In or about February 2005, Plaintiff was employed as a pharmacist at the Rite Aid store located at 1815 Connecticut Avenue, N.W., Washington, D.C. 20009 and had been so employed for many years.

5.    On or about February 5, 2005, another employee at the store, one Alene Ashenafi, who is a black, native African male, complained that Plaintiff had struck him during a confrontation in a storeroom in the back of the store. Plaintiff denied any such striking and contended that Mr. Ashenafi, who had a reputation for taunting and mischievous conduct in the workplace, fell over some boxes in the storeroom and sustained a bleeding nose, as Plaintiff went in to use the men's room located there.

6.    Despite Plaintiff's absolute denial of any assault, the police were called and he was arrested. The case was "no papered" by the United States Attorney and all charges were dropped without a formal complaint being filed.

7.    Despite this fact and despite the fact that the only witness to the incident, an elderly customer, who had entered the storeroom at the time to use the bathroom, verified that Plaintiff did not strike or otherwise physically threaten Mr. Ashenafi, Plaintiff was suspended and ultimately discharged on or about February 20, 2005. Upon information and belief, no adverse action was taken against Mr. Ashenafi based upon the wrongful accusation or otherwise as a result of the incident.

8.    All efforts by Plaintiff, through his counsel, to obtain reinstatement were fruitless, despite sworn statements from the above witness and other employees and witnesses whose statements corroborated those of Plaintiff, both as to the events of that day, the general professional decorum and peaceful conduct of Plaintiff in discharging his duties as pharmacist and the mischevious and belligerent nature of his accuser.

## CAUSE OF ACTION

### (Discrimination based on Disparate Treatment)

9.    Plaintiff repeats and reiterates each allegation set forth above in paragraphs 1 through 8 of the Complaint.

10.    Pursuant to the provisions of 42 U.S.C. §§ 2000e et seq., it is unlawful for an employer to ..."discharge any individual or to otherwise discriminate against any individual with respect to his... privileges of employment because of such individual's race..."

11. Several months before the termination of Plaintiff, at another Rite Aid store in the District of Columbia, a black native African pharmacist named Steve Obidike was accused by a female employee of striking her in that store. That pharmacist was likewise arrested and shortly thereafter the case was "no papered" by the United States Attorney and all charges were dismissed. That black employee received a two-week suspension and was returned to full duty thereafter.

12. Plaintiff alleges that Defendant has treated him less favorably than his peers because of his race, which is Caucasian. Plaintiff believes that this disparate treatment by Defendant is the result of an intent to discriminate against Plaintiff on the basis of his race.

13. Defendant has engaged in disparate treatment against Plaintiff as an act of reverse discrimination, Plaintiff being a Caucasian male and the other peer pharmacist similarly situated being black, as well as is the individual who falsely accused Plaintiff.

14. Plaintiff has exhausted his administrative remedies at the state and federal level and has received a "Right to Sue" letter from the U.S. Equal Employment Opportunity Commission, which letter is dated October 20, 2006 and was received by Plaintiff on October 22, 2006. (Copy attached as Exhibit 1.)

WHEREFORE, Plaintiff respectfully demands judgment against Defendant as follows:

1. Full reinstatement and retroactive promotions to which he would have been entitled;

2. Full back pay consisting of salary loss, lost overtime, shift differential and fringe and other benefits;

3. All costs and reasonable attorney's fees incurred by Plaintiff; and

4. Such other and further relief as the Court deems just and proper.

**Plaintiff demands a jury trial on all issues.**

Respectfully submitted,

Robert F. Condon, Bar No. 108290
818 18th Street, N.W., Suite 410
Washington, D.C. 20006
(202) 861-0070
Fax (202) 861-0070
E-Mail rfcondon@artabane-belden.com

EEOC Form 161 (3/98)

U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

| | |
|---|---|
| To: Michael P. Checka<br>5836 Rexford Drive<br>Springfield, VA 22152 | From: Washington Field Office - 570<br>1801 L Street, N.W.<br>Suite 100<br>Washington, DC 20507 |

|  | On behalf of person(s) aggrieved whose identity is<br>CONFIDENTIAL (29 CFR § 1601.7(a)) |

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 10C-2006-00061 | David Gonzalez,<br>State & Local Coordinator | (202) 419-0714 |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

| | |
|---|---|
| [ ] | The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC. |
| [ ] | Your allegations did not involve a disability as defined by the Americans with Disabilities Act. |
| [ ] | The Respondent employs less than the required number of employees or is not otherwise covered by the statutes. |
| [ ] | Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge. |
| [ ] | Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge. |
| [ ] | While reasonable efforts were made to locate you, we were not able to do so. |
| [ ] | You were given 30 days to accept a reasonable settlement offer that affords full relief for the harm you alleged. |
| [ ] | The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge. |
| [X] | The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge. |
| [ ] | Other (briefly state) |

### - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this Notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

*Dana R. Hutter*                                    OCT 2 0 2006

Dana Hutter,
Director                                          (Date Mailed)

Enclosure(s)

cc: Marilyn -. McClure-Demers
Rite Aid Corporation
30 Hunter Lane
Camp Hill, PA 17011



## CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF  Fairfax
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Robert F. Condon
818 18th St., NW
Washington, DC 20006 (202) 8610070

ATTORNEYS (IF KNOWN)

### II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

☐ 1 U.S. Government
Plaintiff

☒ 3 Federal Question
(U.S. Government Not a Party)

☐ 2 U.S. Government
Defendant

☐ 4 Diversity
(Indicate Citizenship of Parties
in item III)

### III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

### IV. CASE ASSIGNMENT AND NATURE OF SUIT
**(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)**

| ☐ A. *Antitrust* | ☐ B. *Personal Injury/Malpractice* | ☐ C. *Administrative Agency Review* | ☐ D. *Temporary Restraining Order/Preliminary Injunction* |
|---|---|---|---|
| ☐ 410 Antitrust | ☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Medical Malpractice<br>☐ 365 Product Liability<br>☐ 368 Asbestos Product Liability | ☐ 151 Medicare Act<br><br>**Social Security:**<br>☐ 861 HIA ((1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g)<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)<br><br>**Other Statutes**<br>☐ 891 Agricultural Acts<br>☐ 892 Economic Stabilization Act<br>☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 890 Other Statutory Actions (If Administrative Agency is Involved) | Any nature of suit from any category may be selected for this category of case assignment.<br><br>*(If Antitrust, then A governs)* |

### ☐ E. *General Civil (Other)* OR ☐ F. *Pro Se General Civil*

| | | | |
|---|---|---|---|
| **Real Property**<br>☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent, Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property<br><br>**Personal Property**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | **Bankruptcy**<br>☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br><br>**Prisoner Petitions**<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br><br>**Property Rights**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark<br><br>**Federal Tax Suits**<br>☐ 870 Taxes (US plaintiff or defendant)<br>☐ 871 IRS-Third Party 26 USC 7609 | **Forfeiture/Penalty**<br>☐ 610 Agriculture<br>☐ 620 Other Food &Drug<br>☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 630 Liquor Laws<br>☐ 640 RR & Truck<br>☐ 650 Airline Regs<br>☐ 660 Occupational Safety/Health<br>☐ 690 Other<br><br>**Other Statutes**<br>☐ 400 State Reapportionment<br>☐ 430 Banks & Banking<br>☐ 450 Commerce/ICC Rates/etc.<br>☐ 460 Deportation | ☐ 470 Racketeer Influenced & Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Satellite TV<br>☐ 810 Selective Service<br>☐ 850 Securities/Commodities/Exchange<br>☐ 875 Customer Challenge 12 USC 3410<br>☐ 900 Appeal of fee determination under equal access to Justice<br>☐ 950 Constitutionality of State Statutes<br>☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act |

| ☐ G. *Habeas Corpus/ 2255* | ☐ H. *Employment Discrimination* | ☐ I. *FOIA/PRIVACY ACT* | ☐ J. *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General ☐ 510 Motion/Vacate Sentence | ☒ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation) *(If pro se, select this deck)* | ☐ 895 Freedom of Information Act ☐ 890 Other Statutory Actions (if Privacy Act) *(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ☐ K. *Labor/ERISA (non-employment)* | ☐ L. *Other Civil Rights (non-employment)* | ☐ M. *Contract* | ☐ N. *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act ☐ 720 Labor/Mgmt. Relations ☐ 730 Labor/Mgmt. Reporting & Disclosure Act ☐ 740 Labor Railway Act ☐ 790 Other Labor Litigation ☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act) ☐ 443 Housing/Accommodations ☐ 444 Welfare ☐ 440 Other Civil Rights ☐ 445 American w/Disabilities-Employment ☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance ☐ 120 Marine ☐ 130 Miller Act ☐ 140 Negotiable Instrument ☐ 150 Recovery of Overpayment & Enforcement of Judgment ☐ 153 Recovery of Overpayment of Veteran's Benefits ☐ 160 Stockholder's Suits ☐ 190 Other Contracts ☐ 195 Contract Product Liability ☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify)   ☐ Multi district Litigation   ☐ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

Title VII - Disparate Treatment on Basis of Race

**VII. REQUESTED IN COMPLAINT**   CHECK IF THIS IS A CLASS ☐ ACTION UNDER F.R.C.P. 23   **DEMAND $**   Check YES only if demanded in complaint **JURY DEMAND:** ☐ YES   ☒ NO

**VIII. RELATED CASE(S) IF ANY**   (See instruction) ☐ YES ☒ NO   If yes, please complete related case form.

DATE 1/16/07   SIGNATURE OF ATTORNEY OF RECORD   *[signature]*

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed *only* if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the *primary* cause of action found in your complaint. You may select only *one* category. You *must* also select *one* corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

# EXHIBIT F

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

MICHAEL P. CHECKA      )
      )
      **Plaintiff**      )
      )
vs.      )      **C.A. No.: 07-00099 (GK)**
      )      **Judge Gladys Kessler**
RITE AID CORPORATION,      )
et al.      )
      )
      **Defendants.**      )
_____)

## PRAECIPE

Plaintiff Michael P. Checka, by undersigned counsel, hereby requests that the

Court enter a dismissal of all claims against Defendant Rite Aid Corporation, in the

instant action.  All claims remain against Defendant Rite Aid of Washington, D.C., Inc.

Respectfully submitted,

   /s/ Robert F. Condon
Robert F. Condon, Esq.
D.C. Bar No. 108290
818 18th Street, N.W., Suite 410
Washington, D.C. 20006
(202) 861-0070
Fax No. (202) 861-2939
rfcondon@artabane-belden.com

Counsel for Plaintiff, Michael Checka

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Praecipe was served by U.S. Mail, postage prepaid, this 16th day of July, 2007 on:

Katherine E. Bierma Pregel
Littler Mendelson, P.C.
1150 17th Street, N.W., Suite 900
Washington, D.C. 20036

Theodore A. Schroeder
Littler Mendelson, P.C.
625 Liberty Avenue, 26th Floor
Pittsburg, PA 15222


    /s/ Robert F. Condon
Robert F. Condon

# EXHIBIT G

LEXSEE

**PAUL G. PLUMMER, Plaintiff, v. SAFEWAY, INC., Defendant.**

**Civil Action No. 93-0316 (PLF)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

**1995 U.S. Dist. LEXIS 3428; 66 Empl. Prac. Dec. (CCH) P43,590**

**March 17, 1995, Decided**
**March 17, 1995, FILED**

**COUNSEL:** [*1] PAUL G. PLUMMER, plaintiff, (PRO SE), Union Bridge, MD.

For SAFEWAY, INC., Ms. Terry Eyler, EEOC Supervisor, defendant: Richard C. Hotvedt, MORGAN, LEWIS & BOCKIUS, Washington, DC.

**JUDGES:** PAUL L. FRIEDMAN, United States District Judge

**OPINION BY:** PAUL L. FRIEDMAN

**OPINION**

MEMORANDUM OPINION

Paul G. Plummer is a white male who worked as a part-time clerk for Safeway, Inc., from March or April 1990 until his discharge in December 1990. Mr. Plummer alleges that Safeway engaged in racial discrimination when it terminated him for conduct for which similarly situated African-American female employees were not terminated. Compl. at 2. He claims that Safeway "customer relations" policies were enforced in a way that resulted in the disparate treatment of white males. Id. Plaintiff alleges that his discharge was racially motivated and seeks relief under Title VII of the Civil Rights Act of 1964. 42 U.S.C. §§ 2000(e) et seq. Safeway maintains that it terminated Mr. Plummer after he had an altercation with two customers on December 21, 1990, because he violated company policy and not because of his race or sex.

Plaintiff and defendant have each moved for summary judgment. The Court finds that there are no genuine issues of material fact and that defendant is entitled to judgment as a matter of law.

I. SUMMARY JUDGMENT STANDARD

Under Rule 56(c) of the Federal Rules of Civil [*2] Procedure, summary judgment may be granted if the pleadings, depositions, answers to interrogatories, admissions on file and affidavits, if any, show that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Material facts are those "that might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). The court must view the evidence in a light most favorable to the non-movant and draw all reasonable inferences in his favor. Id. at 255; see also Washington Post Co. v. U.S. Dept. of Health and Human Services, 865 F.2d 320, 325 (D.C. Cir. 1989). On the other hand, the nonmoving party is "required to provide evidence that would permit a reasonable jury to find" in his favor. He may not rely on mere unsupported allegations or denials and must provide affidavits or other competent evidence setting forth specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986); Laningham v. U.S. Navy, [*3] 259 U.S. App. D.C. 115, 813 F.2d 1236, 1242 (D.C. Cir. 1987). If the evidence provided is "merely colorable" or "not significantly probative," summary judgment may be granted. Anderson v. Liberty Lobby, Inc., 477 U.S. at 249-50.

In employment discrimination cases, summary judgment must be viewed with special caution because intentional discrimination and proof of disparate treatment are difficult for a plaintiff to establish. Johnson v. Digital Equip. Corp., 836 F. Supp. 14, 18 (D.D.C. 1993). The Court therefore must be "extra-careful to view all the evidence in the light most favorable" to Mr. Plummer when considering Safeway's summary judgment motion. Ross v. Runyon, 859 F. Supp. 15, 21-22 (D.D.C. 1994). This rigorous review, however, does not relieve Mr. Plummer from his obligation to substantiate his claims of

Case 1:07-cv-00099-GK    Document 15-11    Filed 11/01/2007    Page 3 of 5

Page 2

1995 U.S. Dist. LEXIS 3428, *; 66 Empl. Prac. Dec. (CCH) P43,590

discrimination with affidavits or other affirmative, credible and probative evidence showing that there is a genuine issue of material fact for trial. Johnson v. Digital Equip. Corp., 836 F. Supp. at 15. If defendant provides evidence that plaintiff was terminated because of poor performance, as it has here, plaintiff "must then bring forward evidence of [*4] the pretextual nature of the legitimate non-discriminatory purpose posited by defendant . . . . Evidence of discrimination that is 'merely colorable', or 'not significantly probative' cannot prevent the issuance of summary judgment." Johnson v. Digital Equipment Corp., 836 F. Supp. 14, 15 (D.D.C. 1993) (citation omitted).

## II. RACIAL DISCRIMINATION

The Supreme Court has set forth a three-step analysis for claims of disparate treatment under Title VII. Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 252-53, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973)). First, the plaintiff must establish a prima facie case of discrimination. Id. If a plaintiff establishes a prima facie case, then the burden of production shifts to the defendant to articulate some legitimate, non-discriminatory reason for the employee's discharge. Id. at 253. If the defendant meets its burden, the plaintiff must provide evidence showing that the defendant's reason is no more than a pretext for a discriminatory decision. Id. If a motion for summary judgment is sought in a Title [*5] VII action, the court must determine at each stage if a genuine issue of material fact exists and, if not, whether the case calls for judgment as a matter of law. Abraham v. Graphic Arts Int'l Union, 212 U.S. App. D.C. 412, 660 F.2d 811, 815 (D.C. Cir. 1981).

In the instant case, Mr. Plummer has failed to provide evidence sufficient to establish a prima facie case of discrimination. In addition, Safeway has articulated a legitimate reason for terminating Mr. Plummer, and he has failed to provide evidence that Safeway's reason was a pretext for the discrimination asserted.

### A. Failure To Establish Prima Facie Case

In an ordinary case alleging a discriminatory discharge, a plaintiff may make out a prima facie case by showing (1) membership in a protected class, (2) that he has performed "at or near the employer's legitimate expectations," (3) that he was terminated, and (4) that he was replaced by a person of equal or lesser ability who is not a member of a protected class or, alternatively, that the position remained open after termination. Neuren v. Adduci, Mastriani, Meeks & Schill, 43 F.3d 1507, 1512 (D.C. Cir. 1995); Harding v. Gray, 9 F.3d 150, 152 (D.C. [*6] Cir. 1993). These elements are flexible and must be

adapted to the facts of the case at hand. Harding v. Gray, 9 F.3d at 152 (citing McDonnell Douglas Corp. v. Green, 411 U.S. at 802 n.13). By making out a prima facie case, a plaintiff demonstrates that he was rejected "under circumstances which give rise to an inference of discrimination." Id. (quoting Texas Dept. of Community Affairs v. Burdine, 450 U.S. at 253).

In an ordinary discrimination case, an inference of discrimination arises if the plaintiff is a member of a minority class, is performing satisfactorily and is fired. See McDonnell Douglas Corp. v. Green, 411 U.S. at 802; Harding v. Gray, 9 F.3d at 153. The courts have held, however, that no such inference should be drawn when the plaintiff is a white male because "invidious racial discrimination against whites is relatively uncommon in our society, and so there is nothing inherently suspicious in an employer's decision" to discharge a white male employee. Harding v. Gray, 9 F.3d at 153. As a substitute for showing membership in a protected class, a white male alleging "reverse" discrimination must show "background circumstances [that] [*7] support the suspicion that the defendant is that unusual employer who discriminates against the majority." Id. (quoting Parker v. Baltimore & Ohio R.R., 209 U.S. App. D.C. 215, 652 F.2d 1012, 1017 (D.C. Cir. 1981)). A white male plaintiff either may provide evidence that a particular employer had a reason or inclination to discriminate invidiously against whites, or he may provide evidence "indicating that there is something 'fishy' about the facts of the case at hand that raises an inference of [reverse] discrimination." Harding v. Gray, 9 F.3d at 153.

Mr. Plummer has provided no evidence that Safeway had a reason or inclination to discriminate against white males. He admits that no Safeway representative ever made a statement indicating that race or sex were factors considered in Safeway's decision to discharge him. Deposition of Paul G. Plummer ("Plummer Dep.") at 152-53, 170-71. In addition, of the ten employees Safeway terminated during the period January 1989 through December 1990, five were male and five were female, eight were African-American, one was Asian and only one, the plaintiff, was white. D.C. Dep't of Human Rights Determination, Tab 1 to Defendant's [*8] Discovery Materials ("Def. Disc.") at 3. These statistics do not demonstrate either an inclination to discriminate against white males or that there is something "fishy" about the facts that raise an inference of reverse discrimination. Harding v. Gray, 9 F.3d at 153.

Mr. Plummer contends, however, that other facts about the case give rise to an inference of discrimination. First, he argues that Safeway's affirmative action policy constitutes "background circumstances" sufficient to draw an inference of racial discrimination. Compl. at 1.

Case 1:07-cv-00099-GK    Document 15-11    Filed 11/01/2007    Page 4 of 5

Page 3

1995 U.S. Dist. LEXIS 3428, *; 66 Empl. Prac. Dec. (CCH) P43,590

The existence of a race-conscious affirmative action program alone, however, is not evidence of suspicious circumstances sufficient to justify an inference of the discriminatory intent of an employer. Bishopp v. District of Columbia, 252 U.S. App. D.C. 156, 788 F.2d 781, 784 n.3 (D.C. Cir. 1986); Dougherty v. Barry, 607 F. Supp. 1271, 1283 n.8 (D.D.C. 1985), vacated on other grounds, 869 F.2d 605 (D.C. Cir. 1989). A plaintiff must aggregate credible direct or circumstantial evidence of an employer's discriminatory intent in order to establish an inference of racial discrimination. Bishopp v. District of Columbia, 788 F.2d at 786-87; [*9] Lanphear v. Prokop, 227 U.S. App. D.C. 89, 703 F.2d 1311, 1315 (D.C. Cir. 1983); Dougherty v. Barry, 607 F. Supp. at 1287. Here, plaintiff has provided no other substantiated circumstances that, together with Safeway's affirmative action plan, could be viewed cumulatively to establish an inference of discrimination.

Mr. Plummer next suggests that he has shown an inference of discrimination because Safeway did not discharge an African-American female employee for similar behavior. Mr. Plummer has not offered more than unsubstantiated allegations that his qualifications, employment record and behavior were equivalent to this particular employee, or to any other African-American female employee, whom Safeway did not discharge. There is no evidence that Safeway treated African-American women in clerk positions more favorably than white males, thus giving rise to an inference of discrimination against white males, or that any African-American female had engaged in conduct comparable to plaintiff's.

Finally, Mr. Plummer has not shown that his "performance [was] at or near the employer's legitimate expectations." Neuren v. Adduci, Mastriani, Meeks & Schill, 43 F.3d at 1512. [*10] Mr. Plummer admitted that he had breached Safeway customer relations policies, that management had given him repeated warnings, and that he had been counseled on a number of occasions prior to December 21, 1990, when he engaged in a verbal dispute with customers. He therefore did not satisfy the normal work requirements of his employment. Plummer Dep. at 25, 34-35, 89.

Because Mr. Plummer has failed to establish any background circumstances that give rise to an inference of discrimination against white males or against plaintiff in particular, or that he met Safeway's express employment expectations, he has failed to make out a prima facie case.

B. Failure To Establish Pretext

Even if Mr. Plummer had established a prima facie case of discrimination, Safeway would still be entitled to judgment as a matter of law because it has articulated a legitimate, nondiscriminatory reason for Mr. Plummer's termination and he has failed to show that the reason was pretextual.

To prove that an employer's proffered reason for termination was a pretext for racial discrimination, the plaintiff must provide more than simply a refutation. Slade v. Billington, 700 F. Supp. 1134, 1147 [*11] (D.D.C. 1988). He may establish pretext with (1) direct evidence of race or gender animus, such as statements that the plaintiff is being fired because of his race or gender; or (2) comparative evidence that African-American or female employees with similarly poor work performance or employment records were retained while plaintiff was not; or (3) "statistical evidence showing that the employer had a pattern or practice of discrimination against persons of plaintiff's race" or gender. Bailey v. MCI Telecommunications Corp., 29 F.E.P. Cases 1457, 1459 (D.D.C. 1982); see McDonnell Douglas Corp. v. Green, 411 U.S. at 804-05. Mr. Plummer has offered no direct evidence of racial or gender bias nor any statistical evidence of a pattern or practice of discrimination. Rather, the heart of his claim involves comparative evidence.

Prior to commencing work at Safeway Mr. Plummer received training on "customer relations," including how to deal with unruly customers. Plummer Dep. at 82-83. He was instructed to refer all problems with customers directly to the management office. Id. at 86-87. The Safeway Employee Handbook, which Mr. Plummer signed in order to acknowledge that he had [*12] studied it, reiterates this policy. Id at 92; Safeway Employee Handbook, Def. Disc., Tab 4, at 14-16. Mr. Plummer concedes that on as many as three occasions Safeway managers counseled him about his problems with customer relations and the importance of adhering to Safeway training and handbook guidelines when confronted with such problems. Plummer Dep. at 25-29, 31. Nonetheless, on December 21, 1990, in disregard of his training, the employee handbook and management warnings, Mr. Plummer returned an insulting comment to two customers and did not contact the management office for assistance. Plummer Dep. at 34-35, 40, 43, 48-50, 93-95, 105-06.

Mr. Plummer does not deny that he breached Safeway's customer policy, but claims that Safeway used this breach of duty as a pretext for implementing its discriminatory policy toward white male employees. Mr. Plummer alleges that Safeway's customer policy is not applied evenly to all races and was selectively used to terminate him because he is a white male. Plaintiff claims that African-American female employees who engaged in similar conduct were retained. He attempts to substantiate this allegation by pointing to the conduct of an allegedly [*13] similarly situated African-American

1995 U.S. Dist. LEXIS 3428, *; 66 Empl. Prac. Dec. (CCH) P43,590

female co-worker, Tracy Smith, who was not terminated under circumstances similar to those leading to plaintiff's termination. Plummer Dep. at 131-32, 150.

Mr. Plummer presents no evidence that his conduct and disciplinary history were comparable to Ms. Smith's or to any other African-American female clerk employees. He provides no evidence to show that Ms. Smith's behavior with customers involved calling them names or that Safeway had counseled her about improving her behavior. See Plummer Dep. at 117. Nor has he provided evidence that any other Safeway employee had been involved in a similar incident after having been repeatedly counseled regarding his or her relations with customers or that Safeway failed to discipline such employees. There is simply no evidence in the record that Safeway favored any similarly situated African-American female employee, or anyone else, over white male employees, including Mr. Plummer, or that Safeway failed to discipline or discharge anyone else for conduct nearly identical to plaintiff's. See Neuren v. Adduci, Mastriani, Meeks & Schill, 43 F.3d at 1514-1515.

Mr. Plummer correctly points out that a white [*14] plaintiff deserves the same protection under Title VII as a minority plaintiff. See McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273, 278-80, 49 L. Ed. 2d 493, 96 S. Ct. 2574 (1976). But plaintiff has failed to demonstrate that there is a genuine issue of material fact that his termination by Safeway for breaching customer relations policy was a pretext for a discriminatory employment decision. The Court therefore grants defendant's motion for summary judgment, denies plaintiff's motion for summary judgment and enters judgment in favor of defendant. An Order consistent with this Opinion is entered this same day.

SO ORDERED.

PAUL L. FRIEDMAN

United States District Judge

DATE: 3/17/95

JUDGMENT

This case is before the Court on Plaintiff's Motion For Summary Judgment and Defendant's Motion For Summary Judgment. Upon consideration of the motions, the supporting and opposing papers, and the entire record in this case, including the exhibits submitted by the Defendant and the transcript of the deposition of Plaintiff, and for the reasons stated in the Court's accompanying Memorandum Opinion, the Court finds that there are no genuine issues as to any material facts and [*15] that Defendant is entitled to judgment as a matter of law. Accordingly, it is hereby

ORDERED that Defendant's Motion For Summary Judgment is GRANTED; it is

FURTHER ORDERED that Plaintiff's Motion For Summary Judgment is DENIED; and it is

FURTHER ORDERED that judgment is entered in favor of Defendant.

SO ORDERED.

PAUL L. FRIEDMAN

United States District

DATE:

3/17/95

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MICHAEL P. CHECKA,** ) | |
| ) | |
| **Plaintiff,** ) | **Case No. 1:07CV00099 (GK)** |
| ) | **Judge Gladys Kessler** |
| **v.** ) | |
| ) | **Next Scheduled Deadline:** |
| ) | **Dispositive Motions Due** |
| ) | **November 1, 2007** |
| **RITE AID OF** ) | |
| **WASHINGTON, D.C., INC.,** ) | |
| ) | |
| **Defendant.** ) | |

### PROPOSED ORDER

Upon consideration of Defendant's Motion for Summary Judgment, the memorandum in support, the opposition thereto, the reply, and the entire record herein, it is hereby:

ORDERED that Defendant's Motion is GRANTED and that Plaintiff's Amended Complaint is hereby DISMISSED with prejudice.

Dated: _____        _____

Gladys Kessler
United States District Judge

**COPIES TO:**

Robert F. Condon, Esquire
ARTABANE & BELDEN, P.C.
818 18th Street, N.W.
Suite 410
Washington, DC 20006

Counsel for Plaintiff
Michael P. Checka

Katherine E. Bierma Pregel, Esquire
LITTLER MENDELSON, P.C.
1150 17th Street, N.W.
Suite 900
Washington, DC 20036

Theodore A. Schroeder, Esquire
LITTLER MENDELSON, P.C.
625 Liberty Avenue
26th Floor
Pittsburgh, PA 15222

Counsel for Defendant,
Rite Aid of Washington, D.C., Inc.