IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MICHAEL P. CHECKA | ) | |
| | ) | |
| Plaintiff | ) | C.A. No.: 07-99 (GK) |
| vs. | ) | Judge Gladys Kessler |
| | ) | |
| RITE AID CORPORATION, | ) | |
| et al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, Michael P. Checka , by undersigned counsel, submits this memorandum of points and authorities in opposition to Defendant, Rite Aid of Washington, D.C. Inc.'s Motion for Summary Judgment.

### PRELIMINARY STATEMENT

The claim set forth by Plaintiff herein is that Defendant engaged in an act of reverse discrimination against him, a white male, in that they terminated his employment for an alleged act of violence in the work place against an African born male. The workplace principally employs minorities, either African-American, African born or Hispanic. Another similarly situated African born employee of another store in the same jurisdiction, Washington, D.C., was not disciplined in any way for an alleged act of violence against another black female employee in a totally comparable, factually similar situation. Plaintiff submits that there exist material issues of fact as to whether Defendant's action constitutes a knowing and intentional discrimination against him requiring a trial by a jury.

## STATEMENT OF FACTS

A full statement of the material facts is contained in the Declaration of Michael P. Checka, attached hereto and incorporated herein by reference. Plaintiff respectfully suggests that these facts need not be repeated herein. Certain salient facts that Plaintiff believes support his argument will be contained in the argument section of this memorandum.

## ARGUMENT

Plaintiff agrees that the standard for summary judgment is that, viewing the facts in a light most favorable to the nonmoving party, "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56©.

The absence of evidence supporting the claims of the Plaintiff is what must be shown by the Defendant to shift the burden to Plaintiff to present specific evidence that sets forth a genuine issue requiring a trial of the facts. Celotex Corp. v. Catrett, 477 U.S. 242, 255 (1086).

Plaintiff likewise concedes that a "discriminatory motive" is a necessary element of his proof of discrimination based on his race. Plaintiff must set forth evidence adequate to create an inference that an employment decision was based on a discriminatory criterion illegal under the act. Furnco Constr. Corp. v. Waters, 438 U.S. 567. If Plaintiff accomplishes this, i.e., a prima facie case, the burden shifts to Defendant to present a legitimate, nondiscriminatory reason for the action taken against Plaintiff. Stella v. Mineta, 284 F. 3d 135, 144 (D.C. Cir. 2002). If Defendant accomplishes that,

the burden returns to Plaintiff to show that the stated "nondiscriminatory" reason for its action was a pretext for discrimination. Stella, 284 F.3d at 144.

This is a "reverse discrimination" claim. The basis for this claim is that Plaintiff, a white male employee, was treated disparately for an alleged violation of the *zero tolerance for violence in the workplace* rule of the Defendant than was a minority employee similarly situated, who was not disciplined for a violation of the above rule under virtually identical circumstances. Not only was the determination to single Plaintiff out for discipline, in fact the ultimate discipline of termination, wrong and unfair, but was intentionally discriminatory. Plaintiff submits that the very happening of the events, only months apart and occurring in the same jurisdiction and investigated by the same individual on behalf of the Defendant company, gives rise to an inference of discrimination since there is "something fishy" about the facts in the case. Harding v. Gray, 9 F.3d 150, 153 (D.C. Cir. 1993).

The D.C. circuit in Harding has determined that, in reverse discrimination cases, since the claimant is not a member of the traditional protected class that a minority claimant would occupy, he must show additional "background circumstances" that support the suspicion that Defendant is "that unusual employer who discriminates against the majority." Harding, at 153. While Plaintiff is not presently claiming that Rite Aid has a company policy or inclination generally to discriminate against white employees or that it does so as a general proposition, Plaintiff is claiming that Rite Aid discriminated intentionally against this white employee in this situation, by treating him disparately from a minority employee similarly situated. Mr. Checka was virtually the only white employee in the pharmacy at Florida Avenue, N.W. at the time of his termination. The

conduct alleged to have taken place was against a minority employee and other minority employees were heard to express criticism of Mr. Checka and to advise the supervisor that they would have trouble working with him. He was fired. A virtually identical situation had arisen only months earlier in another Rite Aid store in the same jurisdiction, again a store with an overwhelming minority population. The minority senior pharmacist, Steve Obidike, was accused of assault, as was Mr. Checka; the other minority pharmacist was arrested for assault as was Mr. Checka; the charges were dropped for both; the alleged assault was not witnessed as to Mr. Obidike, but there was reddening of the arm of the alleged victim, an immediate outcry from her, and a history of animosity between the two parties. In Mr. Checka's situation, there was a witness that totally corroborated his version of events and exonerated him from any credible claim of violence. Mr. Obidike's situation was virtually the same, except that there was no witness to the alleged act of violence, but no exoneration evidence either. Mr.Obidike was returned to work without punishment of any kind.

A reasonable jury is entitled to draw the inference that the sensitivity to the minority population in Mr. Checka's case resulted in a contrived basis for his termination, contrary to the overwhelming weight of the factual evidence and the absence of any supporting evidence of workplace violence (or the later added basis-inappropriate behavior.) The triers of fact could reasonably conclude that the actions of this employer were intentionally discriminatory and the reasons given to justify these actions were pretextual and designed to "keep peace" in the minority family of that store. There was something "fishy" about a several actions of Rite Aid in those situations and Plaintiff respectfully submits that this alone raises an inference of discrimination entitling Plaintiff

to a trial by a jury. The Harding decision hastens to point out that "background circumstances" need not mean "some circumstances in the employer's background". Rather, the court noted, "other evidence about the background of the case at hand – including an allegation of superior qualifications- can be equally valuable." Harding, at 154. Although the instant situation does not involve selection for hire, the corollary is quite the same.

Defendant argues that Plaintiff cannot sustain his burden in that he cannot demonstrate that he was similarly situated to the other party with whom he seeks to be compared. This constitutes the third prong of the *prima facie* claim of discrimination, under the McDonnell Douglas test.

Defendant argues that the facts are not comparable. One involved a claim of assault resulting in a bloody nose and the other had no blood. What happened to the "Zero tolerance for violence in the work place" standard espoused by Defendant that has been paraded with great fanfare in front in Plaintiff's situation, but which was ignored in the comparable situation. Defendant is trying to create distinctions, but only succeeds in creating distinctions without a difference. "Violence" should be "violence" and 'zero tolerance" should be "zero tolerance", if the employer is to be considered even-handed.

The alleged "admissions" of Mr. Checka were denied by him and others in his behalf and do not constitute a reasonable difference, once the supposed "investigation" was done. Defendant says it found no evidence corroborating the claim of the "victim" in the Obidike case. What about the redness on the arm of the woman, the immediate outcry and her hysterical condition. Certainly no more "evidence" existed with respect to Mr. Checka's situation, and in fact, his case contains an exculpatory statement by a

disinterested third party eye-witness, albeit made some time after the event. The
"different positions" argument of dissimilarity likewise is a distinction without a
difference. Mr. Checka may have gotten the title of Pharmacy Manager, but it was a title
without any additional duties than that of a senior pharmacist, which was Mr. Obidike's
position. Also, Mr. Obidike did apparently supervise the clerical staff associate who he
was charged with assaulting.

No material difference existed between the two situations, except that Mr. Checka
is white and Mr. Obidike is a member of a minority class. Plaintiff has presented
evidence showing that the third prong of his *prima facie* case has been established.

Defendant claims a legitimate, non-discriminatory reason for terminating him.
The credible evidence, including a credibility evaluation and determination of Mr.
Ashenafi, did not support the sole ground on which Mr. Checka was terminated, violence
in the workplace, a claim that he assaulted Mr. Ashenafi. That was the reason and the
only reason that he was terminated. That determination was made of whole cloth, since
the credible evidence clearly disabuses any conclusion of assault. So, thereafter,
Defendant conjures up another ostensible basis for its action, Inappropriate Behavior in
the Workplace. Assuming that ground for discipline even existed at the time of this
incident (the Atlas containing that language was published after the termination), it is
confined to conduct consisting of "displaying threatening, physically aggressive or
violence that intimidates or instills fear in others [or] [m]aking threats of any kind,
verbally, physically or in writing."

Every person interviewed who knew Mr. Ashenafi and Mr. Checka described the daily
bantering and antics of Ashenafi and the interplay between them when Mr. Ashenafi

would tease Mr. Checka and shout names at him and Mr. Checka would make believe he was after Ashenafi, who would dart in the aisles of the store, often giggling. The "good-natured", albeit annoying to Mr. Checka, interplay had been going many months on a regular basis. No angry or serious confrontation or frightening actions by either ever took place. All the witnesses, including Plaintiff, who spoke to Scott Zavinski told the same or similar versions of the background and facts surrounding the February 5 events. There was no credible evidence to infer that Mr. Checka's actions in the back storeroom on the afternoon of February 5 were anything other than the same kind of bantering. The fact that, on that occasion, Mr. Ashenafi tripped and fell over the debris in that room is the only distinguishing factor, one that was not the fault or responsibility of the Plaintiff.

The "finding" of Defendant could be found by a reasonable trier of the facts to have been a pretext to sustain its decision to terminate Mr. Checka and sacrifice him to "keep the peace." That determination would not be second-guessing the decision of the employer, albeit in error, which Plaintiff agrees is not permitted in this type of case. But, a reasonable evaluation of what the employer found in its "investigation", taken together with its disparate treatment of a similarly situated fellow employee, raises sufficient issues and satisfies the "*prima facie*" burden, thus entitling Plaintiff to proceed with the case.

Wherefore, for all the foregoing reasons, and in light of the Statement of Disputed Material Facts, Plaintiff respectfully requests this Court to enter an Order deny Defendant's Motion for Summary Judgment.

Respectfully submitted,

Robert F. Condon, #108290
818 18th Street, N.W., Suite 410
Washington, D.C. 20006
(202) 861-0070 Telephone
(202) 861-2939 Facsimile
rfcondon@artabane-belden.com
Counsel for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of Plaintiff's Memorandum in Opposition to

Defendant's Motion for Summary Judgment, Statement of Disputed Material Facts and

Exhibits and Proposed Order were served via ECF Electronic Filing this 16th day of

November, 2007, upon:

Katherine Bierma Pregel
1150 17th Street, N.W., Suite 900
Washington, D.C. 20036
And
Theodore A. Schroeder
625 Liberty Avenue
26th Floor
Pittsburg, PA 15222

Robert F. Condon

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MICHAEL P. CHECKA                    )
                                     )
              Plaintiff              )        C.A. No.: 07-99 (GK)
vs.                                  )        Judge Gladys Kessler
                                     )
RITE AID CORPORATION,                )
et al.                               )
                                     )
              Defendants.            )
_____)

### ORDER

      **THIS MATTER**, having come before the Court on Defendant's Motion for

Summary Judgment and

      All parties having been heard and good cause having been shown for the denial of

the Motion, it is

      **THEREFORE**, ordered that the Motion for Summary Judgment shall be and the

same is hereby **DENIED.**


Dated:                       _____

                                United States District Judge

Copies to:

Robert F. Condon
818 18th Street, N.W., Suite 410
Washington, D.C. 20006

Katherine E. Bierma Pregel
1150 17th Street, N.W., Suite 900
Washington, D.C. 20036

Theodore A. Schroeder
625 Liberty Avenue
26th Floor
Pittsburg, PA 15222

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MICHAEL P. CHECKA                      )
                                       )
            Plaintiff                  )      C.A. No.: 07-99 (GK)
vs.                                    )      Judge Gladys Kessler
                                       )
RITE AID CORPORATION,                  )
et al.                                 )
                                       )
            Defendants.                )
_____)

## PLAINTIFF'S STATEMENT OF DISPUTED MATERIAL FACTS
## IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, Michael P. Checka, by undersigned counsel, hereby submits his

Statement of Disputed Material Facts in Opposition to Defendant's Motion for Summary

Judgment..

1.      The exhibit (No. A) to the Declaration of Scott Zavinski, submitted to

support the company policy prohibiting Violent and Inappropriate Behavior in the

Workplace, was not in effect until after the termination of Plaintiff from employment

with Rite Aid.

2.      The actions of Plaintiff on February 5, 2007, based upon any credible view

of the facts, could not reasonably be interpreted to violate the alleged company policy

prohibiting "displaying threatening, physically aggressive or violent behavior that

intimidates or instills fear in others {or} making threats of any kind, verbally, physically

or in writing".

3.      The actions described in paragraph 10 and 11 of Defendant's Statement of

Undisputed Material Facts in Support of the Motion for Summary Judgment do not

support any allegation of violation of the Violence in the Workplace policy of Defendant as the only reasonable interpretation of these actions are that they were frivolous bantering or horseplay, such as went on between Mr. Ashenafi and Plaintiff and Mr. Ashenafi and others on a regular basis. (Checka Declaration; Sherry Persaud Declaration; David Christopher Green Declaration; Harold D. Vizian Declaration.)

4.      The statement made by Plaintiff to Mr. Ashenafi in the storeroom, "What do you have to say to me now?" was intended by him to mean "What do you have to say to me now that you do not have aisles to run down, what taunts do you have to say to me?"

5.      Plaintiff never had any physical contact with Mr. Ashenafi in the storeroom on February 5, 2005, nor did he take any action that would have placed Ashenafi in fear of harm. (Checka Declaration)

6.      The running away by Mr. Ashenafi was a common reaction to the motion of Plaintiff as if he was going to approach, as it had happened many times in the past in a playful fashion by both parties. (Checka Declaration; Vizian Declaration; Green Declaration).

7.      Plaintiff only came close to Mr. Ashenafi after he fell and bloodied his nose in order to assist him and it was at that time the Mr. Ashenafi blew droplets of blood at Plaintiff marking his smock. (Checka Declaration; Norman Collins Declaration).

8.      Mr. Ashenafi fell purely through his own carelessness and not as a result of any aggressive act by Plaintiff and not through any reasonable fear of Plaintiff. Checka Declaration; Collins Declaration; Green Declaration.).

9.    Plaintiff did not wash his hands in the pharmacy sink after the incident as there was no blood on them. He merely turned the water on when Mr. Ashenafi came into the pharmacy area thinking he was coming to get his nose cleaned up. (Checka Declaration; Green Declaration.).

10.    Although the senior executives who were working for Rite Aid at the time of the discharge of Plaintiff may be white, the overwhelming majority of the employees at the Florida Avenue store where Plaintiff was employed are minorities, either African-American, African born or Hispanic (Checka Declaration).

11.    The overwhelming majority of the employees at the Georgia Avenue N.W. store where Steve Obidike was employed when the incident involving him occurred are minorities.

12.    Although Mr. Zavinski conducted interviews of employees of the Florida Avenue store, including David Green, he did ask Mr. Green to explain what he meant when he characterized Plaintiff's statement to him that he "lunged" at Mr. Ashenafi. (Zavinski Declaration; Green Declaration).

13.    Mr., Zavinski was the person who investigated the Obidike incident as well as the Checka incident. (Zavinski Declaration; Checka Declaration).

14.    Plaintiff did not state to the shift supervisor, Markund Karnik, in words or substance that he "may have hit him (Ashenafi) he was not sure." David Green was right next to Plaintiff during that conversation and heard nothing of the kind. (Checka Declaration).

15.    Plaintiff, while offering to pay any out-of-pocket medical cost that Mr. Ashenafi might have underwent, did not state in words of substance that the "incident

was his fault.", but rather stated that he felt badly that Mr. Ashenafi had injured himself. (Checka Declaration).

16.     Plaintiff did not move "quickly" toward Mr. Ashenafi in the storeroom and did not so state to Mr. Zavinski. (Checka Declaration; Zavinski Declaration; Collins Declaration).

17.     It was reported to Mr. Zavinski by at least one female minority employee after the incident that "she would have difficulty working with [Mr. Checka] after this."

18.     Plaintiff was 15 to 20 feet away from Mr. Ashenafi, near the doorway to the room, when the latter man fell and struck his face on the floor rather hard. He was nowhere near him [Ashenafi]. (Collins Declaration).

19.     Plaintiff did not notice or, at least, remember Mr. Collins' presence in the storeroom that afternoon due to the excitement and stress of the events that took place. (Checka Declaration).

19.     Plaintiff was advised upon being notified of his termination that it was based on "violence in the workplace". At no time did the employer's representatives advise him that his termination was based in any way upon any other"inappropriate behavior in the workplace." (Checka Declaration).

20.     The incident involving Steve Obidike, who was a senior pharmacist at the Georgia Avenue, N.W., Washington, D.C. store, arose from a complaint by a black female pharmacy associate, who worked with him and who he supervised, that Mr. Obidike had grabbed her arm and shoved her against a wall causing her to fall. The incident apparently stemmed from the female employee objecting to the loudness of a radio belonging to Mr. Obidike that she felt was too loud. The woman screamed

immediately bringing assistance and that person noticed a redness on the woman's arm.
Although, Mr. Obidike denied physically assaulting the woman, he was arrested for
simply assault and the charge was later "no-papered" by the U.S. Attorney. (Zavinski
Declaration Exhibits.)

21.    Except for a suspension that lasted until the criminal charges were
dropped, Mr. Obidike received no other discipline in the form of a discharge or even a
suspension. Zavinski Declaration Exhibits.)

22,    Although Plaintiff was designated as a Pharmacy Manager, he was not
given keys to the store nor the combination to the safe and the title was for compensation
purposes only and did not entail any additional powers or duties as a practical matter.
(Checka Declaration).

Dated: November 16, 2007.                        Respectfully submitted,

                                                 Robert F. Condon,#108290
                                                 818 18th Street, N.W., Suite 410
                                                 Washington, D.C. 20006
                                                 (202) 861-0070 Telephone
                                                 (202) 861-2939 Facsimile
                                                 rfcondon@artabane-belden.com

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MICHAEL P. CHECKA )
)
Plaintiff ) **C.A. No.: 07-99 (GK)**
vs. ) **Judge Gladys Kessler**
)
RITE AID CORPORATION, )
et al. )
)
Defendants. )
_____)

## DECLARATION OF MICHAEL P. CHECKA

I, Michael P. Checka, under penalty of perjury, do hereby state and aver the
following, which is based upon my own knowledge as to the matters contained therein:

1.      I am over the age of 18 years and am competent to make this declaration.

2.      I am the Plaintiff in the within action. I began work at Rite Aid in May
1997, having previously worked at People's Drug, which was absorbed into CVS in
1997.

3.      I have been a pharmacist in the District of Columbia since the early
1980's.

4.      In 1998, I moved to the Rite Aid store on Florida and Connecticut
Avenues in the District of Columbia.

5.      During that entire time, until the incident for which I was terminated in
February 2005, I worked without complaint or incident, in a store whose employees, both
clerical and professional were almost exclusively minorities, either African-American,
African born or Hispanic. I got along with all personnel and management. Although I

was paid from late 1999 as a Pharmacy Manager, I did not have keys to the office or the combination to the safe. The title was nominal at best and only reflected the compensation I was paid.

6.     The incident that occurred on February 5, 2005 that led to my firing, began as most days when Ashenafi Alene, a clerical hourly associate, who comes from Ethiopia, came to work. His behavior followed a consistent pattern that consisted of playful taunting of me and other associates on the floor or in the pharmacy; making faces and shouting " Mike, Mike, look, look" as he was dancing around in the aisles and laughing. Other similar taunts, all laughable, were the daily diet with Mr. Ashenafi. Although I did refer to him as a "freak" on an earlier occasion, that was because of reports to me of Mr. Ashenafi's inappropriate behavior toward female associates in the store and toward female customers, who complained of his physical "groping" of them and his propositioning of customers.

7.     I must emphasize, as everyone who has been asked to comment on this interaction between Mr. Ashenafi and myself has stated, there was never any serious confrontational behavior on my part toward him and any movements in his direction were greeted with him giggling and running up or down an aisle and never any movement on my part except for an occasional few steps in his direction. It was never confrontational and everyone dealt with it the same way.

8.     It has been reported to me that Mr. Ashenafi had expressed an animosity toward me because of my referring to him as a "freak" on a much earlier occasion, but that was never stated by him to me.

9.    On the day in question, Mr. Ashenafi began his shift as usual by taunting me with his customary tongue wave and shout of "Mike, Mike, I love you" and such ridiculous taunts, none of which caught more than passing attention. The store had been very busy that day due to a conference of students in the hotel across the street. At a certain time in the afternoon, long into my shift, Mr. Ashenafi was on the loading ramp shouting his usual rants. I went to get some sodas and saw him about 20 feet away in the store and when I gestured (as I had done many, many times before in jest as everyone who worked there knew) as if I was going to go after him, he ran down the aisle giggling as he always did. I did not move more than several steps at that time or at any time.

10.    Later, I felt a little queasy from reflux and went into the back storage room where the bathrooms were, as I thought I might be sick. Mr. Ashenafi was in the middle of the room about 15 or 20 feet away. I said to him in the same tone I always used when the banter occurred, "What do you have to say to me now?", meaning that, now that you can't disappear down the aisles, what taunts will you come up with?

11.    I began to walk toward him, as I always did, for a few feet and he turned and began to run toward the rear of this big storeroom as he always did. He tripped on something, lost his balance and fell striking his nose. He came up bleeding and I approached him asking if I could take him into the bathroom to stop the bleeding. He blew some blood from his nose at me that struck my smock, leaving droplets of blood on it. We both returned to the store where Mr. Ashenafi was intercepted by two African-American female employees, who detered him after following me into the pharmacy area and took him upstairs to "make a report" of the incident. Neither of the persons asked me what happened. I hasten to state that I did not wash my hands behind the pharmacy

separation at that time, despite what was stated by Ms. Brooks, who accompanied Mr. Ashenafi upstairs to "make a report". I turned the faucet on when Mr. Ashenafi came into the pharmacy area thinking he was going to let me clean up his nose and blood, but he was escorted away. I did not have any blood on my hands or anywhere other than the spatter on my smock.

12.     Later, a shift supervisor, Markun Karnik, telephoned me to ask what had happened. I told him that Mr. Ashenafi had accidentally tripped over some boxes and fell, hitting his nose. I did not, repeat, did not say to Mr. Karnik in words or substance that "I may have hit him- I don't know." Nothing in my brief conversation with Mr.Karnik could in any way have been interpreted to suggest that. If he insists that is what I said, he is telling an untruth." My pharmacy associate, Chris Green, heard the entire of my end of the conversation with Mr. Karnik and has stated and will state under oath that I never said or intimated that I "may have hit him". The alleged statement of Mr. Green, made to the Rite Aid investigator, that I may have "lunged at him" can be easily clarified upon a complete interview or examination of Mr. Green that he meant I moved in his direction a few feet like I was going to chase him(as I always did and everyone else who got caught up in his silliness did).

13.     There was nothing any more threatening or more serious in my actions toward Mr. Ashenafi on February 5, 2006 than there had been on the many prior occasions in which he and I, and almost everyone in the store who dealt with him on a regular basis, had a bantering interaction. None of that prior activity was taken seriously by management of Rite Aid, as it should not have been. Looking at this incident, nothing

except Mr. Ashenafi's bloody nose and his shouts of assault, which should likewise not have been taken seriously in light of his long history of misbehavior, untruths and erratic conduct, should have prompted the result that obtained.

14.     I had a long and unblemished career with Rite Aid prior to this incident and that was not taken into consideration, in my view, when the determination was made to terminate me over a disputed, contradicted incident between me and an employee whose entire career at Rite Aid was peppered with complaints about inappropriate behavior, antics, confrontational taunts and other actions that should have resulted in his termination long before his interaction with me on February 5, 2006. No disciplinary action was taken against Mr. Ashenafi as a result of this incident, although I understand that he never returned to work at the Rite Aid store on Florida Avenue and that his claim for workers compensation was rejected.

15.     I was arrested and charged with simple assault, not with assault and battery as is stated in Defendant's statement. The matter was "no-papered" shortly thereafter without my ever having to go back before the Court. I was terminated for the given reason that I violated the company policy of "zero tolerance for violence" in the workplace. I was informed by company officials that it was because I hit Mr. Ashenafi. Now they state in their motion argument that I was terminated for "violating their policy against violent AND inappropriate workplace behavior." The latter reason was never cited to me or to anyone in my behalf at the time this happened. I sincerely believe that this new basis for their actions came about because they were aware that their "rush to judgment" in upholding Mr. Ashenafi's false claim of assault, was a sham and could not withstand scrutiny. But, when Mr. Norman Collins surfaced, quite by accident, they had

to come up with some other contrived reason to justify what they did to me, but that reason was also a pretext and had not one iota of substance. The incident that they are now claiming violates their policy against "...inappropriate workplace behavior" is likewise, in my belief, a sham and a pretext. The kind of bantering that preceded the fall and bloody nose is exactly what went on on a daily basis with Mr. Ashenafi and myself as well as between him and other associates at Rite Aid, with full knowledge of management. It was banter, often good-humored, and harmless. It did not and should not suddenly have become a dismissable offense just because Mr. Ashenafi hurt himself.

16.    Mr. Norman Collins, an elderly customer at the pharmacy for his diabetes medication, called me "out of the blue" some weeks after my termination to tell me he had learned that I had been terminated and that he had been in the back storage room going to the bathroom at the time the incident occurred. He told me what he observed and I asked him to contact my attorney, Mr. Condon, which he did. He witnessed the heart of the event, even though in the heat of the aftermath, as I was being arrested and accused of an assault I did not commit, I did not recall seeing him there. Mr. Collins' sworn statement makes clear to anyone who cared to listen that I was a distance from Mr. Ashenafi when he fell and that I could not have struck him, causing his nosebleed. I had absolutely no personal relationship with Mr. Collins, who I knew only as a customer of the pharmacy.

18.    The investigators from Rite Aid were given Mr. Collins' sworn statement several months after my termination and they rejected it out of hand. They had made the determination that I should be sacrificed to preserve the peace among the

overwhelmingly black or minority population of that store regardless of the obvious truth of the situation.

17.    I am familiar with a comparable situation that involved a Nigerian pharmacist, Steve Obidike, who had once worked with me, and who worked in another Rite Aid store in the District of Columbia. The incident occurred some months earlier than mine and involved an allegation that Mr. Obidike had physically grabbed the arm of a black female pharmacy associate and shoved her against the wall causing her to fall. She immediately complained and Mr. Obidike was arrested and, like me, his case was "no papered" by the District of Columbia. Unlike my situation, there were no direct witnesses to the incident, although I understand there was an immediate outcry from the woman, some evidence of redness on her arm and a possible statement to the police that he pushed her. My case involved a witness who fully supported my version of what happened. Mr. Obidike was fully reinstated after several weeks. His case was investigated by Mr. Scott Zavinski, who also was the investigator in my case.

This Declaration is true and accurate and verified under penalty of perjury.

Date:  11/14/2007

Michael P. Checka

## DECLARATION OF NORMAN B. COLLINS

I, Norman B. Collins, residing at 603 Twinbrook Parkway, Rockville, Maryland 20851, being over the age of 18 years and competent to make this Declaration, under penalty of perjury declares as follows:

1. I am a diabetic and I utilize the services of the Rite Aid Pharmacy located at 1815 Connecticut Avenue, N.W., Washington, D.C. 20009 on occasion to purchase syringes and other medical needs.

2. I am familiar with Mr. Michael Checka in his capacity as a Pharmacist at the above Rite Aid store. I do not know Mr. Checka in any other capacity.

3. On February 5, 2005, I purchased some syringes from Mr. Checka at the Pharmacy at about 1:30 pm on that date. I left and went to a nearby restaurant.

4. At between 3:30 –4:00 pm, I left the restaurant and got in my car. I decided to relieve myself prior to the trip home and double-parked my car outside the Rite Aid. I went to the back of the store and into the Men's Room in the storage area. As I left the Men's Room, a small black man rushed past me heading toward the back of the storage area. I witnessed him trip on some milk cartons and cardboard boxes that was stacked on the floor. He went down face first and struck the floor rather hard. At the time, I noticed Mr. Checka standing about 15-20 feet away near the entrance to the Ladies Room. He was not anywhere near the small man when he fell.

5. I left the room and the store immediately without having or hearing any conversation with any of the two men. Some time later, I went to the Rite Aid store and inquired of Mr. Checka. I was informed that he was terminated and no longer working for Rite Aid.

6. I am making this statement of my own free will, having been promised or given nothing in return. I have no personal relationship with Mr. Checka or any other person connected with this matter, but am only relating what I witnessed.

Signed this date under penalty of perjury.

Dated: _5/20/05_

_Norman B Collins_
Norman B. Collins

## DECLARATION OF DAVID CHRISTOPHER GREEN

I, David Christopher Green, residing at 7963 Riggs Road, Unit 4, Adelphi, Maryland 20783, being over the age of 18 years and competent to make this declaration, under penalty of perjury, do hereby declare as follows:

1.    I am an intern at the Rite Aid Pharmacy located at Connecticut and Florida Avenues in the District of Columbia. I was hired by Michael Checka, who was then the pharmacist at the store.

2.    I was working with Mr. Checka on February 5, 2005, when the incident over which he was terminated occurred. Mr. Ashenafi was also working that day and, as usual, was clowning around and acting foolish. At some point, Mr. Checka went to the bathroom and several minutes later, I heard the sound of totes falling (these were stored in the storeroom where the bathroom was located). Shortly thereafter, Mr. Checka came out of the storeroom and I saw blood sprayed on his lab coat, like it had been spit there. He did not have blood on his hands of anywhere else on his person, that I could see.

3.    He said that Ashenafi had fallen in the storeroom. I saw some blood on the floor of the storeroom and the totes that had been stacked up were spread around. Ashenafi came into the pharmacy and washed his face which had blood on it. He said nothing to me and went back to work. Two other employees came down to our area to see if they could help him, but no manager came down. Several policemen, who had been in the store shopping, came down and questioned us. They asked Ashenafi if he wanted to go to the hospital and he went at that point, even though he had gone back to work. They arrested Mr. Checka.

4.    I have known Mr. Checka for several years and have worked closely with him during that time. I have never seen him violent, that is not his nature to be physical with anyone. He is a stickler for cleanliness, a hard worker and a totally honest man. When he told me that he did not strike Ashenafi, I believed him and I believe him now. The same cannot be said for Ashenafi. He was a clown, very annoying and always messing with people's heads. I would not accept his word over Mr. Checka's.

5.    My relationship with Mr. Checka is strictly professional and not social. I am making this statement of my own free will and volition and have not been coerced or promised anything in return for my statement.

Signed this date under penalty of perjury.

Dated: 3|17|06

David Christopher Green

## DECLARATION OF SHERRY PERSAUD

I, Sherry Persaud, under penalty of perjury, declare and state as follows:

1. I am over the age of 18 years and am competent to make this declaration.

2. I am presently employed as a Guest Services Agent with Hilton Hotels in Washington, D.C.

3. Between 1999 and 2004, I was employed as an Assistant Manager at the Rite Aid store at Connecticut Avenue and Florida Avenue in Washington, D.C.

4. I knew Michael Checka in a work-related way for more than two years during the period in which I managed the store during Michael's shifts.

5. Michael is an excellent pharmacist, very knowledgeable and cordial. He is easy going and someone on whom you could always count to do his job in a professional way. I never saw him get unduly annoyed or angry on the job.

6. I came to know Ashanafy after he was hired. Once he learned the English language better and came to be more familiar with the "lay of the land" by watching others in the store, his conduct became increasingly across the line of acceptable behavior. There was constant teasing, including toward Michael because of his "germophobic" attitude around his work space

7.

8.

9. . The teasing and taunting were common to others as well and were generally light and not serious.

10. Ashanafy had to be counseled about several incidents of inappropriate behavior toward several female employees and for breaking other rules of behavior. I never witnessed any serious misconduct toward Michael by Ashanafy or vice versa.

11. Although I had left the employ of Rite Aid when the incident in question happened, I learned of it from other employees. Knowing Michael as I do and did, I cannot imagine him striking Ashanafy or any other employee, regardless of the provocation. He is too respectful of appropriate behavior in the workplace.

12. Had I been managing the day of the incident, I never would have gotten the police involved and Michael arrested. I would have tried to handle it within the organization and, at least as a first matter, would have made sure Ashanafy got any medical treatment he needed.

13. My relationship with Michael Checka was on a professional basis only and I am making this declaration of my personal free will and volition and not under any promise or favor.

The foregoing Declaration and true and accurate to my own knowledge, information and belief and is made under penalty of perjury.


Dated: _____        _____

                                Sherry Persaud.

## DECLARATION OF HAROLD D. VIZIAN

I, Harold D. Vizian, residing at 4716 Bradley Boulevard, Apt. #105, Chevy Chase, Maryland 20815, being over the age of 18 years and competent to make this Declaration, under penalty of perjury declares as follows:

I am a Pharmacy Intern at the Rite Aid Pharmacy located at 1815 Connecticut Avenue, N.W., Washington, D.C. 20009 and have been employed there for about 5 years.

I am familiar with Mr. Michael Checka in his capacity as a Pharmacist at the above Rite Aid store as I have worked with him there. I do not know Mr. Checka in any other capacity.

On the day of the alleged incident which led to the termination of Mr. Checka, I was not working and cannot comment on the events of that date.

I am familiar with the other person involved, a man from Ethiopia, named Ashenafi. He had been employed in the store as a stock clerk for about 2 years. Mr. Ashenafi is notorious throughout the store for his "horseplay", which consisted mostly of teasing female employees and customers, sometimes inappropriately (complaints were made to managers) and general silliness, which did not amount to anything that I could describe as unreasonably provative. Everybody knew Ashenafi and did not take him seriously when he would engage in his activity.

For example, Mr. Checka, who was a stickler for cleanliness and an environment free of germs would regularly spray Lysol or another disinfectant in the area of our work. Ashenafi would come by and fake sneezing and coughing, which, of course was not appreciated by Mr. Checki. But it never went any further than tossing a box of Q-Tips or cotton balls back and forth. Ashenafi engaged in this kind of activity with many employees other than Mr. Checka.

Having worked with Mr. Checka for five years, I can say with confidence that, besides being a total professional as a pharmacist, he is not a violent man and it is beyond my imagination that he would strike a fellow employee, especially Ashenafi, for any reason. This is especially true given the regular bantering that took place between them and others.

Finally, I would like to say that the store room in which the incident took place is cluttered with boxes and cartons, especially toward the back and I could easily see how Ashenafi, who was always running and rushing here and there in the store, could slip and fall in that area.